UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**　　　　　　**'O'**

| Case No. | 2:16-cv-02859-CAS(PLAx) | Date | March 6, 2017 |
|---|---|---|---|
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | |

| Present: The Honorable | CHRISTINA A. SNYDER | |
|---|---|---|
| Catherine Jeang | Not Present | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:　　　　　Attorneys Present for Defendants:

Not Present　　　　　　　　　　　　　　Not Present

**Proceedings:**　　(IN CHAMBERS) - DEFENDANT INFINEON TECHNOLOGIES AMERICAS CORPORATION'S MOTION TO STAY OR MODIFY A PORTION OF THE COURT'S PRELIMINARY INJUNCTION ORDER (Dkt. 200, filed January 5, 2017)

## I.　INTRODUCTION

On April 26, 2016, plaintiffs MACOM Technology Solutions Holdings, Inc. ("MACOM"), and Nitronex, LLC filed the instant action against defendants Infineon Technologies AG ("AG") and Infineon Technologies Americas Corp. ("Americas"). Dkt. 1. The gravamen of plaintiffs' complaint is that defendants breached the intellectual property purchase agreement and the license agreement entered into in 2010 by Nitronex Corporation (the predecessor-in-interest to MACOM) and International Rectifier Corporation (the predecessor-in-interest to Americas).[1]

In their first amended complaint ("FAC"), plaintiffs asserted eight claims for relief: (1) breach of contract for wrongful termination of a 2010 license agreement; (2) breach of contract for marketing and preparing for sale of products within plaintiffs' "exclusive field" under the terms of to the 2010 license agreement; (3) a declaration that the 2010 license agreement has not been terminated; (4) breach of the covenant of good faith and fair dealing implied in the 2010 license and intellectual property ("IP") purchase agreements; (5) a declaration of non-infringement; (6) breach of the 2010 intellectual IP purchase agreement; (7) a declaration that defendants may not transfer to a third party the patents covered by the 2010 agreements without MACOM's consent; and (8) if AG is not

---

[1] On February 13, 2014, MACOM announced its acquisition of Nitronex; Nitronex became a wholly-owned subsidiary of MACOM.  Dkt. 170 ¶ 101.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | **CIVIL MINUTES – GENERAL** | | **'O'** |
|---|---|---|---|
| Case No. | 2:16-cv-02859-CAS(PLAx) | Date | March 6, 2017 |
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | |

subject to plaintiffs' breach of contract claims, intentional interference with contractual relations against AG.  Dkt. 65 ("FAC").

On October 31, 2016, the Court issued an order in which the Court: (a) denied AG's motion to dismiss plaintiffs' FAC to the extent AG argued that the Court lacked personal jurisdiction; (b) granted without prejudice AG's motion to dismiss plaintiffs' first, second, third, fourth, fifth, and seventh claims for relief; (c) granted without prejudice Americas' motion to dismiss plaintiffs' fifth claim for relief to the extent the claim relied on unidentified products; (d) otherwise denied Americas' motion to dismiss plaintiffs' fifth claim for relief; (e) denied AG's motion to dismiss plaintiffs' eighth claim for relief; and (f) denied Americas' motion to dismiss plaintiffs' second claim for relief. Dkt. 140 ("October Order").  In addition, the Court granted plaintiffs' request for a preliminary injunction against Americas and directed plaintiffs to submit a proposed order detailing the injunctive relief plaintiffs sought.  Id.

On November 16, 2016, the Court issued a proposed injunction and requested that the parties serve any objections.  Dkt. 158.  After receiving briefing on the Court's proposed order, the Court issued a preliminary injunction against Americas on December 7, 2016.  Dkt. 177 ("Preliminary Injunction").  On January 3, 2017, Americas appealed to the Court of Appeals for the Federal Circuit, this Court's order granting plaintiffs' motion for a preliminary injunction.  Dkt. 193.

On November 28, 2016, plaintiffs filed the operative second amended complaint. Dkt. 170 ("SAC").  Americas and AG filed motions to dismiss certain claims in the SAC. Dkts. 186, 187.  On February 28, 2017, the Court issued an order in which the Court: (a) denied Americas' motion to dismiss plaintiffs' second and fifth claims for relief, along with plaintiffs' contingent claims for the relief based on rescission; and (b) denied AG's motion to dismiss plaintiffs' eighth claim for relief.  Dkt. 271.

On January 5, 2017, Americas filed a motion to stay pending appeal or modify a portion of the Court's preliminary injunction order.  Dkt. 200 ("Motion").  Plaintiffs filed their opposition to Americas' motion on February 1, 2017.  Dkt. 229 ("Opp'n").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CIVIL MINUTES – GENERAL | | | 'O' |
|---|---|---|---|
| Case No. | 2:16-cv-02859-CAS(PLAx) | Date | March 6, 2017 |
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | |

Americas filed its reply on February 20, 2017, dkt. 246 ("Reply").  With the Court's permission, plaintiffs filed a surreply on February 28, 2017.  Dkt. 263 ("Surreply").[2]

Having carefully considered the parties' arguments, the Court finds and concludes as follows.

## II.   BACKGROUND

The Court and the parties are familiar with the facts of the case as alleged by plaintiffs.  Nonetheless, the Court summarizes the facts alleged in the SAC.

Nitronex Corporation was formed in February 1999, and headquartered in Durham, North Carolina.  SAC ¶ 40.  Nitronex developed a semiconductor (material that conducts electrical current only under certain conditions) using gallium nitride ("GaN") to form the epitaxial layer of the semiconductor and silicon ("Si") to form the substrate (or wafer) for the semiconductor.  Id. ¶¶ 41, 52–53.  Nitronex used GaN semiconductors on silicon wafers to produce high-frequency radio frequency devices ("RF GaN-on-Si devices").  Id. ¶¶ 54–57.  RF GaN-on-Si devices are used as part of, inter alia, light emitting diode ("LED") devices, id. ¶ 58, and cellular telephone base stations, id. ¶ 87.  Nitronex has obtained more than 35 U.S. patents based on its work with gallium nitride.  Id. ¶ 63.

In 2004, Nitronex and International Rectifier ("IR"), a company that produced power management products, entered into a license agreement and technology transfer agreement.  Id. ¶¶ 67–70.  The 2004 license agreement granted IR the right to practice certain Nitronex patents in power management, IR's field of use, and required Nitronex to transfer some of its GaN-on-Si technology to IR.  Id. ¶ 71.

### A.   The 2010 IP Purchase and License Agreements

In 2010, Nitronex and IR entered into an IP purchase agreement and new license agreement.  Id. ¶ 78; dkt. 170-1 ("IP Purchase Agreement").  The IP Purchase Agreement assigns to IR 54 U.S. and international patents and applications and the right to file related applications and requires Nitronex and IR to work together to enforce the

---

[2] The Court notes that Americas does not seek to stay the Court's proceedings entirely.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:16-cv-02859-CAS(PLAx) | Date | March 6, 2017 |
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | |

Nitronex Patents.[3]  SAC ¶¶ 79–83; IP Purchase Agreement.  Specifically, IR has the first and primary right to prosecute for an actual, potential or alleged infringement.  SAC ¶ 80; IP Purchase Agreement § 4.02.  If, after three months of receiving written notice of actual, potential, or alleged infringement IR has (1) failed to pursue the alleged infringer to desist the allegedly infringing activity, (2) not brought and diligently prosecuted an infringement action, and (3) not entered into a settlement agreement with respect to such alleged infringement, or if IR notifies Nitronex that IR has decided not pursue any of those three courses of conduct, Nitronex has the right to bring suit to enforce the Patents against the alleged infringer.  SAC ¶ 81; IP Purchase Agreement § 4.02.  To enable Nitronex to prosecute for an infringement, IR agreed to assign the relevant Patents to Nitronex.  SAC ¶ 81; IP Purchase Agreement § 4.02.

