LINDA M. BURROW, Bar No. 194668
  *lburrow@bsfllp.com*
ALISON M. MACKENZIE, Bar No. 242280
  *amackenzie@bsfllp.com*
BOIES SCHILLER FLEXNER LLP
725 South Figueroa Street 31st Floor
Los Angeles, CA 90017-5524
Telephone: 213-629-9040
Facsimile: 213-629-9022

DAVID G. WILLE (admitted *pro hac vice*)
  *david.wille@bakerbotts.com*
JEFFERY D. BAXTER (admitted *pro hac vice*)
  *jeff.baxter@bakerbotts.com*
BRIAN D. JOHNSTON (admitted *pro hac vice*)
  *brian.johnston@bakerbotts.com*
JAMES C. WILLIAMS (admitted *pro hac vice*)
  *james.williams@bakerbotts.com*
CHARLES YEH (admitted *pro hac vice*)
  *charles.yeh@bakerbotts.com*
BAKER BOTTS L.L.P.
2001 Ross Avenue, Suite 600
Dallas, TX 75201
Telephone:  214.953.6500 / Fax:  214.953.6503

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. and NITRONEX, LLC, | Case No. CV 16-02859 CAS (PLAx) |
| Plaintiffs, | **DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF** |
| v. | **Hon. Christina A. Snyder** |
| INFINEON TECHNOLOGIES AG, *et al.*, | |
| Defendants. | |

1
2

# TABLE OF CONTENTS

INTRODUCTION ..................................................................................................1

LAW OF CLAIM CONSTRUCTION ..................................................................1

I.    Weeks Patent Family Disputed Terms ...........................................................2

    A.    "compositionally-graded layer" / "compositionally graded transition layer"....................................................................................2

        1.    The specification consistently describes a compositionally-graded layer as an individual layer with a varying composition. ...................................................................3

        2.    The Week Patents' file histories support Defendants' construction...........................................................................................7

        3.    Plaintiffs' "multiple layers" argument would strip "compositionally-graded layer" of its meaning and render claims indefinite.............................................................................9

    B.    "intermediate layer" .....................................................................11

    C.    "substantially matches"................................................................12

    D.    "a composition of said transition layer at a top surface thereof substantially matches a composition of said gallium nitride material layer [or III-nitride layer] at a bottom surface thereof"........14

    E.    "an alloy of gallium nitride selected from the group consisting of $Al_xIn_yGa_{(1-x-y)}N$, $In_yGa_{(1-y)}N$, and $Al_xGa_{(1-x)}N$" ..............................17

        1.    The specification of the Weeks Patents supports Defendants' construction............................................................18

        2.    The surrounding claim language supports that subscripts cannot be zero. ........................................................................19

    F.    "said transition layer is discontinuously graded" ...............................21

3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

II.    '015 Patent Disputed Terms ...................................................................... 22

    A.    "an amorphous silicon nitride-based material layer formed directly on the entire top surface of the silicon substrate" ................. 22

        1.    The claim language "formed . . . on the . . . top surface of the silicon substrate" limits Claim 41 to a silicon nitride layer deposited on the top surface of the substrate ................... 22

        2.    The claim term "entire" means entire—not "essentially the entire" as Plaintiffs propose .................................................. 24

III.   '889 Patent Disputed Terms ...................................................................... 25

    A.    "a silicon nitride-based material layer formed between the silicon substrate and the III-nitride material region" .......................... 25

IV.    '002 Patent Disputed Terms ...................................................................... 26

    A.    "the via is formed through the substrate" ........................................... 26

        1.    The alleged "invention" described in the specification is a backside via. ............................................................................. 27

        2.    Claim 8 is limited to a backside via. ........................................... 28

V.    Defendants are not estopped from raising indefiniteness arguments ............ 29

1

## <u>TABLE OF AUTHORITIES</u>

2

**Page(s)**

3

**CASES**

4

5 *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*,
637 F.3d 1324 (Fed. Cir. 2011)..................................................................7

6 *Aylus Networks, Inc. v. Apple Inc.*,
7 856 F.3d 1353 (Fed. Cir. 2017)..................................................................7

8 *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*,
224 F.3d 1308 (Fed. Cir. 2000).............................................................23, 24

9 *CCS Fitness, Inc. v. Brunswick Corp.*,
10 288 F.3d 1359 (Fed. Cir. 2002)..................................................................3

11 *Centillion Data Sys., Inc., v. Am. Mgmt. Sys., Inc.*,
12 138 F. Supp. 2d 1117 (S.D. Ind. 2001) .......................................................1

13 *Chamberlain Grp. v. Lear Corp.*,
516 F.3d 1331 (Fed. Cir. 2008)..................................................................7

14 *Chiron Corp. v. Genentech, Inc.*,
15 363 F.3d 1247 (Fed. Cir. 2004)..................................................................3

16 *Datamize LLC v. Plumtree Software, Inc.*,
17 417 F.3d 1342 (Fed. Cir. 2005) (abrogated on other grounds) ..................7

18 *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*,
815 F.3d 1314 (Fed. Cir. 2016)................................................................14

19 *Geneva Pharm., Inc. v. GlaxoSmithKline PLC*,
20 349 F.3d 1373 (Fed. Cir. 2003)................................................10, 14, 17

21 *Halliburton Energy Servs., Inc. v. M-I LLC*,
22 514 F.3d 1244 (Fed. Cir. 2008)................................................................10

23 *Holder v. Holder*,
305 F.3d 854 (9th Cir. 2002)......................................................................30

24 *Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
25 452 F.3d 1312 (Fed. Cir. 2006)................................................................27

26 *ICU Med., Inc. v. Alaris Med. Sys., Inc.*,
27 558 F.3d 1368 (Fed. Cir. 2009)..................................................................4

28

*In re Ark-La-Tex Timber Co.*,
   482 F.3d 319 (5th Cir. 2007) ................................................................30

*Innova/Pure Water v. Safari Water Filtration Sys.*,
   381 F.3d 1111 (Fed. Cir. 2004) ...........................................................20

*Interval Licensing LLC v. AOL, Inc.*,
   766 F.3d 1364 (Fed. Cir. 2014) .......................................................6, 12

*Linear Tech. Corp. v. ITC*,
   566 F.3d 1049 (Fed. Cir. 2009) .............................................................3

*Liberty Ammunition, Inc. v. United States*,
   835 F.3d 1388 (Fed. Cir. 2016) ...........................................................15

*Markman v. Westview Instruments, Inc.*,
   517 U.S. 370 (1996) ...............................................................................9

*Markman v. Westview Instruments, Inc.*,
   52 F.3d 967 (Fed. Cir. 1995) .................................................................1

*Martek Biosciences Corp. v. Nutrinova, Inc.*,
   579 F.3d 1363 (Fed. Cir. 2009) .............................................................3

*Masimo Corp. v. Tyco Health Care Grp.*,
   No. 02-4770, 2004 WL 7094931 (C.D. Cal. Dec. 17, 2004) ..............30

*Maytag Corp. v. Electrolux Home Prods., Inc.*,
   411 F. Supp. 2d 1008 (N.D. Iowa 2006) ..............................................1

*Meds. Co. v. Mylan, Inc.*,
   853 F.3d 1296 (Fed. Cir. 2017) ...........................................................10

*Microsoft Corp. v. Multi-Tech Sys. Inc.*,
   357 F.3d 1340 (Fed. Cir. 2004) .............................................................7

*Nautilus, Inc. v. Biosig Instruments, Inc.*,
   134 S. Ct. 2120 (2014) ................................................................9, 14, 25

*Nystrom v. Trex Co.*,
   424 F.3d 1136 (Fed. Cir. 2005) .............................................................2

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008) .............................................................1

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) ....................................................1, 2, 25

*Reed Elsevier, Inc. v. Muchnick*,
   559 U.S. 154 (2010) .............................................................................30

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Ruckus Wireless, Inc. v. Innovative Wireless Sols.*,
    LLC, 824 F.3d 999 (Fed. Cir. 2016) ...................................................28

*Southwall Techs., Inc. v. Cardinal IG Co.*,
    54 F.3d 1570 (Fed. Cir. 1995) ..........................................................7

*Transcend Med., Inc. v. Glaukos Corp.*,
    No. 13-830, 2015 WL 5546988 (D. Del. Sept. 18, 2015) ...................25, 26