The 2010 license agreement provides Nitronex a license to the Nitronex Patents, and a sole right to sublicense them.  SAC ¶ 88; dkt. 170-2 ("License Agreement").  The License Agreement permits *only* Nitronex and IR to practice in certain parts of the "Field of Use" of GaN-on-Si RF devices.  SAC ¶ 88; License Agreement.  The License Agreement also provides Nitronex with the exclusive right to practice the Nitronex Patents, including as against IR, within Nitronex's "Exclusive Field."  SAC ¶ 89; License Agreement.  Nitronex's exclusive field includes most RF applications in the Field of Use, except those that operate solely below 100MHz in frequency, including cellular telephone infrastructure base stations and repeaters.  SAC ¶¶ 89–90; License Agreement.

The License Agreement prohibits either party to the agreement from assigning, selling, or otherwise transferring an interest or obligation under the License Agreement without the consent of the other party.  License Agreement § 12.12.  Any assignment in violation of that provision is void.  Id.

The License Agreement also includes a negative covenant with respect to IR: "IR itself may not directly or indirectly market, sell or service Products in the Exclusive Field and IR may not grant further licenses or sublicenses to any other party under the Licensed Patents to design, develop, make, have made, use, market, sell or service Products in the Field of Use."  License Agreement § 2.1; SAC ¶ 91.  The License Agreement does *not*

---

[3] Thirty-two U.S. patents and applications, along with related applications filed by IR and any patents that issued from these applications comprise the "Nitronex Patents." SAC ¶ 85.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:16-cv-02859-CAS(PLAx) | Date | March 6, 2017 |
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | |

include a negative covenant in which Nitronex promises to refrain from practicing the Nitronex Patents outside its fields of use. SAC ¶ 92. Nitronex and IR may terminate the License Agreement only for a material breach that is not cured within 30 days of receipt of written notice of such a breach. Id. ¶ 95; License Agreement § 7.1.

**B.     Acquisitions**

In June 2012, Nitronex was acquired by GaAs Labs and converted to a limited liability company and renamed Nitronex, LLC. SAC ¶ 99. On February 13, 2014, MACOM announced the purchase of Nitronex, LLC from GaAs Labs and Nitronex, LLC became a wholly-owned subsidiary of MACOM. Id. ¶ 101. MACOM, a semiconductor company that designs and manufactures devices including RF semiconductor products, acquired Nitronex to enter the market for GaN-on-Si devices. Id. ¶¶ 100, 102. Nitronex assigned some of its rights under the 2010 IP Purchase Agreement to MACOM and sublicensed its rights under the License Agreement to MACOM. Id. ¶ 104.

On August 20, 2014, Infineon AG, a German corporation, and IR announced that Infineon AG would acquire IR. Id. ¶ 106. Infineon AG stated in its press releases that it acquired IR in part to "expand[] its expertise in compound semi-conductors (Gallium Nitride on Silicone)" and described IR as a "an advanced manufacturer in Gallium Nitride on Silicon based power semiconductors." Id. ¶ 107. Infineon AG's acquisition of IR closed on January 13, 2015. Id. ¶ 109. IR changed its name to Infineon Technologies Americas Corp. and succeeded to IR's rights and obligations under the Nitronex-IR agreements, including the License and IP Purchase Agreements. Id. ¶ 17. Infineon Americas is a Delaware corporation with its headquarters and principal place of business at the former IR headquarters in El Segundo, California. Id. ¶ 13. Infineon Americas is a wholly owned subsidiary of Infineon AG. Id. Plaintiffs refer to AG and Americas collectively as "Infineon." Id. at 1.

**C.     Defendants' Alleged Misconduct**

Plaintiffs allege that after Infineon AG acquired IR, Infineon AG attempted to disrupt or renegotiate the Nitronex-IR agreements. Id. ¶ 113. For example, plaintiffs allege that in January 2015, Infineon sent MACOM a letter complaining about an April 1, 2014 press release in which MACOM announced an agreement with a supplier of GaN-on-Si wafer for RF applications that included a license to MACOM's intellectual

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | **CIVIL MINUTES – GENERAL** | | | **'O'** |
|---|---|---|---|---|
| Case No. | 2:16-cv-02859-CAS(PLAx) | | Date | March 6, 2017 |
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | | |

property rights. Id. ¶ 114. Infineon also sent a letter to MACOM's supplier complaining of the proliferation of IR's patented technology. Id. ¶ 116. Plaintiffs contend that this conduct was intended to chill MACOM's practice of its rights under the 2010 agreements, which permit Nitronex to sublicense the Nitronex Patents. Id. Plaintiffs also allege that Infineon largely refused to engage with MACOM in good faith with respect to the enforcement of the Nitronex Patents against third-party infringement. Id. ¶ 119.[4] According to plaintiffs, Infineon repeatedly attempted to renegotiate the License and IP Purchase Agreements such that MACOM would lose its exclusive rights in the radio frequency fields, even though MACOM repeatedly stated that it would not agree to any modifications to the agreements that would allow Infineon rights in MACOM's exclusive GaN-on-Si RF fields. Id. ¶ 120. Infineon AG attorneys participated in telephone conversations about the License and IP Purchase Agreements. Id. ¶ 121. Plaintiffs allege that in-house counsel for Infineon Americas indicated several times that decisions regarding patent matters were controlled by Infineon in Germany. Id.

Also during these telephone calls, plaintiffs allege that Infineon representatives, including representatives from Infineon AG, stated that Infineon believed MACOM was infringing on unidentified Nitronex Patents by selling gallium nitride-on-silicon *carbide* ("GaN-on-SiC") devices. Id. ¶ 124. MACOM had been selling GaN-on-SiC products since 2011, before its acquisition of Nitronex. Id. ¶ 126. Plaintiffs believe that neither IR nor Infineon has ever previously or since claimed that any company selling GaN-on-SiC products infringes the Nitronex Patents. Id. ¶ 125. MACOM informed Infineon that its sales of GaN-on-SiC products were low in volume and revenue and that it was discontinuing GaN-on-SiC products because its third-party supplier informed MACOM that it could no longer supply the wafers necessary to manufacture GaN-on-SiC products. Id. ¶¶ 126–29.

In late 2015, Infineon informed MACOM that IR and/or Infineon was contemplating assigning some of the Nitronex Patents to an undisclosed third party and that it would proceed without MACOM's consent. Id. ¶¶ 130–31.