*Unique Concepts, Inc. v. Manuel*,
    No. 85 C 4181, 1986 WL 8039 (N.D. Ill. July 16, 1986) ......................25

*United Carbon Co. v. Binney & Smith Co.*,
    317 U.S. 228 (1942) ...........................................................................9

*United Steelworkers of Am. v. ASARCO*,
    512 F.3d 555 (9th Cir. 2008) ............................................................30

*Verizon Servs. Corp. v. Vonage Holdings Corp.*,
    503 F.3d 1295 .................................................................................27

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014) ..........................................................4

*Wyler Summit P'ship v. Turner Broad. Sys.*,
    235 F.3d 1184 (9th Cir. 2000) ..........................................................29

### INTRODUCTION

Plaintiffs seek to avoid any construction that ties the asserted claims to the alleged inventions described in the patents at issue.  For eight of the nine disputed terms, Plaintiffs fail to provide any construction, stating that "no construction is needed" and proposing "plain and ordinary meaning."  Yet Plaintiffs never explain precisely what those plain meanings are, apparently preferring to keep those meanings nebulous so that they can stretch the patents to cover any device they wish to accuse of infringement as the case proceeds.  Because parties rarely agree on the plain meaning of a term, courts recognize that a proper construction must specify the alleged plain meaning of a term.  *Maytag Corp. v. Electrolux Home Prods., Inc.*, 411 F. Supp. 2d 1008, 1036–38 (N.D. Iowa 2006); *see also Centillion Data Sys., Inc., v. Am. Mgmt. Sys., Inc.*, 138 F. Supp. 2d 1117, 1121–22 (S.D. Ind. 2001).  It would be legal error to find that a term should be given its "plain meaning" and leave unresolved the parties' dispute as to what that meaning may be. *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008).  The only actual construction proposed by Plaintiffs is an improper attempt to broaden a claim by a wholesale rewriting of the claim language.  Plaintiffs seek to substitute "on *essentially* the entire top surface" for the claim language "on the entire top surface."  The Court should reject Plaintiffs' attempts to avoid specifying the meaning of the terms at issue, leaving the scope of the claims uncertain and disconnected from the alleged inventions described in the patents at issue.

### LAW OF CLAIM CONSTRUCTION

The proper construction of a claim is a legal determination based on a patent's intrinsic evidence, which includes the claims themselves, the specification, and the prosecution history.  *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 979 (Fed. Cir. 1995).  In *Phillips v. AWH Corp.*, the Federal Circuit re-emphasized the primacy of the specification in claim construction.  *Phillips v. AWH Corp.*, 415 F.3d 1303 (Fed. Cir. 2005).  While the words of a claim are to be given their

DEFENDANTS' OPENING CLAIM CONSTRUCTION BRIEF

ordinary and customary meaning from the standpoint of one skilled in the art at the time of the invention, the terms must be read "not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id.* at 1313. *Phillips* highlighted the importance of the specification in claim construction, calling it the "single best guide to the meaning of a disputed term" and usually "dispositive." *Id.* Claim terms can be limited based on statements in the specification, whether those statements constitute express definitions or clear disclaimers or simply establish meaning through context or consistent use. *See Nystrom v. Trex Co.*, 424 F.3d 1136, 1145 (Fed. Cir. 2005) (consistent use of a term in the specification can limit the term's meaning, even without express definition or a clear disavowal).

## I.     Weeks Patent Family Disputed Terms

### A.     "compositionally-graded layer" / "compositionally graded transition layer"

| Defendants | Plaintiffs |
|---|---|
| A layer having a composition that varies across at least a portion of the thickness of the layer. | No construction is needed; the plain and ordinary meaning to one of skill in the art should be applied, including that "compositionally graded" means "having a composition that varies across at least a portion of the thickness of the layer. "Transition layer" and "layer" both can include multiple layers or sub-layers. |

The term "compositionally-graded layer" appears in '034 Claim 13, '119 Claim 14, '335 Claim 3, and '686 Claim 6. The term "compositionally-graded transition layer" appears in '921 Claim 5 and EP '927 Claims 3 and 10. These terms identify the first of the three types of transition layers that the Weeks Patents describe.[1]

---

[1] Those three types of transition layers are (1) a compositionally-graded layer; (2) a superlattice; and (3) a combination of a compositionally-graded layer and a superlattice. Shealy Decl. at ¶ 20; Def. Tech. Tutorial at 35. (Dkt. No. 424).

This term should not raise a dispute because the Weeks Patents expressly define it. "When a patentee explicitly defines a claim term in the patent specification, the patentee's definition controls." *Martek Biosciences Corp. v. Nutrinova, Inc.*, 579 F.3d 1363, 1380 (Fed. Cir. 2009); *see also CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). The Weeks Patents provide the following definition: "As used herein, the term 'compositionally-graded layer' refers to a layer having a composition that varies across at least a portion of the thickness of the layer." Ex. B, '417 Patent at 4:4–6. The "as used herein" language in this sentence "unambiguously" signifies that the sentence is defining the term at issue. *Chiron Corp. v. Genentech, Inc.*, 363 F.3d 1247, 1258 (Fed. Cir. 2004); *Linear Tech. Corp. v. ITC*, 566 F.3d 1049, 1054 (Fed. Cir. 2009) (finding that "as used herein, '[term]' refers to" is a controlling definition). Accordingly, Defendants have adopted word-for-word the specification's controlling definition.

Plaintiffs take pains to avoid the specification's definition. Plaintiffs argue that "no construction is needed." And to the extent Plaintiffs provide any explanation of the meaning of the term, they argue for a meaning plainly inconsistent with the specification's definition. Even though the specification defines "compositionally-graded layer" as a single graded layer, Plaintiffs apparently contend that the term can encompass multiple layers, none of which are graded. Plaintiffs' position conflicts with the intrinsic record and should be rejected.

### 1. The specification consistently describes a compositionally-graded layer as an individual layer with a varying composition.

As noted above, the Weeks Patents define the term "compositionally-graded layer" as a single layer with a composition that varies across its thickness:

> As used herein, the term 'compositionally-graded layer' refers to a layer having a composition that varies across at least a portion of the thickness of the layer.

Ex. B, '417 Patent at 4:4–8.  In accordance with this definition, the specification consistently characterizes a compositionally-graded layer as a single, individual layer with a graded composition.  When a patent "repeatedly and consistently" characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization.  *See, e.g., VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1318 (Fed. Cir. 2014); *ICU Med., Inc. v. Alaris Med. Sys., Inc.*, 558 F.3d 1368, 1374–75 (Fed. Cir. 2009).

        a)    **The specification distinguishes a compositionally-graded layer from a layer with constant composition.**

The specification characterizes a compositionally-graded as an individual layer with a graded composition and distinguishes it from an individual layer with a non-graded (or constant) composition.  Both types of layers are grown by a chemical reaction. Ex. B, '417 Patent at 8:65–9:2.  The specification states that the chemical reaction "proceeds until a layer of desired thickness is achieved." *Id.* at 9:2–3.  This "desired thickness" is the same "thickness" referred to in the specification's definition of compositionally-graded layer.  *Id.* at 4:4–6 ("'compositionally-graded layer' refers to a layer having a composition that varies across at least a portion of the ***thickness*** of the layer.") (emphasis added).  Because this "thickness" is determined by when the chemical reaction is stopped, the layer is necessarily an individual layer.  Shealy Decl. at ¶ 23.  When the chemical reaction is stopped, an observable physical interface is formed, distinguishing the layer from any adjacent layer that may be subsequently formed on top of the layer.  *Id.*

Confirming that the specification's definition requires grading across an individual layer, the specification teaches that a compositionally-graded layer is made by adjusting, rather than maintaining constant, the process parameters during the chemical reaction that forms an individual layer.  The specification states, "The composition of the layer may be controlled, as described further below, by several factors including gas composition, gas concentration, and the reaction conditions

(e.g. temperature and pressure)." Ex. B, '417 at 9:3–6. A compositionally-graded layer is formed by adjusting the process parameters as the layer is grown. *Id.* at 9:36–56, 11:28–38. In contrast, a layer without grading (in other words, a layer with constant composition) is formed by maintaining the process parameters constant as the layer is grown. *Id.* at 9:67–10:3 ("When depositing the gallium nitride material layer (or the intermediate layer), however, the process parameters are maintained constant so as to provide a film having a constant composition."). Thus, whether the process parameters are adjusted or maintained constant during the growth of an individual layer determines whether that layer is a compositionally-graded layer. Shealy Decl. at ¶ 24.