---

[4] However, the parties executed a common interest agreement in 2015 when MACOM and Infineon agreed to work together in connection with patent prosecution issues. SAC ¶ 28; see dkt. 170-3 ("Common Interest Agreement").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | **CIVIL MINUTES – GENERAL** | | 'O' |
|---|---|---|---|
| Case No. | 2:16-cv-02859-CAS(PLAx) | Date | March 6, 2017 |
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | |

On January 15, May 19, May 25, June 10, June 17, and June 24, 2016, MACOM sent Infineon and IR letters notifying them that third parties were infringing fifteen of the Nitronex Patents. Id. ¶ 134. MACOM deemed these letters notice of an actual, potential, or alleged infringement under the IP Purchase Agreement. Id. ¶ 136. Defendants failed to persuade the infringers to desist, pursue a claim of infringement, or enter into a settlement agreement with the third-party infringers within three months after receiving notice of the infringement. Id. ¶ 138. On April 15, August, 23, August 26, September 12, September 19, and September 26, 2016, MACOM wrote to Infineon with respect to defendants' failure to comply with their obligations under Section 4.02 of the IP Purchase Agreement and demanded that defendants assign the relevant patents back to MACOM so that MACOM had standing to bring suit against the infringing third parties. Id. ¶ 139. Defendants have not assigned the relevant patents back to MACOM. Id. ¶ 140.

In a February 2, 2016 letter to MACOM, Infineon complained of MACOM's GaN-on-SiC sales and asserted that such sales were a material breach of the License Agreement that, if not remedied within 30 days, would allow Infineon to terminate that agreement. Id. ¶ 143. MACOM responded that Infineon's allegations were insufficiently specific because defendants did not identify any specific MACOM products that were infringing or any specific patents that were infringed. Id. ¶¶ 142, 145. MACOM further stated that MACOM's sales of GaN-on-SiC devices were de minimis and therefore could not constitute a material breach, and that MACOM's GaN-on-SiC products had been "end-of-lifed" because the supply of a necessary element had been cut off. Id. ¶ 145. In a letter dated March 22, 2016, Infineon purportedly terminated the License Agreement. Id. ¶ 147. In that same letter, Infineon for the first time identified the MACOM product that Infineon alleged to be infringing. Id.

Plaintiffs allege that Infineon's purported termination was without cause, done in bad faith, and pretextual. Id. ¶ 148. On information and belief, plaintiffs aver that Infineon AG directed Infineon Americas to terminate or controlled Infineon Americas' purported termination of the License Agreement. Id. ¶ 149.

MACOM responded to Infineon's purported termination letter on April 1, 2016, and stated that the termination was without basis and without effect. Id. ¶ 150. MACOM further asserted that it would continue to exercise its rights under the License Agreement. Id. MACOM continues to produce and offer to sell, or is "on the cusp of producing and/or offering to sell" 52 GaN-on-Si products. Id. ¶ 151. MACOM alleges that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:16-cv-02859-CAS(PLAx) | Date | March 6, 2017 |
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | |

Infineon's termination of the License Agreement puts MACOM and its products at risk of infringement suit and puts MACOM's customers in fear of an infringement suit if they purchase and use MACOM's products. Id. ¶ 152.

After plaintiffs filed their original complaint, MACOM learned from its customers that Infineon has been promoting and marketing GaN-on-Si RF products for use in cellular base statute applications. Id. ¶ 157. MACOM contacted Infineon by letter in May 2016, to ask Infineon if it was designing, manufacturing, or sampling GAN-on-Si RF base station products, or if was discussing or demonstrating the use of such products with consumers or potential customers. Id. ¶ 158. Plaintiffs contend that Infineon's responses have not provided MACOM with the assurance it sought. Id. In an investor presentation released on July 14, 2016, Infineon stated that it has GaN-on-Si RF products in development for the cellular infrastructure market. Id. ¶ 160. Plaintiffs thus allege that Infineon has been promoting and/or marketing GaN-on-Si RF products for use in cellular base station applications—activities that are within MACOM's exclusive field—in violation of the License Agreement. Id. ¶ 163–64.

As a result of the alleged conduct by defendants, plaintiffs filed the instant action.

## III. LEGAL STANDARD

When a notice of appeal is filed, jurisdiction over the matters being appealed normally transfers from the district court to the appeals court. See Marrese v. Am. Academy of Orthopaedic Surgeons, 470 U.S. 373, 379 (1985) ("In general, filing of a notice of appeal confers jurisdiction on the court of appeals and divests the district court of control over those aspects of the case involved in the appeal."). Federal Rules of Civil Procedure 62(c) provides an exception, however, that allows the district court to retain jurisdiction to "suspend, modify, restore, or grant an injunction" during the pendency of the appeal in order to preserve the status quo. Mayweathers v. Newland, 258 F.3d 930, 935 (9th Cir. 2001) (citing Fed. R. Civ. P. 62(c)). However, Rule 62(c) "does not restore jurisdiction to the district court to adjudicate anew the merits of the case." McClatchy Newspapers v. Cent. Valley Typographical Union No. 46, 686 F.2d 731, 734 (9th Cir. 1982).

In deciding whether to grant a stay of an injunction pending appeal, the court must ask: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay;

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | | 'O' |
|---|---|---|---|---|
| Case No. | 2:16-cv-02859-CAS(PLAx) | | Date | March 6, 2017 |
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | | |

(3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." Nken v. Holder, 556 U.S. 418, 434 (2009). There is "substantial overlap" between this standard and the factors governing preliminary injunctions. Id.; see Winter v. Natural Resources Defense Council, Inc., 555 U.S. 7, 20 (2008) ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."). "The first two factors of the traditional standard are the most critical." Nken, 556 U.S. at 434. To satisfy the first factor and make a strong showing of likelihood of success, the Ninth Circuit requires that "at a minimum, a petitioner must show that there is a substantial case for relief on the merits." Lair v. Bullock, 697 F.3d 1200, 1204 (9th Cir. 2012) (quotation marks omitted). "The standard does not require the petitioners to show that it is more likely than not that they will win on the merits." Id. (quotation marks omitted).

However, "[a] stay is not a matter of right, even if irreparable injury might otherwise result. It is instead an exercise of judicial discretion, and [t]he propriety of its issue is dependent upon the circumstances of the particular case." Nken, 556 U.S. at 433 (citations and quotation marks omitted). The party seeking a stay bears the burden of demonstrating that "the circumstances justify an exercise of that discretion." Id. at 433–34.

## IV.   ANALYSIS

Americas requests that the Court stay or modify a portion of its December 7, 2016 Preliminary Injunction.[5] The December 7, 2016 Preliminary Injunction reads as follows:

> The Court hereby **GRANTS** MACOM Technology Solutions Holdings, Inc. and Nitronex, LLC's Motion for Preliminary Injunction. The Court **ORDERS** that until further order of the Court, the 2010 License Agreement

---

[5] Plaintiffs argue that the Court should treat Americas' motion to stay or modify the Preliminary Injunction as a motion for reconsideration. Opp'n at 10. The Court disagrees. When a party moves to stay or modify an injunction pending appeal, a court considers whether the moving party is likely to succeed on the merits of its appeal, see Lair, 697 F.3d at 1204, which necessarily requires the court to reconsider whether the preliminary injunction was proper.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:16-cv-02859-CAS(PLAx) | Date | March 6, 2017 |
|---|---|---|---|
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | |

shall remain in full force and effect and that defendant Infineon Technologies Americas Corp.'s purported termination of that agreement on March 22, 2016 shall have no effect.

In the event that Infineon Technologies Americas ("Infineon Americas") asserts that there is a new breach of the 2010 License Agreement by plaintiffs, Infineon Americas shall advise the Court in writing of its intention to declare a breach, stating the action it intends to take and the claimed basis for that action. Infineon Americas shall provide the Court with such notice 30 days before declaring a breach.