> **b)   The specification distinguishes a compositionally-graded layer from the multi-layer superlattice.**

The patent figures also confirm that a compositionally-graded layer is an individual layer with grading. Figure 1 illustrates the compositionally graded layer 12 as a single layer—in contrast to Figure 3, which illustrates superlattice 22 as including multiple "individual layers 24a, 24b" (Ex. B, '417 Patent at 5:46–47, 50, 62; Shealy Decl. at ¶ 25). In these figures, the lines between the individual layers correspond to the observable, physical interface that is created when the chemical reaction forming each individual layer is stopped. *Id.*





Fig. 1                                 Fig. 3A

FIG. **1** illustrates a semiconductor material including a compositionally-graded transition layer according to one embodiment of the present invention.

FIGS. **3A** and **3B** illustrate a semiconductor material that includes a superlattice transition layer according to another embodiment of the present invention.

'417 Patent, Ex. D at 2:65-67            '417 Patent, Ex. D at 3:4-6

The specification later emphasizes the distinction in the number of individual layers in the compositionally-graded layer and superlattice.   The specification describes a transition layer that is a combination of a compositionally-graded layer and a superlattice.   The specification emphasizes that a compositionally-graded layer is a single layer in contrast to the superlattice (which the specification describes as having multiple "individual layers 24a, 24b," Ex. B, '417 Patent at 5:46–47, 50, 62):

> It should be understood that transition layer 12 may be formed of a combination of a ***single layer having a graded composition*** and a superlattice.  In some cases, the superlattice is formed over the ***single compositionally-graded layer***.  In other cases, the ***single compositionally-graded layer*** is formed over the superlattice.

*Id.*

### c)     Plaintiffs' argument is contrary to the specification.

Plaintiffs apparently contend that a compositionally-graded layer can encompass multiple layers, none of which are graded.  The specification provides no support for Plaintiffs' position.  It never refers to a compositionally-graded layer as including multiple individual layers like the superlattice.   Instead, the specification maintains a distinction between the two.  Shealy Decl. at ¶¶ 25–27. The specification likewise maintains a distinction between the compositionally-graded layer and non-graded layers such as the intermediate layer and gallium nitride material layer.  *Id.* at ¶ 22.  For the compositionally-graded layer, the process parameters are adjusted during the chemical reaction that grows an individual layer, whereas for the intermediate layer, the process parameters are held constant during the layer growth.  *Id.* at ¶ 24.  The consistent distinction in the specification between the compositionally-graded layer on the one hand and multi-layer structures and non-graded layers on the other demonstrate that Plaintiffs' interpretation cannot be correct.  *See, e.g.*, *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1376 (Fed. Cir. 2014) (rejecting attempt to construe "instructions" to

cover "data" where the "specification . . . maintain[s] a distinction between" those terms); *Chamberlain Grp. v. Lear Corp.*, 516 F.3d 1331, 1339 (Fed. Cir. 2008) (rejecting overbroad construction to "preserve the independent meaning" of the terms as used in the patent, which did "not permit these two terms to overlap").

**2.    The Week Patents' file histories support Defendants' construction.**

The statements Applicants made to the Patent Office when prosecuting the Weeks Patents likewise confirm that a compositionally-graded layer is an individual graded layer, and not multiple, ungraded layers as Plaintiffs contend. Statements made during prosecution are highly relevant to claim construction. "Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995). Rather, the public is "entitled to rely on [Applicants'] representations" to the Patent Office as to the scope of the invention and the extent of the patent's exclusionary rights. *Aylus Networks, Inc. v. Apple Inc.*, 856 F.3d 1353, 1359 (Fed. Cir. 2017); *Am. Piledriving Equip., Inc. v. Geoquip, Inc.*, 637 F.3d 1324, 1336 (Fed. Cir. 2011) (finding that the patentee "unambiguously argued that 'integral' meant 'one-piece' during reexamination and cannot attempt to distance itself from the disavowal of broader claim scope").

During prosecution of Application No. 15/240,789,[2] the Applicant unambiguously stated that individual layers cannot be combined to form a compositionally-graded layer. The Examiner took the position that three

---

[2] This Application is in the Weeks patent family, meaning it claims priority to same initial application and shares the same common specification as the Weeks Patents asserted in this case. Ex. F at 64–66. As a result, its file history is relevant to construing the claims in dispute. *Datamize LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1353 (Fed. Cir. 2005) (indicating that the prosecution history of a continuation application is relevant when construing the claims of the parent application) (abrogated on other grounds); *Microsoft Corp. v. Multi-Tech Sys. Inc.*, 357 F.3d 1340, 1349 (Fed. Cir. 2004) (stating that "the prosecution history of one patent is relevant to an understanding of the scope of a common term in a second patent stemming from the same parent application").

individual, non-graded layers in a prior art reference could be treated together as one compositionally-graded transition layer as recited in the claims.  Shealy Decl. at ¶ 28; Ex. C at 34–39.  The Applicant criticized the Examiner's analysis, pointing out that equating three layers with one layer "strips the term 'layer' of any appreciable meaning":

> In rejecting claim 16, the Office Action equated three different layers in the Shibata reference . . . to Applicant's claimed compositionally-graded transition layer[.]  This finding, i.e. that three layers can be one layer, strips the term 'layer' of any appreciable meaning and therefore is in clear error.

Ex. E at 58.[3]  Relying on a dictionary definition of "layer" and the specification's definition of "compositionally-graded layer," the Applicant argued that the claimed layer must be an "individual layer" with a graded composition and that multiple different layers cannot "be arbitrarily equated to the compositionally-graded layer of Applicants' claim invention":

> The Examiner construes the term 'layer' so broadly to include **three different layers 4, 5, and 61** of Shibata's light-emitting diode 10.  No reasonable construction of the term "layer" can include three separate layers.  Otherwise, any number of layers could be arbitrarily equated to the compositionally-graded transition layer of Applicant's claimed invention.  **None of the individual layers 4, 5 and 61** of Shibata's light-emitting diode 10 identified in the Office Action is a compositionally-graded transition layer comprising a gallium nitride alloy and a gallium concentration that increases from the back surface to the front surface of the layer.  Hence, the §103 rejection of pending independent claim 16 is in error and must be withdrawn.

Ex. E at 59–60.

Similar arguments were made during prosecution of the asserted EP '927 Patent from the same family.  There, Applicants tried to distinguish the claims from a prior art reference that disclosed three individual layers, each having a different but non-graded composition.  Shealy Decl. at ¶ 30; Ex. G at 105–106.  Applicants

---

[3] The referenced "Shibata" reference is attached as Exhibit D.

argued that the prior art—with its three individual layers of constant composition—did not "describe a compositionally-graded transition layer formed over the substrate." Ex. G at 112–113.  According to Applicants, "choosing compositions of buffer layers is <u>not</u> the same as forming a compositionally-graded transition layer." *Id.*

The prosecution history discussed above leaves no room for doubt about the meaning of the terms in dispute.  A compositionally-graded transition layer must be an individual layer whose composition changes over its thickness.  Plaintiffs' argument that would allow multiple, separate non-graded layers to be treated together as a compositionally-graded layer is flatly contrary to the prosecution arguments.  Plaintiffs' interpretation would allow exactly what the prosecution history confirms the invention does not:  Under Plaintiff's interpretation, "any number of layers could be arbitrarily equated to the compositionally-graded transition layer of Applicant's claimed invention."  Ex. E at 60.  Plaintiffs' interpretation therefore cannot be correct.

### 3.   Plaintiffs' "multiple layers" argument would strip "compositionally-graded layer" of its meaning and render claims indefinite.

The Supreme Court has repeatedly held that patent claims must delineate the outer boundaries of the claimed subject matter with "reasonable certainty" to give the public full and fair notice of what the patent covers and what is free for all to use.  *Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014). *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996); *United Carbon Co. v. Binney & Smith Co.*, 317 U.S. 228, 236 (1942) (holding that a patent may not create a "zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims").  Thus, "[e]ven if a claim term's definition can be reduced to words, the claim is still indefinite if a person of ordinary skill in the art cannot translate the definition into meaningfully precise claim scope."