Consistent with existence of a valid License Agreement, Infineon Americas may not design, develop, make, have made, use, offer to sell, sell, or service products in MACOM's Exclusive Field (as defined by the under-seal 2010 License Agreement) that practice the Nitronex Patents, nor may Infineon Americas directly or indirectly market, sell, or service products in the Exclusive Field that practice the Nitronex Patents. In addition, Infineon Americas may not grant licenses or sublicenses to the Licensed Patents (identified in Schedule A to the 2010 License Agreement) to design, develop, make, have made, use, market, sell or service products in the Exclusive Field or Field of Use (as defined by the 2010 License Agreement) that practice the Nitronex Patents, including but not limited to the grant of such licenses to its corporate affiliates.

Infineon shall, within ten days from the date of issuance of this Preliminary Injunction, provide notice and a copy of this Preliminary Injunction to all subsidiaries, affiliates, officers, directors, employees, principals, agents, customers, and attorneys that may have any involvement whatsoever in designing, developing, making, having made, using, marketing, selling, servicing, or licensing products in the Exclusive Field or Field of Use that use the Nitronex Patents, as well as any other person or entity acting in active concert or participation with Infineon Americas with respect to any of the activities enjoined here.

See Preliminary Injunction.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:16-cv-02859-CAS(PLAx) | Date | March 6, 2017 |
|---|---|---|---|
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | |

Americas argues that the injunction improperly limits Americas' design and development activities.  Motion at 5.  According to Americas, Section 2.1 of the License Agreement permits it to design and develop products in MACOM's Exclusive Field, as long as Americas does not "market, sell, or service" those products.  Id. at 2–4, 8–16.  Because the Preliminary Injunction prohibits Americas from designing, developing, making, having made, and using products in MACOM's Exclusive Field, Americas contends that the Preliminary Injunction alters the status quo in a manner inconsistent with the License Agreement.[6]  Id. at 7.  Section 2.1 of the License Agreement provides:

> IR hereby grants to Nitronex the following: a) a worldwide, royalty-free, fully paid exclusive license in the Field of Use only, with right to sublicense in the Field of Use only, to use the Licensed Patents to design, develop, make, have made, use, offer for sell, sell and service Products; and b) a worldwide, royalty-free, fully paid exclusive license, including as against IR, in the Exclusive Field only, with right to sublicense in the Exclusive Field only, and subject to the foregoing provision (a), to use the Licensed Patents to design, develop, make, have made, use, offer to sell, sell and service Products.  *Notwithstanding the foregoing, IR retains the right, under the Licensed Patents, to design, develop, make, have made, use, offer to sell, sell and service any and all IR products in the Field of Use, **provided that IR itself may not directly or indirectly market, sell or service Products in the Exclusive Field** and IR may not grant further licenses or sublicenses to any other party under the Licensed Patents to design, develop, make, have made, use, market, sell or service Products in the Field of Use.*

License Agreement § 2.1 (emphasis added).  In particular, the parties dispute the meaning of the italicized portion of Section 2.1.  The Court will refer to this sentence as the "Notwithstanding Sentence" or the "Second Sentence," and it will refer to the bold text as the "Prohibitions Clause."

At bottom, Americas asks the Court to decide whether the License Agreement prohibits Americas from designing, developing, making, having made, and using products in MACOM's Exclusive Field, as opposed to only prohibiting Americas from

---

[6] Americas initially advanced this argument, albeit more briefly, on November 23, 2016, in its opposition to the Court's proposed preliminary injunction order.  Dkt. 166-1.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:16-cv-02859-CAS(PLAx) | Date | March 6, 2017 |
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | |

directly or indirectly marketing, selling, or servicing products in MACOM's Exclusive Field. The License Agreement is governed by California law. See License Agreement § 10.9. The Court therefore looks to California's contract interpretation rules to construe Section 2.1. The California Supreme Court summarized the principles of contract interpretation as follows:

> The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the mutual intention of the parties. Under statutory rules of contract interpretation, the mutual intention of the parties at the time the contract is formed governs interpretation. Such intent is to be inferred, if possible, solely from the written provisions of the contract. The clear and explicit meaning of these provisions, interpreted in their ordinary and popular sense, unless used by the parties in a technical sense or a special meaning is given to them by usage, controls judicial interpretation. A policy provision will be considered ambiguous when it is capable of two or more constructions, both of which are reasonable. But language in a contract must be interpreted as a whole, and in the circumstances of the case, and cannot be found to be ambiguous in the abstract. Courts will not strain to create an ambiguity where none exists.

Waller v. Truck Ins. Exch., Inc., 900 P.2d 619, 627 (Cal. 1995) (citations and quotation marks omitted). However, "California has long abandoned a rule that would limit the interpretation of a written instrument to its four corners." First Nat'l Mortg. Co. v. Federal Realty Inv. Trust, 631 F.3d 1058, 1066 (9th Cir. 2011) (citing Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co., 442 P.2d 641, 644 (1968)). Under California law, "[t]he interpretation of a contract involves a two-step process." F.B.T. Prods., LLC v. Aftermath Records, 621 F.3d 958, 963 (9th Cir. 2010) (quoting Winet v. Price, 4 Cal. App. 4th 1159, 1165 (1992)).

> First the court provisionally receives (without actually admitting) all credible evidence concerning the parties' intentions to determine ambiguity, i.e., whether the language is reasonably susceptible to the interpretation urged by a party. If in light of the extrinsic evidence the court decides the language is reasonably susceptible to the interpretation urged, the extrinsic evidence is then admitted to aid in the second step—interpreting the contract.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:16-cv-02859-CAS(PLAx) | Date | March 6, 2017 |
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | |

Id. (quotation marks omitted). "Even if a contract appears unambiguous on its face, a latent ambiguity may be exposed by extrinsic evidence which reveals more than one possible meaning to which the language of the contract is yet reasonably susceptible." Dore v. Arnold Worldwide, Inc., 139 P.3d 56, 60 (Cal. 2006) (quotation marks omitted); see also First Nat'l Mortg., 631 F.3d 1067 (same); Pac. Gas & Elec., 442 P.2d at 646 n.8 ("[T]he ambiguity may be exposed by extrinsic evidence that reveals more than one possible meaning."). Accordingly, the Court first reviews the extrinsic evidence submitted by the parties to determine whether there Section 2.1 of the License Agreement is ambiguous.

Americas contends that IR and Nitronex intentionally deleted the words "design, develop, make, have made, [and] use" (the "Design and Develop Language") from the Prohibitions Clause, thereby permitting IR to conduct such activity within the Exclusive Field. Motion at 9. Americas reaches this conclusion by relying on evidence introduced by Vishwas Karve, a former IR employee who participated in the License Agreement negotiations in 2010. See id. 9–12; dkt 200-1 ("Karve Decl."). The documents attached to Karve's declaration establish the following drafting history with respect to the Notwithstanding Sentence:

- On July 13, 2010, Section 2.1 of the draft License Agreement provided:

  Notwithstanding the foregoing, IR retains the right, under the Licensed Patents, to design, develop, make, have made, use, offer to sell, sell and service any and all IR products in the Field of Use, provided that IR may not grant further licenses or sublicenses to any other party under the Licensed Patents to design, develop, make, have made, use, market, sell or service Products in the Exclusive Field.