1    *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1251 (Fed. Cir. 2008).

2         By arguing that multiple, non-graded layers can be combined to create a

3    compositionally-graded layer, Plaintiffs strip "compositionally-graded layer" of its

4    meaning, rendering it indefinite.  Dr. Shealy analyzed a hypothetical structure and

5    showed how Plaintiffs' interpretation allows arbitrary line-drawing to identify what

6    structures would correspond to the claim terms "compositionally graded layer" and

7    "intermediate layer."  Shealy Decl. at ¶¶ 35–40.  Under Plaintiffs' interpretation,

8    depending on how a person skilled in the art chose to identify those layers, the

9    structure might have one or possibly two compositionally-graded layers.  *Id.* at ¶¶

10   38–40.  But, at the same time, with a different and equally plausible identification

11   of the layers under Plaintiffs' interpretation, the structure would have no

12   compositionally-graded layer at all.   Similar problems arise in identifying the

13   number and location of the intermediate layers under Plaintiffs' interpretation, since

14   there would be no reliable way to distinguish them from a compositionally-graded

15   layer.  Given Plaintiffs' overbroad and amorphous interpretation, a person skilled in

16   the art could arbitrarily select the location and boundaries of both types of layers,

17   and those selections would change the outcome of the infringement analysis.  *Id.*

18   Thus, it is impossible for someone skilled in the art to determine with reasonable

19   certainty whether a particular structure infringes the claims of the Weeks Patents,

20   making the claims indefinite.  Shealy Decl. at ¶ 40.  *See Geneva Pharm., Inc. v.*

21   *GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003) ("A claim is

22   indefinite if its legal scope is not clear enough that a person of ordinary skill in the

23   art could determine whether a particular composition infringes or not.").  To avoid

24   these indefiniteness issues and give meaning to "compositionally-graded layer"

25   consistent with its usage in the specification and the file history, Defendants'

26   proposed construction should be adopted.  *See Meds. Co. v. Mylan, Inc.*, 853 F.3d

27   1296, 1302–03 (Fed. Cir. 2017) (rejecting proposed construction that would not

28   provide "reasonable certainty" regarding the scope of the asserted claims).

**B.** **"intermediate layer"**

| Defendants | Plaintiffs |
|---|---|
| A layer with a generally constant composition throughout its thickness located between the substrate and the gallium nitride material layer. | No construction is needed; the plain and ordinary meaning to one of skill in the art should be applied. |

This term appears in '034 Claim 13; '119 Claim 14; '335 Claim 3; '686 Claim 6; '862 Claim 16; '921 Claim 15; and EP '927 Claims 3 and 10. Although Plaintiffs have not provided a construction, it appears that the parties' dispute is whether an "intermediate layer" has "a generally constant composition."[4]

The specification establishes that an intermediate layer has a "generally constant composition." The specification states, "The composition of the intermediate layer is generally constant throughout its thickness." Ex. B, '417 Patent at 8:34–35.[5] The specification expressly contrasts an intermediate layer with a compositionally-graded layer based on the intermediate layer's constant composition. After describing how to form a compositionally-graded layer by adjusting the process parameters during the growth of an individual layer, the specification states, "When depositing the gallium nitride material layer (or the *intermediate layer*), however, the process parameters are maintained constant so as to provide a film having a constant composition." *Id.* at 9:67–10:3 (emphasis added). Because the specification consistently "maintain[s] a distinction" between an intermediate layer and a compositionally-graded layer based on the intermediate layer's constant composition, the correct construction should account for this

---

[4] Plaintiffs indicated that their expert would testify that "an 'intermediate layer' is not limited to having a constant composition." Ex. N, Pl. Preliminary Disclosure of Claim Construction Evidence at 4. Plaintiffs apparently agree that the intermediate layer must be "located between the substrate and the gallium nitride material layer," as stated in Defendants' proposal. The specification supports this location requirement. Shealy Decl. at ¶ 34.

[5] The Weeks Patents use the same description for the gallium nitride material layer and contrasts it with the compositionally-graded transition layer 12: "The composition of gallium nitride material layer 16 is generally constant across its thickness as distinguished with transition layer 12. Ex. B, '417 at 6:37–40.

distinction.  *Interval Licensing*, 766 F.3d at 1376.  Thus, the intermediate layers must have a generally constant composition.

This constant composition requirement is necessary to allow someone skilled in the art to distinguish an intermediate layer from a compositionally-graded layer. Shealy Decl. at ¶¶ 33, 35–40.  The Weeks Patents fail to provide any other distinguishing characteristic.[6]  Without the constant composition requirement, someone skilled in the art would not know how to distinguish a compositionally graded layer and an intermediate layer.  Shealy Decl. at ¶¶ 35–40, 50.  Thus, identifying a layer as either a "compositionally-graded layer" or an "intermediate layer" would become arbitrary, rending the claim indefinite.  *See supra* Sec. I.A.3.

### C.   "substantially matches"

| Defendants | Plaintiffs |
|---|---|
| Compositions that are the same, setting aside slight differences introduced by the manufacturing process. | No construction is needed; the plain and ordinary meaning to one of skill in the art should be applied, including that an intentional difference between two layers greater than those introduced by the manufacturing process can substantially match. |

Claim 1 of the '417 Patent, Claim 15 of the '921 Patent, and Claim 16 of the '862 Patent each use the term "substantially matches" to compare the composition at the top of the "transition layer" with the bottom of the "gallium nitride material layer" (or "III-nitride layer").  In the context of the Weeks patents, "substantially matches" refers to "compositions that are the same, setting aside slight differences introduced by the manufacturing process."  Plaintiffs offer no competing construction, instead insisting that none is needed and that the plain meaning should apply.  Yet Plaintiffs do not explain what that plain meaning is, except to say that

---

[6] According to the Weeks Patents, a compositionally-graded layer and an intermediate layer can share many characteristics, such as being located between the substrate and the gallium nitride material layer; being composed of an alloy of gallium nitride, *see, e.g.,* Ex. B, '417 at 4:14–15, 8:36–37; and performing the function of relieving stress in the gallium nitride material layer.  *Id.* at 6:54–55, 8:8:28–30.

1    Defendants' construction is wrong.

2         The specification does not define or even use the term "substantially
3    matches."  It does, however, compare the relative compositions of the top of the
4    transition layer and the gallium nitride material layer—the same comparison as the
5    claims at issue.  Ex. B, '417 Patent at 4:52–59.  In its only descriptions of such a
6    comparison, the specification twice emphasizes the desirability of the two having
7    the same composition.  First, it states that it is "particularly preferred" for the top of
8    the transition to be GaN when the gallium nitride material layer is GaN.  *Id.* at
9    4:52–55.  Second, it states that if the gallium nitride material is an alloy of GaN
10   (*i.e.*, AlGaN, InGaN, or AlInGaN) instead of GaN, it is "preferable" for the
11   composition of the top of the transition layer to be "the same."  *Id.* at 4:55–59.

12        The prosecution history confirms that the "substantially matches" limitations
13   are directed to this aspect of the invention.  The claim language at issue was added
14   during the prosecution of the '921 Patent to distinguish from earlier-issued
15   members of the Weeks patent family and thereby overcome a double patenting
16   rejection.  Ex. J at 133–34; Shealy Decl. at ¶¶ 43–44.  In explaining the amendment,
17   Applicants equated this added claim language with the preferred embodiment in
18   which the compositions are "the same," citing the specification passage discussed
19   above.  Ex. K at 141 ("Applicants have expressly taught that, in one embodiment, it
20   may be preferable that a composition of the top surface of the transition layer (e.g.,
21   top surface 20 of transition layer 12) be the same as the composition of the gallium
22   nitride material layer (e.g., gallium nitride material layer 16).").  Thus, the intrinsic
23   record confirms that the "substantially matches" claim language is directed to the
24   embodiments in which the two relevant portions have "the same" composition.

25        A person skilled in the art recognizes that even if two layers were designed to
26   have precisely the same composition, variations could occur during the
27   manufacturing process, resulting in a very slight mismatch.  Shealy Decl. at ¶ 47.
28   Defendants' construction permits such minor variations by allowing for "slight

differences introduced by the manufacturing process."   By contrast, Plaintiffs apparently intend to stretch the term "substantially matches" to cover even very large mismatches.   Such an interpretation is wholly untethered from the embodiments of the invention to which the claims are directed.  Plaintiffs are "not entitled to a claim construction divorced from the context of the written description and prosecution history."  *Eon Corp. IP Holdings LLC v. Silver Spring Networks, Inc.*, 815 F.3d 1314, 1320 (Fed. Cir. 2016).  Only Defendants' proposal comports with the intrinsic record and should therefore be adopted.