  Karve Decl., Ex. 2.

- On July 15, 2010, Nitronex's attorney sent a revised draft of the License Agreement to IR's attorney, with "the relatively few changes [they] discussed [that] afternoon." Karve Decl., Ex. 3. At that time, the Notwithstanding Sentence read:

  Notwithstanding the foregoing, IR retains the right, under the Licensed Patents to design, develop, make, have made, use, offer to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**    **'O'**

| Case No. | 2:16-cv-02859-CAS(PLAx) | | Date | March 6, 2017 |
| --- | --- | --- | --- | --- |
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | | |

> sell, sell and service any and all IR products in the Field of use, *provided that IR itself may not design, develop, make, have made, use, market, sell or service Products in the Exclusive Field* and IR may not grant further licenses or sublicenses to any other party under the Licensed Patents to design, develop, make, have made, use, market, sell or service Products in the Exclusive Field.

Id. (emphasis added). In other words, the Prohibitions Clause included the Design and Develop Language.

- On July 16, 2010, IR's attorney sent a revised draft of the License Agreement to Karve and Charles Shalvoy, then Nitronex's chief executive officer ("CEO"). Karve Decl., Ex. 4. The Notwithstanding Sentence then read:

> Notwithstanding the foregoing, IR retains the right, under the Licensed Patents, to design, develop, make, have made, use, offer to sell, sell and service any and all IR products in the Field of Use, provided that IR itself may not market, sell or service Products in the Exclusive Field and IR may not grant further licenses or sublicenses to any other party under the Licensed Patents to design, develop, make, have made, use, market, sell or service Products in the Exclusive Field.

Id. The Design and Develop Language had been removed from the Prohibitions Clause.

- On July 18, 2010, Nitronex's attorney sent an annotated draft of the License Agreement to IR's attorney. Karve Decl., Ex. 5. After the Notwithstanding Sentence, Nitronex's attorney included the following note: "Need to discuss deletion of 'design, develop, make, have made, use'. Nitronex requests that these words be reinserted." Id.

Those words were not reinserted in the final version of the License Agreement signed by the parties. On the basis of this drafting history, Americas argues that Nitronex bargained away the ability to prohibit IR from designing, developing, making, having made, and using the Nitronex Patents in the Exclusive Field. Motion at 10. Karve

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:16-cv-02859-CAS(PLAx) | Date | March 6, 2017 |
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | |

believes "that the parties discussed the language Nitronex wanted to include and that it was agreed that this language would not be included." Karve Decl. ¶ 21. Karve describes IR's rationale for deleting the Design and Develop Language from the Prohibitions Clause as follows: "Because of the overlap between the Field of Use and the Exclusive Field, International Rectifier wanted the right to engage in these activities under the Licensed Patents in the Exclusive Field." Id. ¶ 17. In its motion, Americas expands on Karve's statements, arguing that the Prohibitions Clause was deliberately crafted to enable IR (and now Americas) to design and develop products that have multiple applications in the Field of Use, within and outside of the Exclusive Field. Motion at 12. In other words, IR sought to protect its ability to design and develop "dual use" products that could also be marketed and sold within the Field of Use, *not* within the narrower Exclusive Field, while the License Agreement remained effective. Id. at 12–13. Americas asserts that it must be able to design and develop dual use products "even if it is not able to sell those products in the Exclusive Field." Id. at 12. Furthermore, the ability to develop and design in the Exclusive Field allows Americas to be in a position to market and sell such dual use products within the Exclusive Field "as soon as it is legal to do so." Id. at 13.

Plaintiffs dispute Americas' interpretation Section 2.1 and Americas' explanation of its rationale for deleting the Design and Develop Language. According to plaintiffs, the Notwithstanding Sentence was intended to make clear that IR's shared rights in the *Field of Use* were preserved; the sentence was *not* intended to grant rights within the narrower Exclusive Field. Opp'n at 14. Plaintiffs argue that the Design and Develop Language was removed only to permit IR to *test* products in the shared Field of Use at frequencies above 100 MHz (the threshold for the Exclusive Field definition). Id. at 16–17. Plaintiffs further assert that Americas' interpretation of the contested provision is illogical. Id. Plaintiffs contend that is it not credible that Nitronex would simultaneously: (1) expressly reserve for itself "an exclusive license, including as against IR" to "design develop, make, have made, use, offer to sell, and service Products"; and (2) permit IR to design, develop, make, have made, and use products in the Exclusive Field, merely by not including such activities in the Prohibitions Clause. Id.

In support of their arguments, plaintiffs submit a declaration from Charles Shalvoy, Nitronex's CEO at the time of the negotiations. Dkt. 229-3 ("First Shalvoy Decl."). Shalvoy negotiated the IP Purchase Agreement and the License Agreement on behalf of Nitronex. Id. ¶ 7. Shalvoy explains the context in which the License Agreement was

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | | 'O' |
|---|---|---|---|---|
| Case No. | 2:16-cv-02859-CAS(PLAx) | | Date | March 6, 2017 |
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | | |

negotiated. Id. ¶ 9. Shalvoy states that in 2010, Nitronex and IR were focused on
different applications for GaN-on-Si products. Id. Nitronex was focused on RF
applications, while IR was focused on power management products. Id. Nonetheless, IR
stated during the negotiations that it sought rights in the RF space because some of its
power management products had or could have in the future some RF functionality. Id.
¶ 11. The types of RF applications that IR mentioned were likely to operate at
lower frequencies (below 100 MHz), therefore Nitronex and IR agreed that the companies
would share rights for RF applications, *except* Nitronex would have "sole exclusive rights
for certain applications that operate above 100 MHz." Id. In support of his assertion that
the parties intended Nitronex to have "sole exclusive rights" for RF applications that
operate above 100 MHz, Shalvoy points to a March 19, 2010 email, in which Karve
outlined two options for the structure of the transaction between Nitronex and IR. Id.
¶ 12. In both options, IR was "to grant exclusive license to Nx in rf power field of use."
Shalvoy Decl., Ex. 1. In addition, Shalvoy points to a May 3, 2010 email that he sent to
Karve in which Shalvoy stated, inter alia:

> During our call on Sunday, I outlined for you the original rationale for this
> IR-Nitronex partnership, as I understood the intent. . . . Both IR and
> Nitronex agree that our GaN on silicon technology has significant economic
> value in multiple large markets. IR was primarily interested in
> commercializing products in power management, Nitronex in RF power, and
> we could jointly pursue a monetization strategy in other markets, especially
> the rapidly growing LED market.
>
> . . .
>
> IR is primarily interested in commercializing products in power
> management, and would retain exclusive rights in this field of use. Nitronex
> is primarily interested in RF power, and would retain exclusive rights in this
> field of use, and we would share the licensing/royalty revenues in the other
> fields of use.
>
> . . .
>
> It is very important for Nitronex to retain exclusive rights to the RF field of
> use, and we entered into these discussions with the assumption that IR's
> primary interests are in other fields.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**     **'O'**

| Case No. | 2:16-cv-02859-CAS(PLAx) | Date | March 6, 2017 |
|----------|-------------------------|------|---------------|
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | |

First Shalvoy Decl., Ex 2.  After a series of emails and a telephone call between Nitronex and IR regarding whether IR would share in Nitronex's exclusive field, Chris Lynch, Nitronex's outside counsel, sent IR an email proposal with draft terms.  First Shalvoy Decl. ¶ 16.  Lynch stated:

> As you know, we have had some trouble agreeing upon the parameters of Nitronex's rights because of Nitronex's need for an area of exclusivity consistent with Nitronex's business plan focused on RF applications.
>
> Our first request was for complete exclusivity for the entire field of RF applications, but you expressed concern about the breadth of this request due, in part, to the fact that IR has technology and interests that might in the future involve RF technologies.  IR then proposed that it would make Nitronex the "sole licensee" for the RF field, but that IR would retain the co-exclusive right, without right of sublicense, to also sell products in the RF field.  IR also agreed that it would exclude even itself from certain portions of the RF field that IR understood to represent Nitronex's core business.
>
> Initially we had trouble getting comfortable with this IR's proposal, but we think that it represents a fair way to proceed provided that the concept of "core Nitronex business" is defined broadly enough to include Nitronex's current product roadmap, so that Nitronex has room to grow, rather than limiting the truly exclusive field to Nitronex's current product applications. With that in mind, please consider the following language to define the parameters of a broader "Field of Use", in which Nitronex would the IR's sole licensee, but with respect to which IR would retain the right to sell products without granting licenses to others, and a narrower "Exclusive Field" in which Nitronex would have sole exclusivity, even as to IR.  If you agree, we would want to drop this language into the term sheet.

First Shalvoy Decl., Ex. 5.  In May and July of 2010, IR and Nitronex continued to engage in "heavy negotiations" regarding the definitions of Field of Use and Exclusive Field.  First Shalvoy Decl. ¶¶ 17–21.  According to Shalvoy, "[t]he point of having so heavily negotiated and defined the boundaries of the parties' respective fields of use, as I understood it, was because everyone was supposed to stay within their permitted fields."  Id. ¶ 22.  Shalvoy therefore disputes Karve's interpretation of the Section 2.1:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | | 'O' |
|---|---|---|---|---|
| Case No. | 2:16-cv-02859-CAS(PLAx) | | Date | March 6, 2017 |
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | | |

> I disagree with Infineon's and Mr. Karve's assertion that the intent of the second sentence of Section 2.1 was to permit IR to design, develop, make, have made, use, or offer to sell products expressly in and for the Exclusive Field. The suggestion that the License Agreement allowed IR (or now allows Infineon) to design, develop, make, have made, use, and offer to sell products in MACOM's Exclusive Field that practice the Nitronex patents so long as they do not market, sell, or service such products is not consistent with the negotiation of the 2010 License Agreement or my understanding of the intent of Section 2.1

Id. ¶ 27. Shalvoy recalls that IR sought to remove the Design and Develop Language in order to retain the ability to test at high frequencies—including above 100 MHz—products that were designed to be operated *under* 100 MHz and sold in the shared Field of Use. Id. ¶ 28. Shalvoy states that he has no recollection of IR "ever raising any such 'dual use' issue (whether by that name or any other) in our negotiations." Id. ¶ 31. He further states that he does not recall "anyone from IR ever telling me (or anyone else at Nitronex, so far as I am aware) that the change to the second sentence of Section 2.1 was intended to allow IR to design and develop products that are squarely in Nitronex's Exclusive Field." Id. ¶ 32. According to Shalvoy, such a contract provision "would have made no sense, because there would have been no reason either at that time or today that IR would have wanted to design and develop products that it could never market." Id. ¶ 33. Furthermore, Shalvoy contends that Nitronex would not have agreed to allow IR to design and develop products specifically optimized and intended for use in Nitronex's Exclusive Field because that "would have largely defeated Nitronex's goal of having exclusivity for its Exclusive Field, particularly with Nitronex being much a small company relative to IR's (and more so Infineon's) far larger scale and resources." Id. ¶ 34. Shalvoy is "skeptical that the parties would not have agreed to grant IR important affirmative rights "through silence." Id. ¶ 35. In summary, Shalvoy asserts that the removal of the Design and Develop Language "was not intended to allow IR to engage wholesale in those activities outside of the limited testing context for which the words . . . were removed." Id. ¶ 38.

Plaintiffs also argue that Americas' "dual use" theory is inconsistent with the technical and commercial realities of the industry, in which customers demand products that are optimized for particular applications. Opp'n at 18. According to Preetinder Virk—Senior Vice President and General Manager of the Networks Division of

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:16-cv-02859-CAS(PLAx) | Date | March 6, 2017 |
|----------|-------------------------|------|---------------|
| Title    | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | |

MACOM Technology Solutions, Inc. (the operating subsidiary of MACOM Technology
Solutions Holdings, Inc.)—"there are multiple reasons that an RF power amplifier that
was designed for use in cellular base stations specifically would not, as a practical matter,
be designed with the intent to sell it for both cellular base station and other applications,
nor would it be sold for other applications if it had been designed for use in cellular base
stations." Dkt. 229-2 ¶ 12.  For example, according to Virk, RF power amplifiers for
base stations are: (a) optimized for particular frequencies; (b) typically designed for,
characterized, and tested against specifications of certain cellular standards (e.g.,
LTE/4G); and (c) are expensive to produce and would not be used for other applications,
because less expensive alternatives are available.  Id. ¶¶ 13–20.  As a result, Virk believes
that it "is highly unlikely that GaN-on-Si RF power amplifier products for cellular base
stations could or would, as a practical matter, ever be sold for other applications."  Id.
¶ 21.

In its reply, Americas contests the veracity of Shalvoy's testimony regarding IR's
concern for testing above 100 MHz because, at the time IR deleted the Design and
Develop Language, the definition of Exclusive Field did not include the 100 MHz
language that Shalvoy claims motivated IR's concern.  Americas Reply at 3, 9–10.
Americas also asserts that Shalvoy, who is being compensated for his time, did not
provide any documents to corroborate his testimony regarding the concern for testing
over 100 MHz.  Id. at 8.  Americas further argues that Nitronex's aspirations for the
License Agreement are not relevant to what was ultimately negotiated.  Id. at 11.
According to Americas, Nitronex negotiated away more than it would have liked because
Nitronex was "desperate for cash" at the time the parties were negotiating the License
Agreement.  Id.  In support of this argument, Americas points to Shalvoy's deposition,
during which Shalvoy testified that it is typical to have to make some compromises
during a negotiation and that Nitronex did not get everything that it wanted with respect
to Section 2.1 of the License Agreement.  Id.; dkt. 246-1, Ex. B ("Shalvoy Depo.") at
20:3–15, 48:9–17.  Americas contends that Shalvoy stated that IR would have faced a
"near-death experience" in 2011 because it would have run out of cash.  Reply at 11;
Shalvoy Depo. at 27:18–28:11.  According to Americas, Shalvoy's testimony regarding
the meaning of Section 2.1 supports Americas' interpretation of the provision.  Reply at
12–14.  For example, Shalvoy stated in his deposition that the Second Sentence of
Section 2.1 "gives IR additional rights, that they would have been excluded from in the
first sentence, to use RF power capability outside of the exclusive field."  Shalvoy Depo.
at 60:23–61:5.  Shalvoy agreed that the Second Sentence was intended to allow IR to

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:16-cv-02859-CAS(PLAx) | Date | March 6, 2017 |
|----------|--------------------------|------|---------------|
| Title    | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | |

exercise its right to develop and test products in the Field of Use to be sold outside of the Exclusive Field without concern that its development in testing might violate the License Agreement. Id. at 90:4–9. According to Shalvoy, the removal of the Design and Develop Language accomplished that goal because:

> as part of our discussions with IR, they explained that in order to develop current and future power management products, they would want to have the ability to use RF power, perhaps on the same chip. So there may be power management functions and RF functions on the same piece of silicon. And they wanted to be unrestricted in their ability to do that. And we agreed, as long as the resulting product would only be sold under 100 megahertz outside of the exclusive fields.