**D.   "a composition of said transition layer at a top surface thereof substantially matches a composition of said gallium nitride material layer [or III-nitride layer] at a bottom surface thereof"**

| Defendants | Plaintiffs |
|---|---|
| Indefinite. | No construction is needed; the plain and ordinary meaning to one of skill in the art should be applied.  See above construction for "substantially matches." |

This limitation appears in Claim 1 of the '417 Patent and Claim 15 of the '921 Patent.  Claim 16 of the '862 patent contains a very similar limitation, except that it more broadly recites a "III-nitride material layer" instead of specifying a "gallium nitride material layer."  As explained in Section C above, this limitation requires comparing two portions of a semiconductor structure to determine if their compositions "substantially match[]."  The problem is that the patents provide insufficient guidance as to how to identify the two portions whose compositions must be compared.  Consequently, it is impossible to determine the scope of the claims with "reasonable certainty."  *Nautilus,* 134 S. Ct. at 2124.

A patent "must be precise enough to afford clear notice of what is claimed, thereby appris[ing] the public of what is still open to them."  *Id.* at 2123.  Thus, a claim is indefinite if its "scope is not clear enough that a person of ordinary skill in the art could determine whether a particular composition infringes or not."  *Geneva Pharm., Inc. v. GlaxoSmithKline PLC*, 349 F.3d 1373, 1384 (Fed. Cir. 2003).  Such

uncertainty is especially acute when the claims involve terms of comparison or degree—such as the "substantially matches" limitation at issue here—but fail to provide enough guidance as to the reference points for that comparison.

*Liberty Ammunition, Inc. v. United States* provides a useful example. 835 F.3d 1388 (Fed. Cir. 2016). The claim at issue required a projectile (such as a bullet) to have a "reduced area of contact." *Id.* at 1395. Whether an accused projectile has a "reduced area of contact" depends on the specific baseline against which the accused projectile is being compared. Under the district court's construction, the baseline for the comparison was a range of conventional bullets having calibers between .17 and .50. *Id.* at 1397. On appeal, the Federal Circuit explained that the district court's construction would make the claim indefinite because—despite the objective criteria it provided—"a multitude of candidates for the conventional baseline projectile would remain." *Id.* This multitude of available candidates for comparison would create "mixed results" as to infringement (*i.e.*, a projectile may have a "reduced area of contact" based on a comparison with one candidate but be missing that limitation based on a comparison with a different candidate). *Id.* at 1398. The appellate court concluded that such a "scattershot infringement analysis" is a hallmark of indefiniteness. *Id.*

Here, the uncertainty regarding the specific comparison points whose compositions must "substantially match" presents the very same problem. Performing this compositional comparison requires identifying the "top surface" of the transition layer and the "bottom surface" of the gallium nitride material layer (or III-nitride layer). This in turn requires distinguishing between these two claimed layers and any other layers that may be present in an accused structure. Yet the Weeks patents fail to provide enough information to do so. Shealy Decl. at ¶¶ 49–55. For example, the specification discusses various different layers, such as a transition layer, a gallium nitride material layer, and an intermediate layer, all of which are described as being composed of gallium nitride or one of its alloys. *Id.* at

¶ 50.  Thus, the chemical composition of layers does not allow one type of layer to be distinguished from another.  *Id.*



Consider the hypothetical five-layer semiconductor structure depicted above. Even assuming *arguendo* that Layer 5 is the gallium nitride (or III-nitride) material layer (meaning that one of the two comparison points is fixed),[7] the other comparison point—the top of the transition layer[8]—remains elusive.  *Id.* at ¶¶ 52–54.  If Layers 1 through 4 are collectively taken as the transition layer, then the top of Layer 4 is the relevant comparison point (a 0% difference).  *Id.* at ¶ 54.  But, on the other hand, Layer 4 could instead be an intermediate layer, leaving the top of Layer 3 as the top of the transition layer (20% difference).  *Id.*  It is also possible, however, that both Layers 3 and 4 could be intermediate layers, leaving the top of Layer 2 as the top of the transition layer (50% difference), and so on.  *Id.* Ultimately, then, any of Layers 1 through 4 could be the other comparison point that must "substantially match" Layer 5.  *Id.*  But depending on which is chosen, the compositional difference could vary greatly—anywhere from 0% to 80% in the

---

[7] Without this simplifying assumption, the further difficulty involved in determining which layer would be the gallium nitride (or III-nitride) material layer only compounds the uncertainty.

[8] '417 Claim 1 and '862 Claim 16 do not require any grading, and so the transition layer is not necessarily limited by the construction proposed above in Section I.A.

example shown.[9]  *Id.*   As in *Liberty Ammunition*, this "scattershot infringement analysis" makes it impossible to determine infringement for this example structure. *Id.* at ¶ 55.   Accordingly, the claims of the Weeks Patents that recite these limitations are indefinite. *See Geneva Pharm., Inc.*, 349 F.3d at 1384.

### E.   "an alloy of gallium nitride selected from the group consisting of $Al_xIn_yGa_{(1-x-y)}N$, $In_yGa_{(1-y)}N$, and $Al_xGa_{(1-x)}N$"

| Defendants | Plaintiffs |
|---|---|
| An alloy of gallium nitride selected from the group consisting of $Al_xIn_yGa_{(1-x-y)}N$, $In_yGa_{(1-y)}N$, and $Al_xGa_{(1-x)}N$, wherein x, y, (1-x-y), (1-x), and (1-y) are decimals greater than 0 and less than 1, representing a relative amount of each respective element as a percentage of the total amount of all Group III elements (Al, In, Ga). | No construction is needed; the plain and ordinary meaning to one of skill in the art should be applied, including that x may equal zero, y may equal zero, and the sum of (x+y) may equal zero, representing a relative amount of each respective element as a percentage of the total amount of Group III elements (Al, In, Ga) |

This limitation appears in Claim 10 of the EP '927 Patent.  The parties' dispute focuses on the subscripts in the chemical formulas $Al_xIn_yGa_{(1-x-y)}N$, $In_yGa_{(1-y)}N$, and $Al_xGa_{(1-x)}N$.  The parties agree that the subscripts represent "a relative amount of each respective element as a percentage of the total amount of Group III elements (Al, In, Ga)."[10]  Thus, if a subscript is zero, then based on the parties' agreed understanding, the chemical element associated with that subscript is not present.  The parties' dispute is over which, if any, of the subscripts may be zero.   Defendants contend that each chemical element in the three chemical formulas must be present and, thus, that none of the subscripts can be zero.[11]

---

[9] The same problem exists with respect to the gallium nitride (or III-nitride) material layer, compounding the uncertainty.  Assuming *arguendo* that Layer 1 is the claimed transition layer, the GaN material layer could be any of Layers 2, 3, 4, or 5.  Because the bottom surface of the gallium nitride (or III-nitride) material layer is uncertain, the composition difference could be 30% (Layer 2), 60% (Layer 3), or 80% (Layer 4 or 5) depending on which layer is the GaN material layer.

[10] The word "all" before "Group III elements" in Defendants' construction does not change the meaning and thus does not raise a dispute.

[11] Resolution of the parties' dispute as to whether the subscripts can be zero would necessary also resolve any dispute about whether the subscripts can be one. As Dr. Shealy explains, if none of the subscripts can be zero, then the subscripts—x, y, (1-x-y), (1-x), and (1-y)—are all "decimals greater than 0 and less than 1" as provided in Defendants' construction.  Shealy Decl. at ¶ 57.

Plaintiffs contend that subscripts x and y can be zero.[12]

Based on the specification and the surrounding claim language, the three chemical formulas represent three different alloys of gallium nitride.

- $Al_xIn_yGa_{(1-x-y)}N$ is aluminum indium gallium nitride.

- $In_yGa_{(1-y)}N$ is indium gallium nitride.

- $Al_xGa_{(1-x)}N$ is aluminum gallium nitride.