Id. at 90:10–21. Similarly, Shalvoy stated that IR requested clarifying language in the Second Sentence that would give IR the "ability to do development work in the lab" *and* "to develop products that would be sold outside of the exclusive field." Id. at 119:12–20.

In their surreply, plaintiffs contest Americas' assertion that the 100 MHz limitations was not contemplated as part of the field definitions as of mid-July 2010. Surreply at 3. Plaintiffs assert that IR and Nitronex contemplated and recognized at the relevant time in July 2010 that they would have a 100 MHz dividing line between the Exclusive Field and the Field of Use in their License Agreement. Dkt. 242-2 ("Surreply") at 1. In support of this argument, plaintiffs contend that the 100 MHz dividing line between the fields was: (1) in the 2004 license between the parties; (2) indirectly found in the definition of Exclusive Field through the reference to "power management"—a term that expressly included a 100 MHz limit as of July 16, 2010; (3) under discussion during the negotiations; and (4) ultimately incorporated into the final License Agreement's definition of Exclusive Field. Id.; see, e.g., dkt. 263-1 ("Second Shalvoy Decl."), Ex. 11 at § 1.2; Second Shalvoy Decl., Ex. 12 at 3 (the April 19, 2010 term sheet defined "power management" applications as having the characteristics of operation at less than 100 Megahertz"); Second Shalvoy Decl., Ex. 14 at 5 (June 11, 2010 draft of the IP Purchase Agreement provided same definition of "power management" applications); Second Shalvoy Decl. ¶ 5 ("The idea that the definitions for the various fields of use under the License Agreement would be tied to frequency limitations was contemplated and discussed by Nitronex and IR over the course of the parties' 2010 negotiations[.]").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | **CIVIL MINUTES – GENERAL** | | **'O'** |
|---|---|---|---|
| Case No. | 2:16-cv-02859-CAS(PLAx) | Date | March 6, 2017 |
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | |

Also in their surreply, plaintiffs argue that Americas presents an incomplete picture of Shalvoy's deposition testimony. Surreply at 8–9. For example, Shalvoy did not testify that Nitronex was "desperate for cash," but instead stated that Nitronex was in relatively good financial health:

> I think [Nitronex's financial condition] was significantly stronger than it had been on the previous year or the year before that. Because now we had commercial products. We had customers who had designed us in sole source for products that were in production. And we were now at the stage where we were ramping up production and also developing new products for new customers and new markets.

Dkt. 263-3 at 26:22–27:9. In response to the question of whether Nitronex had a "near-death experience," Shalvoy answered: "Until you close the next round of financing, there is a date when you're going to run out of cash. We were always able to raise new money before that time occurred." Id. at 27:24–28:3. Moreover, when asked whether there was "any financial reason" that Nitronex would have had to complete a patent acquisition deal with IR, Shalvoy answered:

> No, because . . . if the final deal violated one of our key needs, i.e., gave up rights that we felt were critical to the long-term success of the company, we would have walked away from the deal and raised money. We were talking to other strategic partners, like the ones I've just described, all of whom were interested in potentially investing money, I might add, and -- or we would have raised more money from venture capitalists, because I was talking to not only our existing investors, but some new venture capital investors, who are generally more risk averse. . . . We had over 500,000 devices shipped out into the field. We had a return rate, a failure rate, of less than .01 percent, so we had far and away the best reliability in the industry, and so it would really be an expansion capital round for us.

Id. at 140:15–141:14. Plaintiffs also emphasize portions of Shalvoy's deposition in which he described the limitations on IR's rights under the License Agreement. For example, Shalvoy stated that Americas has "no rights to develop or test products that are intended to be used above 100 megahertz." Id. at 46:2–4. In particular, plaintiffs highlight the following exchange during Shalvoy's deposition:

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | **CIVIL MINUTES – GENERAL** | | | **'O'** |
|---|---|---|---|---|
| Case No. | 2:16-cv-02859-CAS(PLAx) | | Date | March 6, 2017 |
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | | |

> Q. So your testimony is that the license agreement -- the only rights that it provides to IR in the exclusive field is a testing scenario of RF products that normally operate below 100 megahertz but can be tested above 100 megahertz?
>
> A. That's correct.
>
> Q. And -- and besides that, IR has no rights to use the licensed patents in the exclusive field?
>
> A. The -- they are prohibited.  And this was one of the bright lines that we sought to draw in negotiating the agreement, that any products that are designed to be sold above 100 megahertz is part of the exclusive fields in Nitronex.  Including IR and anyone else.

Id. 46:5–18.  Shalvoy explained that "the intent in sentence number two was to give [IR] the rights to operate in the field-of-use as long as they weren't developing products that would go into the exclusive field.  The shared spectrum that I keep coming back to was very important to IR."  Id. at 62:25–63:4.  Shalvoy further testified that Section 2.1 reflected the parties' agreement that IR would maintain the ability "to test products that would operate outside of the exclusive field if their testing procedures required them to use signals that technically were in the exclusive field."  Id. at 65:18–22.

With the benefit of the parties' new substantial briefing on Section 2.1, and having carefully considered the extrinsic evidence adduced by both parties, the Court concludes that the Notwithstanding Sentence is not reasonably susceptible to the meaning advanced by plaintiffs.  The contested provision expressly states that IR (now Americas) "retains the right, under the Licensed Patents, to design, develop, make, have made, use, offer to sell, sell and service any and all IR products in the Field of Use[.]"  License Agreement § 2.1.  The License Agreement makes clear, and the parties agree, that the Exclusive Field is within the Field of Use.  Id. § 1.2.  The License Agreement then carves out certain activities from IR's rights in the Exclusive Field: "IR itself may not directly or indirectly market, sell or service Products in the Exclusive Field."  Id. § 2.1.  In other words, under Section 2.1, Americas (a) retains the right to design, develop, make, have made, and use products in in the Field of Use, including the Exclusive Field; but (b) lacks the right to indirectly market, sell, or service products in the Exclusive Field.  Because the extrinsic evidence introduced does not reveal any ambiguity in the plain language of Section 2.1,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CIVIL MINUTES – GENERAL | | | **'O'** |
|---|---|---|---|
| Case No. | 2:16-cv-02859-CAS(PLAx) | Date | March 6, 2017 |
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | |

the Court need not admit the extrinsic evidence proffered by the parties.  Nonetheless, the
Court notes that in support of their interpretation, plaintiffs offer only Shalvoy's
explanation of Nitronex's subjective intent in negotiating the License Agreement;
plaintiffs do not present draft agreements or contemporaneous communications that
support plaintiffs' contention that the deletion of the Design and Development Language
was intended *only* to permit IR to *test* products above 100 MHz.  By contrast, drafts of
the License Agreement demonstrate that the Design and Develop Language was
deliberately removed from the Prohibitions Clause, thus supporting Americas' contention
that the parties intended IR to retain the ability to "design, develop, make, have made,
[and] use" products within the Exclusive Field.  Moreover, Americas' explanation for the
removal of the Design and Develop Language—the dual use theory—is consistent with
the drafting history and the final License Agreement.  Indeed, even if the production of
"dual use" GaN-on-Si RF products are improbable, plaintiffs concede that "the possibility
of dual-use products exists in the abstract[.]"  Opp'n at 18.