To represent these three distinct alloys, each the identified chemical elements—aluminum, indium and gallium—must actually be present, which means that none of the subscripts can be zero.

### 1. The specification of the Weeks Patents supports Defendants' construction.

When the specification uses the terms $Al_xIn_yGa_{(1-x-y)}N$, $In_yGa_{(1-y)}N$, and $Al_xGa_{(1-x)}N$ together as in Claim 10, the specification uses these formulas to refer to three different alloys of gallium nitride—aluminum indium gallium nitride, indium gallium nitride, and aluminum gallium nitride.

For example, in several instances, the specification uses all three of the formulas together to refer to the three different alloys. The specification states, "Gallium nitride material layer 16 is formed of gallium nitride (GaN) or any of its alloys including aluminum gallium nitride ($Al_xGa_{(1-x)}N$), indium gallium nitride ($In_yGa_{(1-y)}N$), and aluminum indium gallium nitride ($Al_xIn_yGa_{(1-x-y)}N$)." Ex. B, '417 Patent at 6:34–37. Similarly, the specification states, "Intermediate layer 28, for example, can be composed of a GaN alloy such as aluminum gallium nitride ($Al_xGa_{(1-x)}N$), indium gallium nitride ($In_yGa_{(1-y)}N$), and aluminum indium gallium nitride ($Al_xIn_yGa_{(1-x-y)}N$)." *Id.* at 8:36–39; *see also id.* at 3:38–45. To represent the three different alloys as expressly described in the specification, each of the individual chemical elements—aluminum, indium and gallium—must be present.

---

[12] Plaintiffs apparently agree that that gallium nitride must be present and thus that the other subscripts (1-x-y), (1-x), and (1-y) cannot be zero.

Thus, one skilled in the art would understand that none of the subscripts in the formulas can be zero. Shealy Decl. at ¶ 62.

In another instance, the specification uses two of the formulas, $Al_xGa_{(1-x)}N$ and $Al_xIn_yGa_{(1-x-y)}N$, together and makes clear that each of the identified chemical elements must be present (*i.e.*, that the subscripts cannot be zero). The specification describes $Al_xGa_{(1-x)}N$ as being "free of indium," which is contrasted with "[w]hen indium is present in transition layer 12 (*i.e.* $Al_xIn_yGa_{(1-x-y)}N$)." Ex. B, '417 Patent at 4:62–5:1. The only difference between these chemical formulas is the inclusion of indium (In) with the subscript y. For indium to be "present" as stated in the specification, the subscript for indium [y] cannot be zero. Shealy Dec. at ¶ 63.

Therefore, based on the specification's use of the chemical formulas $Al_xIn_yGa_{(1-x-y)}N$, $In_yGa_{(1-y)}N$, and $Al_xGa_{(1-x)}N$ to refer respectively to aluminum indium gallium nitride, indium gallium nitride, and aluminum gallium nitride, a person skilled in the art would understand that each identified chemical element must be present, meaning that none of the subscripts in the formulas can be zero.

**2. The surrounding claim language supports that subscripts cannot be zero.**

Claim 10 requires that each of the three chemical formulas is an "alloy of gallium nitride." The specification establishes that gallium nitride, by itself, is ***not*** an alloy of gallium nitride. Shealy Decl. at ¶¶ 59–60. To be an alloy, gallium nitride must be combined with another element, such as aluminum or indium. *Id.* The three chemical formulas in Claim 10 include different added elements to represent different alloys.

- $Al_xGa_{(1-x)}N$ adds aluminum to form the alloy *aluminum* gallium nitride.
- $In_yGa_{(1-y)}N$ adds indium to form the alloy *indium* gallium nitride.
- $Al_xIn_yGa_{(1-x-y)}N$ adds both aluminum and indium to form *aluminum indium* gallium nitride.

1    Thus, the three chemical formulas represent the same three alloys identified in the

2    specification.  Because the added elements must be present to form an "alloy of

3    gallium nitride" as required by the claims, none of the subscripts can be zero.

4         If the subscript x could be zero as Plaintiffs contend, the three formulas

5    would make no sense in the context of Claim 10.  $Al_xGa_{(1-x)}N$ would be gallium

6    nitride (because no aluminum would be present).  Shealy Decl. at ¶¶ 62, 66.  That

7    makes no sense because gallium nitride is not an *alloy* of gallium nitride as Claim

8    10 requires.  Moreover, the two remaining formulas ($Al_xIn_yGa_{(1-x-y)}N$ and $In_yGa_{(1-y)}N$)

9    would become redundant of one another because, without aluminum, they

10   would both represent indium gallium nitride.  *Id.* at ¶¶ 62, 67.  This is also improper

11   because it would render a claim term superfluous.  *Id.* at ¶ 67.  *Innova/Pure Water*

12   *v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004) (rejecting a

13   proposed construction that renders a claim limitation superfluous).

14        Similarly, if the subscript y could be zero as Plaintiffs contend, the three

15   formulas would make no sense for the same reasons.  $In_yGa_{(1-y)}N$ would be gallium

16   nitride (because no indium would be present)—which, again, is not an *alloy* of

17   gallium nitride as the claim requires.  Shealy Decl. at ¶¶ 62, 66.  And the two

18   remaining formulas ($Al_xIn_yGa_{(1-x-y)}N$ and $Al_xGa_{(1-x)}N$) would be redundant because,

19   without indium, both formulas would represent aluminum gallium nitride.  *Id.* at

20   ¶¶ 62, 67.

21        If both the subscripts could be zero as Plaintiffs contend, neither aluminum

22   nor indium would be present, and as a result, all three formulas would simply be

23   gallium nitride—which is not an *alloy* of gallium nitride as the claim requires.  *Id.*

24   at ¶¶ 62, 66–67.  Thus, all three would be entirely redundant of one another.  *Id.*

25        Based on the specification and the surrounding claim language, the three

26   chemical formulas ($Al_xIn_yGa_{(1-x-y)}N$, $In_yGa_{(1-y)}N$, and $Al_xGa_{(1-x)}N$) represent three

27   different alloys of gallium nitride—aluminum indium gallium, indium gallium, and

28

aluminum gallium—and thus each of the identified chemical elements—aluminum, indium and gallium—must be present, meaning that the subscripts cannot be zero.

### F.    "said transition layer is discontinuously graded"

| Defendants | Plaintiffs |
|---|---|
| A compositionally-graded layer that is discontinuously graded. | No construction is needed; the plain and ordinary meaning to one of skill in the art should be applied, including that "transition layer" can include multiple layers or sub-layers and that "compositionally-graded" and "transition" are not exact synonyms. |

This term appears in Claim 2 of the '775 Patent.  The parties' dispute is whether the discontinuously graded transition layer of Claim 2 is a single layer or can include multiple layers. Defendants contend that the discontinuously-graded transition layer of Claim 2 must be a single layer and, therefore, a compositionally-graded layer as specified above in Section I.A.

Those skilled in the art use the modifiers "continuous" and "discontinuous" to describe grading across the thickness of an individual layer as opposed to grading across multiple layers.  Shealy Decl. at ¶ 72.  Consistent with this well-understood usage, the Weeks Patents use the modifiers "continuous" and "discontinuous" (or other variation such as "continuously" or "discontinuously") to describe grading across the thickness of a single, compositionally-graded layer.  Shealy Decl. at ¶¶ 74–75, 78; Ex. B, '417 Patent at 5:3–7, 5:26–32, 11:52–53.  For example, the patents use those terms to describe the profiles shown in Figures 2D, 2F, 2G, and 2H.  Shealy Decl. at ¶ 75.  In contrast, the specification never uses those terms to describe a grading profile across multiple layers, such as the superlattice 22.  When describing the multi-layer superlattice, the specification states that the grading profiles of Figures 2A to 2I apply to "each individual layer 24a, 24b" as opposed to the superlattice as a whole.  Shealy Decl. at ¶ 77; Ex. B, '417 Patent at 5:43–46.

Accordingly, based on the understanding of a person skilled in the art and the specification's use of "discontinuously-graded" and "continuously-graded," the

discontinuously-graded transition layer of Claim 2 must be a compositionally-graded transition layer, as defined above.