      Accordingly, the Court finds it appropriate to modify the Preliminary Injunction.
In accordance with this order, the Court will modify the third paragraph of the injunction
to read:

> Consistent with existence of a valid License Agreement, Infineon Americas
> may not ~~design, develop, make, have made, use,~~ offer to sell, sell, or service
> products in MACOM's Exclusive Field (as defined by the under-seal 2010
> License Agreement) that practice the Nitronex Patents, nor may Infineon
> Americas directly or indirectly market, sell, or service products in the
> Exclusive Field that practice the Nitronex Patents.  In addition, Infineon
> Americas may not grant licenses or sublicenses to the Licensed Patents
> (identified in Schedule A to the 2010 License Agreement) to design,
> develop, make, have made, use, market, sell or service products in the
> Exclusive Field or Field of Use (as defined by the 2010 License Agreement)
> that practice the Nitronex Patents, including but not limited to the grant of
> such licenses to its corporate affiliates.

The Court has jurisdiction to issue such a modification, which narrows, rather than
expands, the scope of the injunction and therefore does not "materially alter the status of
the case on appeal."  See Mayweathers, 258 F.3d at 935 (quotation marks omitted).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**            **'O'**

| Case No. | 2:16-cv-02859-CAS(PLAx) | Date | March 6, 2017 |
|---|---|---|---|
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | |

Americas provides three additional arguments as to why the Court should stay the preliminary injunction. First, Americas argues that the injunction should not prohibit it from violating Section 2.1 because: (a) plaintiffs never demonstrated that Americas violated Section 2.1 and (b) the injunction applies a disputed interpretation of Section 2.1 to restrict Americas' activities. Motion at 16–18. The Court finds that Americas is unlikely to succeed on the merits of its appeal on this basis because the injunction—as modified in the manner described above—does nothing more than require Americas to comply with the License Agreement, thus preserving the status quo.

Second, Americas argues that the injunction is ambiguous because the injunction: (a) refers to the "Nitronex Patents," which the Court does not construe; (b) does not define the terms "develop" and "design"; and (c) does not identify the specific products to which it applies. Id. at 18–19. However, the phrase "Nitronex Patents" is defined by the Court's October Order. See October Order at 3 n.2. To the extent the current injunction contains the terms "develop" and "design," those terms are used in the License Agreement and are, therefore, presumably understood by Americas. Finally, while courts should identify particular patents when enjoining patent infringement, see Int'l Rectifier Corp. v. IXYS Corp., 383 F.3d 1312, 1316 (Fed. Cir. 2004), here the Court does not enjoin infringement, but the breach of a contract between the parties. Furthermore, the License Agreement—which Americas seeks to keep under seal—defines the licensed patents in Schedule A. Accordingly, the Court finds that Americas is unlikely to succeed in arguing on appeal that the Court's modified preliminary injunction is ambiguous.

Third, Americas argues that plaintiffs failed to show that they would suffer irreparable harm from Americas' development and marketing activities. Motion at 19; Reply at 18. However, Americas concedes that "harm attributable" to "wrongful conduct in violation of the License Agreement . . . may be prohibited by an injunction." Motion at 20. The License Agreement prohibits Americas from marketing GaN-on-Si products within MACOM's Exclusive Field. See License Agreement § 2.1. Therefore, as described in detail in the Court's October Order, the Court finds that plaintiffs presented sufficient evidence to demonstrate that they will lose business opportunities as a result of Americas' improper marketing activities. See October Order 44–46. Because the modified preliminary injunction no longer prohibits design and development, the Court need not consider whether plaintiffs have demonstrated irreparable harm arising from such conduct. Accordingly, the Court finds that Americas is unlikely to succeed in arguing on appeal that plaintiffs did not show irreparable harm.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | CIVIL MINUTES – GENERAL | | 'O' |
|---|---|---|---|
| Case No. | 2:16-cv-02859-CAS(PLAx) | Date | March 6, 2017 |
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | |

Because the Court has modified the preliminary injunction order and Americas is otherwise unlikely to succeed on the merits of its appeal, the Court declines to grant Americas' request to stay the now-modified preliminary injunction.

## V.    CONCLUSION

The Court **DENIES** Americas' request to stay its preliminary injunction. However, the Court **GRANTS** Americas' motion to modify the preliminary injunction. Accordingly, the following preliminary injunction HEREBY supersedes the Court's December 7, 2016 order:

The Court **ORDERS** that until further order of the Court, the 2010 License Agreement shall remain in full force and effect and that defendant Infineon Technologies Americas Corp.'s purported termination of that agreement on March 22, 2016 shall have no effect.

In the event that Infineon Technologies Americas ("Infineon Americas") asserts that there is a new breach of the 2010 License Agreement by plaintiffs, Infineon Americas shall advise the Court in writing of its intention to declare a breach, stating the action it intends to take and the claimed basis for that action. Infineon Americas shall provide the Court with such notice 30 days before declaring a breach.

Consistent with existence of a valid License Agreement, Infineon Americas may not offer to sell, sell, or service products in MACOM's Exclusive Field (as defined by the under-seal 2010 License Agreement) that practice the Nitronex Patents, nor may Infineon Americas directly or indirectly market, sell, or service products in the Exclusive Field that practice the Nitronex Patents. In addition, Infineon Americas may not grant licenses or sublicenses to the Licensed Patents (identified in Schedule A to the 2010 License Agreement) to design, develop, make, have made, use, market, sell or service products in the Exclusive Field or Field of Use (as defined by the 2010 License Agreement) that practice the Nitronex Patents, including but not limited to the grant of such licenses to its corporate affiliates. In accordance with the positions set forth in the parties' briefs, nothing in this order shall prevent Infineon Americas from designing, making, having made, using, offering to sell, selling, or servicing gallium nitride-on-silicon carbide (GaN-on-SiC) products, or from directly or indirectly marketing, selling, or servicing such products.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**          **'O'**

| Case No. | 2:16-cv-02859-CAS(PLAx) | Date | March 6, 2017 |
|----------|--------------------------|------|----------------|
| Title | MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. ET AL. v. INFINEON TECHNOLOGIES AG ET AL. | | |

Infineon shall, within ten days from the date of issuance of this Preliminary Injunction, provide notice and a copy of this Preliminary Injunction to all subsidiaries, affiliates, officers, directors, employees, principals, agents, customers, and attorneys that may have any involvement whatsoever in designing, developing, making, having made, using, marketing, selling, servicing, or licensing products in the Exclusive Field or Field of Use that use the Nitronex Patents, as well as any other person or entity acting in active concert or participation with Infineon Americas with respect to any of the activities enjoined here.

IT IS SO ORDERED.

|  | 00 | : | 00 |
|---|---|---|---|
| Initials of Preparer | | CMJ | |