## II.   '015 Patent Disputed Terms

### A.   "an amorphous silicon nitride-based material layer formed directly on the entire top surface of the silicon substrate"

| Defendants | Plaintiffs |
|---|---|
| An amorphous silicon nitride-based material deposited as a separate layer on the entire top surface of the substrate rather than converting the top surface of the substrate to silicon nitride-based material. | A non-crystalline silicon nitride-based material layer formed on essentially the entire top surface of the silicon substrate, with no intervening layer, although minor defects might exist. |

This claim term appears in Claim 41 of the '015 Patent and presents two fundamental disputes. The first dispute is over the meaning of "formed . . . on the . . . top surface of the silicon substrate." Defendants contend this language covers a silicon nitride layer *deposited* on the top surface of the substrate but excludes a silicon nitride layer formed by *converting* a portion of the substrate under the top surface from silicon to silicon nitride. Plaintiffs contend Claim 41 encompasses silicon nitride layers formed by either deposition or conversion. The second dispute is over the meaning "entire." Defendants contend "entire" means entire, but Plaintiffs contend "entire" means "essentially the entire."[13]

### 1.   The claim language "formed . . . on the . . . top surface of the silicon substrate" limits Claim 41 to a silicon nitride layer deposited on the top surface of the substrate.

As both sides explained in their technology tutorials, the '015 Patent describes two ways of forming a silicon nitride layer. First, the '015 Patent describes conversion—a process of forming a silicon-nitride layer by converting a region under the top surface of the substrate from silicon to silicon nitride. Ex. O,

---

[13] Plaintiffs also substitute the word "non-crystalline" for "amorphous." Defendants are not aware of any difference in meaning between these two terms or any dispute that turns on some alleged difference in meaning. Given that "non-crystalline" is no less technical or more understandable than "amorphous," Defendants believe the Court should use the claim term "amorphous," unless and until Plaintiffs identify a substantive dispute that needs to be resolved.

'015 Patent at 5:37–42.  Second, the '015 Patent describes deposition—a process of forming a separate silicon nitride layer and depositing it on the top surface of the substrate.  *Id.* at 5:46–50.

After describing both ways of creating the layer, '015 Patent defines four specific phrases ("formed on the substrate," "formed over the substrate," "formed directly on the substrate," and "covering the substrate") as applying generally to both conversion and deposition.  *Id.* at 5:37–50.   In certain unasserted patent claims, the Applicants used one of the defined phrases, clearly signaling that the claim scope covers silicon nitride layers created by both conversion and deposition.[14]   Significantly, however, in the claim at issue here, Claim 41, the Applicants chose **not** to use any of the four defined phrases.  Instead, Claim 41 specifically recites "a silicon substrate including a *top surface*" and then requires that an amorphous silicon nitride–based material layer be "formed directly *on the . . . top surface* of the silicon substrate."  When different claim terms are used, there is a presumption "that the use of these different terms in the claims connote different meanings."  *CAE Screenplates Inc. v. Heinrich Fiedler GmbH & Co. KG*, 224 F.3d 1308, 1317 (Fed. Cir. 2000) (construing "bottom plane" more narrowly than "bottom").  That is especially true here, where the Applicants chose ***not*** to use specific terms expressly defined in the specification.

Rather than use the four phrases defined in the specification, the Applicants created a new term that added the concept of being formed on the "top surface."  This added language significantly distinguishes the claim term at issue from the terms defined in the specification because ***only*** deposition results in a silicon nitride layer formed on the top surface.  Conversion involves converting "the surface region" of the substrate—*i.e.*, the region below the top surface of the substrate—

---

[14] *See, e.g.*, Ex. P, U.S. Patent No. 8,748,298 at Claim 1 ("formed directly on the substrate").  This related patent claims priority to the same original patent filing and thus shares the same common specification.

from silicon to silicon nitride-based material.  Ex. O at 5:37–42.  The resulting silicon nitride layer, therefore, is ***below*** the top surface of the substrate, and thus it is not formed on the "top surface" as required by Claim 41.  In contrast, deposition involves forming "a ***separate*** silicon nitride layer (e.g., using a ***separate*** nitrogen source and silicon source)" and then "depositing [it] ***<u>on the top surface</u>*** of the substrate."  *Id.* at 5:46–50.[15]  This separate silicon nitride layer is formed on the "top surface" as required by Claim 41.   Thus, Claim 41 is limited to silicon nitride layers formed by deposition as opposed to conversion.

### 2. The claim term "entire" means entire—not "essentially the entire" as Plaintiffs propose.

Plaintiffs wrongly try to rewrite the claim language "the entire top surface" of the substrate to "***essentially*** the entire top surface" of the substrate.  The term "entire" means entire.   There can be no justification for Plaintiffs' proposed substantive change in meaning.  When the Applicants wanted to claim less than the entire top surface of the substrate, the Applicants did so.  For example, Claim 1 refers to "a majority of the top surface" of the substrate.   Additionally, the specification describes an embodiment in which the silicon nitride layer covers "substantially the entire top surface" of the substrate.  *Id.* at 5:51–57.   The Applicants chose to limit Claim 41 to "the entire top surface" as opposed to "a majority of the top surface" or "substantially the entire top surface."  The differing scope of these distinct claim terms should be preserved.  *See CAE Screenplates Inc.*, 224 F.3d at 1317.  Plaintiffs cannot now rewrite the claim.  Thus, the claim term "entire" means entire.[16]

---

[15] The specification distinguishes deposition from conversion by stating that the layer is "not formed by converting a surface region of the substrate." *Id.* at 5:46–50

[16] Plaintiffs also try to insert another qualification "although minor defects might exist."  This language has no basis in the intrinsic record.  Furthermore, because it is unclear what Plaintiffs' qualification means, it adds ambiguity rather than resolving actual disputes as to meaning.

III.   **'889 Patent Disputed Terms**

A.   **"a silicon nitride-based material layer formed between the silicon substrate and the III-nitride material region"**

| Defendants | Plaintiffs |
|---|---|
| Indefinite. | No construction is needed; the plain and ordinary meaning to one of skill in the art should be applied. |

This term appears in Claim 9 of the '889 Patent.  Defendants contend that the term "formed between" is indefinite because the specification renders the meaning of the term uncertain to one of ordinary skill in the art.  Shealy Decl. at ¶ 86.

When read in light of the specification and the file history, a claim must inform those skilled in the art about the scope of the invention with reasonable certainty.  *Nautilus*, 134 S. Ct. at 2124.  Claims can never be considered in a vacuum, but instead "must be read in view of the specification, of which they are a part."  *Phillips*, 415 F.3d at 1313.  Where the specification creates uncertainty as to the meaning of a claim term, the claim is indefinite.  *See, e.g.*, *Transcend Med., Inc. v. Glaukos Corp.*, No. 13-830, 2015 WL 5546988, at *5–*7 (D. Del. Sept. 18, 2015); *Unique Concepts, Inc. v. Manuel*, No. 85 C 4181, 1986 WL 8039, at *6–*7 (N.D. Ill. July 16, 1986).  For example, in *Transcend*, the district court determined that the specification rendered the claim term "choroid" indefinite.  *Transcend*, 2015 WL 5546988, at *5–*7.  The court acknowledged that, ignoring the context of the specification, the term has a plain and ordinary meaning.  *Id*. at *6.  But the specification used the term in inconsistent ways, creating uncertainty as to the intended meaning.  *Id*. at *6.  Due to the uncertainty created by the specification, the court concluded that the claim term is indefinite.  *Id*. at *7.

As in *Transcend*, the claim term at issue here cannot be reasonably understood when read in the context of the specification.  The claim requires a silicon nitride-based material layer that is "formed between" a silicon substrate and a III-nitride material region.  Shealy Decl. at ¶ 82.  The specification explains that when a layer is "formed between" the substrate and III-nitride region, the "III-

nitride material region may be formed **directly on** the substrate." Ex. M, '889 Patent at 5:3–6 (emphasis added).  According to the specification "directly on" means that "no intervening structure is present." *Id*. at 3:8–9.  Thus, according to the specification, when the silicon nitride-based material layer is "formed between" the substrate and the III-nitride material region, there may be no intervening layer (such as the silicon nitride-based material layer) between the substrate and the III-nitride material region.  *Id*. at 3:8–9, 5:3–6.  These contradictory statements make no sense, and the '889 Patent provides no guidance on how to reconcile these statements with the plain and ordinary meaning of "formed between."  Shealy Decl. at ¶ 83–85.  As a result, one skilled in the art is left uncertain as to the scope of the term "formed between."  *See id.* at ¶ 86.   The uncertainty created by the specification's use of this term renders the claim indefinite. *See Transcend*, 2015 WL 5546988, at *5–*7.

## IV.   '002 Patent Disputed Terms

### A.    "the via is formed through the substrate"

| Defendants | Plaintiffs |
|---|---|
| The opening is etched from the bottom surface to at least the top surface of the substrate. | No construction is needed; the plain and ordinary meaning to one of skill in the art should be applied, including that the via forms a vertical conducting path through the substrate and that the via need not be created using a particular manufacturing process (e.g., this claim is not limited to vias that are etched from the backside of the substrate to the front side of the substrate). |

This claim term appears in Claim 8 of the '002 Patent, which depends from Claim 1.  Claim 1 recites "a silicon substrate having at least one via extending from a backside of the substrate," and Claim 8 adds that "the via is formed through the substrate."  The Defendants contend that the via in Claim 8 is an opening that is formed from the bottom surface to at least the top surface of the substrate.

Plaintiffs do not appear to dispute that a via is an opening.[17]   Plaintiffs dispute whether the via in Claim 8 must be formed *from the bottom surface* of the substrate.   Plaintiffs seek to avoid the plain meaning of the claims and the specification's description of the invention as a backside via.

### 1.   The alleged "invention" described in the specification is a backside via.

The specification of the '002 Patent establishes that the alleged invention is a backside via.  When a patent states that the "invention" includes a certain feature, then the claims should be construed to include that feature.  *See, e.g.*, *Verizon Servs. Corp. v. Vonage Holdings Corp.*, 503 F.3d 1295, 1308 ("When a patent thus describes the features of the 'present invention' as a whole, this description limits the scope of the invention."); *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1318 (Fed. Cir. 2006).  The title of the patent is "Gallium Nitride Material Devices and Methods Including *Backside Vias*."  Both the Abstract and other parts of the specification repeatedly state that the alleged "invention" is a backside via.  Ex. Q, '002 Patent at Abstract ("The *invention* includes providing gallium nitride material devices having *backside vias* and methods to form the devices.") (emphasis added); *id.* at 3:36–37 ("The *invention* provides gallium nitride material devices including *backside vias* and methods to form the devices.") (emphasis added).  The patent defines "backside" to mean the bottom surface of the device.  *Id.* at 4:20–21.

Moreover, every figure of the '002 Patent shows a backside via formed from the bottom surface of the device. *Id.* at Figures 1–8; 3:11–32.  As seen in each of these figures, a backside via (labeled 24) is formed from the bottom surface of a substrate (labeled 12).  *See id.* at Figures 1–8.  The specification states that "conventional etching techniques may be used to form via 24."  *Id.* at 8:27–28.

---

[17] The claims and the specification distinguish between the via and the "electrical contact," which is the conductive material formed in the opening of the via.  Claim 1 separately recites "an electrical contact formed in the via."

Etching is much like digging a hole in the ground.  It involves using a chemical, gas, or plasma to remove ("etch") material from the surface of an existing layer—in this case, the bottom surface of the substrate.  *Id.* at 8:28–29 (referring to "chemical etching and plasma etching").  For example, with reference to Figure 1, the patent describes using one process ("a fluorine-based RIE process") to etch through substrate 12, and then after the underlying layers are exposed, using another process ("chlorine-based RIE process") to etch through those layers.  *Id.* at 8:31–36.

The specification consistently describes the alleged invention as a backside via formed from the bottom surface of the substrate.  The specification never describes a top-side via formed from the top surface of the device.  Thus, the claims should be limited to a backside via formed from the bottom surface of the substrate. *Ruckus Wireless, Inc. v. Innovative Wireless Sols.*, LLC, 824 F.3d 999, 1003–04 (Fed. Cir. 2016) (finding that the claim term "communication path" is limited to wired communications as opposed to encompassing both wired and wireless communications based on the specification's description of only wired communications).

### 2.     Claim 8 is limited to a backside via.

The via of Claim 8 must "extend[] from a backside of the substrate" as recited in Claim 1 and be "formed through the substrate" as recited in Claim 8. Thus, consistent with the specification's description of the alleged "invention," Claim 8 is limited to a backside via formed from the bottom surface of the substrate.

The "extend[] from a backside of the substrate" claim language mirrors the language that the specification uses to describe the backside vias formed from the bottom surface of the substrate:

- Figure 1: "[V]ia 24 . . . extends from backside 22 of the device."  Ex. Q, '002 Patent at 3:52–53.

- Figure 4: "Via 24 extends from backside 22 to a position within GaN layer 34." *Id.* at 9:43–45.

- Figure 5: "Via 24 extends from backside 22 to AlxGa$_{(1-x)}$N layer 46, which function as an etch stop layer." *Id.* at 9:67–10:1.

- Figure 6: "Via 24 extends from backside 22 to a position within GaN layer 58." *Id.* at 10:14–15.

- Figure 7: "Via 24 extends from backside 22 to a position within GaN layer 66." *Id.* at 10:27–28.

- Figure 8: "Via 24a extends from backside 22 to a position within GaN layer 72 and via 24b extends from backside 22 to a position within GaN layer 80." *Id.* at 10:46–48

Similarly, the "formed through the substrate" claim language matches the specification's description of forming a via from the bottom surface of the substrate. *Id.* at 8:33–34 ("to etch through substrate 12" of Figure 1).

Thus, the specification, figures, and claims of the '002 Patent show that the via of Claim 8 is an opening formed from the bottom surface of the substrate.

**V.      Defendants are not estopped from raising indefiniteness arguments.**

Plaintiffs contend that Defendants should be judicially estopped from arguing indefiniteness because Defendants took an implicit position during prosecution that the claims of the '889, '417, and '921 Patents were definite.  As an initial matter, Defendants did not prosecute the '889 Patent, and thus, judicial estoppel cannot apply with respect to that patent.

As to the remaining two patents (the '417 and '921 Patents), Defendants never argued the indefiniteness issues raised here, so judicial estoppel cannot apply. *Wyler Summit P'ship v. Turner Broad. Sys.*, 235 F.3d 1184, 1190–91 (9th Cir. 2000) (no judicial estoppel because party did not affirmatively assert an inconsistent position).  The Examiner did not raise these indefiniteness issues, and thus, Defendants could not have prevailed as required to establish judicial estoppel.

*Reed Elsevier, Inc. v. Muchnick*, 559 U.S. 154, 169–70 (2010) (party did not prevail on prior argument).  Plaintiffs' contention that Defendants took an ***implicit*** position during prosecution is insufficient.  *See In re Ark-La-Tex Timber Co.*, 482 F.3d 319, 333 (5th Cir. 2007) (judicial estoppel does not apply when a party did not previously assert a position, but merely assumed that the position was true).

The Court asked the parties to address whether these indefiniteness arguments would have been available before *Nautilus*. Dkt. No. 423.  Defendants believe that the Examiner could have raised these indefiniteness problems during prosecution even under the pre-*Nautilus* standard.  But, as explained above, the Examiner did not do so, and thus Defendants never took any position on these issues.  Even assuming these issues had been raised by the Examiner and that Defendants had argued against indefiniteness in response, judicial estoppel would still not apply because such hypothetical arguments would not have been ***necessarily inconsistent*** with Defendants' indefiniteness arguments in this case, due to the change of the standard in *Nautilus*.  *See Holder v. Holder*, 305 F.3d 854, 871–72 (9th Cir. 2002) (no judicial estoppel because a party's prior argument was not "necessarily inconsistent" with his current argument); *United Steelworkers of Am. v. ASARCO*, 512 F.3d 555, 563–64 (9th Cir. 2008) (no judicial estoppel when previous position was not "necessarily inconsistent" with current position); *Masimo Corp. v. Tyco Health Care Grp.*, No. 02-4770, 2004 WL 7094931, at *4 (C.D. Cal. Dec. 17, 2004) (no judicial estoppel when positions are "not necessarily inconsistent").

1    DATED: March 2, 2018                    JEFFERY D. BAXTER
2                                            BAKER BOTTS LLP
3
4
5
6                                     By _____
                                              */s/ Jeffery D. Baxter*
7                                            Jeffery D. Baxter
8                                            Attorney for Defendants
                                             Infineon Technologies AG and Infineon
9                                            Technologies Americas Corp.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28