Lara J. Dueppen, Bar No. 259075
LDueppen@perkinscoie.com
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, CA 90067-1721
Telephone:  310.788.9900
Facsimile:  310.788.3399

Amanda Tessar (admitted *pro hac vice*)
ATessar@perkinscoie.com
PERKINS COIE LLP
1900 Sixteenth Street, Suite 1400
Denver, CO  80202-5255
Telephone:  303.291.2300
Facsimile:  303.291.2400

Ramsey M. Al-Salam, Bar No. 109506
RAlSalam@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone:  206.359.6835
Facsimile:  206.359.7385

**ATTORNEYS FOR PLAINTIFFS**
(Additional Counsel Listed on Signature Page)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC., a Delaware corporation, and NITRONEX, LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>INFINEON TECHNOLOGIES AG, a corporation organized under the laws of Germany, and INFINEON TECHNOLOGIES AMERICAS CORP., a Delaware corporation,<br><br>Defendants. | Case No. CV 16-02859 CAS (PLAx)<br><br>**MACOM'S OPENING CLAIM CONSTRUCTION BRIEF** |

1

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................ii

TABLE OF ABBREVIATIONS AND CONVENTIONS ...........................................v

I. OVERVIEW OF THE CASE ......................................................................1

II. PRINCIPLES OF CLAIM CONSTRUCTION ................................................1

III. DISPUTED TERMS FOR THE WEEKS FAMILY..........................................3

    A. "compositionally-graded layer"/"compositionally-graded transition layer"....................................................................................3

    B. "intermediate layer" ..........................................................................6

    C. "substantially matches"......................................................................8

    D. "a composition of said transition layer at a top surface thereof substantially matches a composition of said gallium nitride material layer at a bottom surface thereof"/"a composition of said transition layer at a top surface thereof substantially matches a composition of said III-nitride layer at a bottom surface thereof" ...................................10

        1. Infineon Is Estopped From Asserting Its Patents Are Invalid .........11

        2. The Language Of The Disputed Claims Is Not Indefinite...............17

    E. "an alloy of gallium nitride selected from the group consisting of $Al_xIn_yGa_{(1-x-y)}N$, $In_yGa_{(1-y)}N$, and $Al_xGa_{(1-x)}N$")....................................19

    F. "said transition layer is discontinuously graded" ....................................20

IV. CLAIM DISPUTES FOR THE '015 PATENT.........................................21

    A. "an amorphous silicon nitride-based material layer formed directly on the entire top surface of the silicon substrate" ...............................22

    B. "on the entire top surface of the silicon substrate"..................................25

V. THE '889 PATENT ...............................................................................25

    A. "a silicon nitride-based material layer formed between the silicon substrate and the III-nitride material region"...........................................26

VI. THE '002 PATENT ...............................................................................29

    A. "the via is formed through the substrate" .............................................30

## TABLE OF AUTHORITIES

**CASES**

*Abbott Labs. v. Sandoz, Inc.*,
566 F.3d 1282 (Fed. Cir. 2009) .......................................................... 20

*Alcohol Monitoring Sys., Inc. v. ActSoft, Inc.*,
No. 07-cv-02261-PAB, 2011 WL 5075619 (D. Co. 2011) ................................. 12

*Analog Devices, Inc. v. Linear Tech. Corp.*,
479 F. Supp. 2d 202 (D. Mass. 2007) .................................................... 12

*Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*,
340 F.3d 1298 (Fed. Cir. 2003) .......................................................... 2

*AutoAlert LLC v. Dominion Dealer Sol'ns, LLC*,
No. 12-16661-JLS, 2014 WL 12042564 (C.D. Cal. Dec. 23, 2014) ..................... 2

*Cal. Inst. of Tech. v. Hughes Comm'ns Inc.*,
35 F. Supp. 3d 1176 (C.D. Cal. 2014) .................................................. 29

*CBT Flint Partners, LLC v. Return Path, Inc.*,
654 F.3d 1353 (Fed. Cir. 2011) ......................................................... 29

*Chaveriat v. Williams Pipe Line Co.*,
11 F.3d 1420 (7th Cir. 1993) ............................................................ 12

*Dahl v. Swift Distribs., Inc.*,
757 F. Supp. 2d 976 (C.D. Cal. 2010) .................................................. 20

*DCG Sys., Inc. v. Checkpoint Tech., LLC*,
No. 11-CV-03792-PSG, 2012 WL 4937969 (N.D. Cal Oct 17, 2012) .................. 28

*Diamond Sci. Co. v. Ambico, Inc.*,
848 F.2d 1220 (Fed. Cir. 1988) ......................................................... 16

*Ex Parte Kenichi Miyazaki*,
89 U.S.P.Q. 2d 1207 (BPAI 2008) ...................................................... 15

*Ex Parte McAward*,
App. No. 2015-006416 (PTAB Aug. 25, 2017) ......................................... 15

*Forest Labs., Inc. v. Abbott Labs*,
239 F.3d 1305 (Fed. Cir. 2001) ........................................................................ 13

*Home Diagnostics, Inc. v. LifeScan, Inc.*,
381 F.3d 1352 (Fed. Cir. 2004) .......................................................................... 2

*In re Packard*,
751 F.3d 1307 (Fed. Cir. 2014) ........................................................................ 15

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
381 F.3d 1111 (2004) ........................................................................................ 21

*Lampi Corp. v. Am. Power Prods., Inc.*,
228 F.3d 1365 (Fed. Cir. 2000) ........................................................................ 12

*Lear, Inc. v. Adkins*,
395 U.S. 653 (1969) .......................................................................................... 16

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
358 F.3d 898 (Fed. Cir. 2004) ............................................................................ 2

*Nautilus, Inc. v. Biosig Instr., Inc.*,
134 S. Ct. 2120 (2014) ..............................................................2, 14-15, 17, 28

*Nystrom v. Trex Co., Inc.*,
424 F.3d 1136 (Fed. Cir. 2005) .......................................................................... 1

*One-E-Way, Inc. v. ITC*,
859 F.3d 1059 (Fed. Cir. 2017) .................................................................... 3, 18

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ........................................................ 2

*Revlon, Inc. v. Carson Prods. Co.*,
602 F. Supp. 1071 (S.D.N.Y. 1985) .................................................................. 11

*Rissetto v. Plumbers & Steamfitters Local 343*,
94 F.3d 597 (9th Cir. 1996) .............................................................................. 12

*Slip Track Sys., Inc. v. Metal Lite, Inc.*,
113 Fed. Appx. 930 (Fed. Cir. 2004) (unpublished) ................................... 16, 17

*Sonix Tech. Co., Ltd. v. Publ'ns Int'l, Ltd.*,
844 F.3d 1370 (Fed. Cir. 2017) ........................................................................ 18

*Sybron Transition Corp. v. Nixon, Hargrave, Devans & Doyle*,
 770 F.Supp. 803 (W.D.N.Y. 1991) ..................................................................... 16

*Thorner v. Sony Computer Entm't Am. LLC*,
 669 F.3d 1362 (Fed. Cir. 2012) ............................................................................ 2

*Toyo Tire & Rubber Co. Ltd. v. Hong Kong Tri-Ace Tire Co.*,
 --- F.Supp.3d ---, 2017 WL 6547649 (C.D. Cal. 2017) ...................................... 13

*Transclean Corp. v. Jiffy Lube Intern., Inc.*,
 474 F.3d 1298 (Fed. Cir. 2007) .......................................................................... 14

*Trustees in Bankr. of N. Am. Rubber Thread Co. v. U.S.*,
 593 F.3d 1346 (Fed. Cir. 2010) .......................................................................... 12

**STATUTES**

35 U.S.C. § 112(b) ........................................................................................... 11

**OTHER AUTHORITIES**

37 C.F.R. § 1.56 ................................................................................................ 11

### TABLE OF ABBREVIATIONS AND CONVENTIONS

| Term or Issue | Meaning or Convention |
|---|---|
| '417 Patent | U.S. Patent No. 8,344,417, which is a member of the Weeks Family; citations to the shared specification of the Weeks Family Patents in Section III are generally to the specific column/line numbering of the '417 Patent; attached as Ex. 1 |
| '921 Patent | U.S. Patent No. 8,105,921, also a member of the Weeks Family; attached as Ex. 2 |
| '862 Patent | U.S. Patent No. 8,592,862, also a member of the Weeks Family; attached as Ex. 3 |
| '034 Patent | U.S. Patent No. 8,928,034, also a member of the Weeks Family; attached as Ex. 4 |
| '335 Patent | U.S. Patent No. 8,937,335, also a member of the Weeks Family; attached as Ex. 5 |
| '775 Paten | U.S. Patent No. 9,064,775, also a member of the Weeks Family; attached as Ex. 6 |
| '686 Patent | U.S. Patent No. 9,437,686, also a member of the Weeks Family; attached as Ex. 7 |
| '119 Patent | U.S. Patent No. 9,461,119, also a member of the Weeks Family; attached as Ex. 8 |
| EP '927 Patent | European Patent EP1343927, also a member of the Weeks Family; attached as Ex. 9 |
| '015 Patent | U.S. Patent No. 7,352,015; attached as Ex. 10 |
| '889 Patent | U.S. Patent No. 7,247,889; attached as Ex. 11 |
| '002 Patent | U.S. Patent No. 6,611,002; attached as Ex. 12 |
| Al | Aluminum |
| AlGaN | Aluminum-gallium nitride |
| AlN | Aluminum nitride |
| Ex. __ | Exhibit to the Declaration of Daniel Keese, filed concurrently herewith |

| Term or Issue | Meaning or Convention |
|---|---|
| Ga | Gallium |
| GaN | Gallium Nitride |
| GaN-on-Si or GaN/Si | Gallium Nitride on Silicon |
| In | Indium |
| Infineon | Defendants Infineon Technologies Americas Corp. (previously Infineon Technologies North America Corporation) and Infineon Technologies AG |
| Internal quotation marks and citations | All omitted, unless otherwise indicated |
| IR | International Rectifier, the predecessor-in-interest to Infineon; Infineon has represented that IR became Defendant Infineon Technologies Americas Corp. |
| MACOM | Plaintiffs MACOM Technology Solutions Holdings, Inc. and Nitronex, LLC, unless the context dictates otherwise |
| Schub. ¶_ | Declaration of Dr. E. Fred Schubert, filed concurrently herewith |
| Si | Silicon |
| SiN | Silicon nitride |
| Weeks Patents or Weeks Family | A family of U.S. and foreign Nitronex Patents, including some of the patents listed above; the parent patent in this family is U.S. Patent 6,649,287, so the Weeks Family is sometimes referred to as the Weeks '287 Family; inventor T. Warren Weeks, Jr. is the lead inventor for this patent family |

# I.   OVERVIEW OF THE CASE

In this case, MACOM claims that Infineon is in breach of its exclusive license to MACOM for the foundational Nitronex Patents because Infineon is practicing those patents in the Exclusive Field, despite its express promise not to do so.  To escape this problem of its own making, Infineon initially tried to cancel the license entirely, but this Court and the Federal Circuit both definitively rejected that ploy.  Infineon therefore now seeks to undermine the license by asserting that the Nitronex Patents are invalid (*e.g.*, because the claims are indefinite) and/or should be construed so narrowly that Infineon's GaN/Si designs do not practice them.

The Court should reject Infineon's latest attempt to undermine its license commitments.  The claim language is plain and straightforward.  Infineon's attempts to graft additional limitations onto the claims are inconsistent with the language of claims, the broad disclosure of the Nitronex Patent specifications, and core principles of claim construction.  Similarly, Infineon's attempts to invalidate its own patents are barred by the doctrines of judicial estoppel and/or assignee estoppel, given that Infineon's predecessor prosecuted many of the patents that Infineon seeks to invalidate at the Patent Office **and** induced Nitronex to transfer the Nitronex Patents to it through the promise of an exclusive license.

# II.   PRINCIPLES OF CLAIM CONSTRUCTION

The purpose of claim construction is to resolve ambiguities and disputes concerning the meaning of patent claim language.[1]  The most important factor in interpreting the claims is the language of the claims themselves.  Courts thus begin the analysis with the language of the claims.  *See Nystrom v. Trex Co., Inc.*, 424 F.3d 1136, 1142 (Fed. Cir. 2005).  Claims are generally given their plain meaning

---

[1]   Because MACOM asserts a breach of contract claim, not an infringement claim, and because the parties have waived the right to a jury trial for contract claims, the Court—not a jury—will ultimately decide whether Infineon is practicing the Nitronex Patents in MACOM's Exclusive Field.

-1-

as understood by a person of ordinary skill in the art when read in the context of the patent disclosure and file history, referred to as "intrinsic evidence." *E.g.*, *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012); *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005) (*en banc*). "Absent a clear disavowal or contrary definition in the specification or the prosecution history, the patentee is entitled to the full scope of its claim language." *Home Diagnostics, Inc. v. LifeScan, Inc.*, 381 F.3d 1352, 1358 (Fed. Cir. 2004).

Infineon attempts to impose limitations on the claim language based on specific examples (often referred to as "embodiments") of the invention disclosed in the patent. But the Federal Circuit has held that importing limitations from the specification to the claim language is "one of the cardinal sins of patent law." *Phillips*, 415 F.3d at 1319-20. "Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using words or expressions of manifest exclusion or restriction." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004). On the other hand, "a claim construction that excludes a preferred embodiment ... is rarely, if ever correct and would require highly persuasive evidentiary support." *Anchor Wall Sys., Inc. v. Rockwood Retaining Walls, Inc.*, 340 F.3d 1298, 1308 (Fed. Cir. 2003) (citation omitted).

Infineon also argues that many of the asserted patent claims are indefinite under *Nautilus, Inc. v. Biosig Instr., Inc.*, 134 S. Ct. 2120 (2014), which holds that a patent is indefinite only "if its claims, read in light of the specification delineating the patent, and the prosecution history, fail to inform, with reasonable certainty, those skilled in the art about the scope of the invention." *Id.* at 2124. Even if a claim might mean several different things, it is indefinite only if "no informed and confident choice is available among the contending definitions." *See AutoAlert LLC v. Dominion Dealer Sol'ns, LLC*, No. 12-16661-JLS, 2014 WL 12042564, at *1 (C.D. Cal. Dec. 23, 2014). Importantly, patents are ***presumed*** valid;

indefiniteness must be shown by clear and convincing evidence. *One-E-Way, Inc. v. ITC*, 859 F.3d 1059, 1062 (Fed. Cir. 2017).

### III. DISPUTED TERMS FOR THE WEEKS FAMILY[2]

Six of the nine terms for construction are from claims in related patents of the Weeks Family. These patents are directed to solving a problem inherent to GaN-on-Si semiconductors—the difficulty of interfacing the GaN material layer(s) and the Si substrate. [Schub. ¶¶13-16.] More specifically, the GaN and Si have a "mismatch" in terms of lattice structure and thermal expansion, which can cause the overlying GaN material layer to crack. [*Id.* ¶¶14-16.] To overcome this problem, the Weeks Family discloses a "transition layer" that effectively makes the transition between GaN and substrate more gradual by, for example, having step changes in composition and/or by using a superlattice that has multiple repetitions of alternating layers with different compositions. [*Id.* ¶¶16-21.] This graded transition layer mitigates the lattice and/or thermal expansion differences between the GaN layer(s) and Si substrate. [*Id.* ¶¶14-18.]

The Weeks Patents claim priority to an application filed in December 2000. As Dr. Schubert explains, a person of ordinary skill in the art for the Nitronex Patents (including the Weeks Patents) is a person with a Bachelor's degree in electrical engineering, material science, physics, or a related field and five years of relevant industry experience, or a Master's degree in such a field and two years of experience, or a Ph.D. and relevant research involvement. [*Id.* ¶¶9-10.]

**A.** **"compositionally-graded layer" ('034 Claim 13; '119 Claim 14; '335 Claim 3; and '686 Claim 6)/"compositionally-graded transition layer" ('921 Claim 15; EP '927 Claims 3 and 10)**

---

[2] MACOM follows the order of terms in Dkt. No. 430, except it groups its own single term for construction with the other disputed term of the '015 Patent.

| **MACOM's Proposed Construction:** No construction is needed; the plain and ordinary meaning to one of skill in the art should be applied, including that "compositionally-graded" means "having a composition that varies across at least a portion of the thickness of the layer." "Transition layer" and "layer" both can include multiple layers or sublayers. | **Defendants' Proposed Construction:** A layer having a composition that varies across at least a portion of the thickness of the layer. |
|---|---|

These terms are directed to the idea of having a "transition layer" that is "compositionally-graded" or that includes at least one "compositionally-graded" layer. As discussed in prior briefing, the meaning of the terms is straightforward and clear in the context of the patent disclosure.[3] The "transition layer" is formed between the GaN layer(s) and Si substrate and has a varying composition (*i.e.*, the composition is "graded"). [*E.g.*, '417 Patent 2:1-8, 3:47-55, 4:4-13, 5:3-20.] As discussed above, the purpose of the transition layer is to vary the composition from the bottom of the transition layer to the top of the transition layer so as to mitigate the lattice and thermal expansion coefficient mismatch between the GaN layer above the transition layer and the underlying Si substrate.

Both parties agree that the composition varies across at least a portion of the layer, but disagree as to another aspect of Infineon's construction. Specifically, Infineon's proposed construction is wrong because it limits the claims to those having a singular ("a") layer—a point that Infineon's prior briefing makes clear is no accident and that forms the centerpiece for its argument that it does not practice the Weeks Patents. [*E.g.*, Dkt. 363-1; 378-2.] Specifically, Infineon takes the position that "a layer" cannot have sublayers and/or that a compositionally-graded transition layer must be formed in a single step, without stopping the deposition process between layers. [Dkt. No. 378-2 at 9:10-20, 9:26-28, 10:1-10.]

---

[3] MACOM addressed the "compositionally-graded," "intermediate layer," and "substantially matches," extensively in prior briefing, which is incorporated by reference. [*E.g.*, Dkt. 349 at 12; Dkt. 349-1 at 19-31, 35-37, 41-43, 49-68; Dkt. 376 at 15-20; Dkt. 376-2 at 1-2, 5-26; Dkt. 391 at 2-3; Dkt 392 at 3-7.]

-4-

1  Infineon's position cannot be reconciled with either the claim language or the

2  disclosures of the specification.  Those sources make clear that, just as the

3  sedimentary layer of the Earth is composed of sublayers that are deposited over one

4  another, just as the skin's epidermis layer has sublayers, and just as a layer of a

5  hardwood floor has sublayers based on the annual growth of a tree, the

6  "compositionally-graded layer" of the Weeks Patents may have sublayers.

7  The Weeks Family expressly contemplates that the transition layer includes

8  structures made of many individual component layers.  [Schub. ¶¶18-21, 29-32.]

9  For example, Figures 2A and 2B of the Weeks Patents (annotations added below)

10  disclose transition layer embodiments with stepwise grading having two or more

11  portions (*e.g.*, sublayers or component layers), each of a constant composition:



18  As Dr. Schubert explains, it is technically equivalent to view Figure 2B, for

19  instance, either as a single compositionally-graded layer or as two separate

20  component layers, each of which is not graded.  [*Id.* ¶¶30-31, 33-34.]

21  The specification also describes another embodiment where a

22  compositionally-graded transition layer "may be a compositionally-graded strained

23  layer superlattice," which the patent explicitly defines as a structure made up of

24  multiple "alternating layers 24a, 24b of semiconductor compounds having different

25  compositions."  [*Id.* ¶¶21, 32; '417 Patent, 5:39-51.]  The specification also

26  explains that the alternating layers in some cases each have a constant composition

27  across each component sublayer: "the composition of individual layers 24a, 24b is

28  constant across the thickness of the individual layer…."  [*Id.*, 5:60-62; *see also id.*,

5:46-48.] Accordingly, it is clear that a compositionally-graded transition layer can include multiple individual layers each with no grading within the individual layers.

Because Infineon's construction is limited to "a" layer (*i.e.*, arguably disallowing any sublayers or component layers), it implicitly limits the claims to a process where the entire transition layer or compositionally-graded layer is formed without stopping, since that is the way to create "a" layer in the way that Infineon seems to use that term. [Schub. ¶35.] But the claims are largely directed to ***structures*** and provide no basis for importing such a ***process*** limitation. [*E.g.*, '034 Patent Claims 11, 13; '119 Patent Claims 13-14; '335 Patent Claims 1, 3; '686 Patent Claim 6; EP '927 Patent Claims 1, 3, 10.] Claim 15 of the '921 Patent, the only asserted Weeks ***method*** claim, does not suggest that the transition layer must be formed without stopping or that the transition layer is formed in "a" single layer, instead reciting only the step of: "forming a compositionally-graded transition layer over a silicon substrate." ['921 Patent Claim 15.] In short, the claims provide no basis to limit these terms to formation of "a" single layer without stopping, and, as discussed above, nor does the specification support such a limiting construction.

Infineon's unduly limiting and results-oriented construction excludes preferred embodiments of a transition layer, including the embodiments that use a superlattice and those that have a step-graded transition layer, and improperly limits device claims to specific processes. The Court should reject Infineon's construction and adopt the plain and ordinary meaning of these terms.

**B.   "intermediate layer" ('034 Patent Claim 13; '119 Patent Claim 14; '335 Patent Claim 3; '686 Patent Claim 6'; '862 Patent Claim 16; '921 Patent Claim 15; EP '927 Patent Claims 3 and 10)**

| MACOM's Proposed Construction: | Defendants' Proposed Construction: |
| --- | --- |
| No construction is needed; the plain and ordinary meaning to one of skill in the art should be applied. | A layer with a generally constant composition throughout its thickness located between the substrate and the gallium nitride material layer. |

-6-

1    The plain and ordinary meaning of the disputed term should apply because

2    the specification and claim language are clear.  The claim language requires only

3    that the layer be "intermediate," which a person of ordinary skill would understand

4    to mean that it lies somewhere between the GaN layer and the substrate, without

5    further qualifiers.  [Schub. ¶¶37-39.]  Consistently with that, the specification

6    explains that the intermediate layer may be located between the substrate and the

7    transition layer, between the transition layer and the GaN material layer, or in other

8    locations.  ['417 Patent, 8:23-28.]  The specification also explains that the function

9    of the intermediate layer is to "further relieve stress" in a GaN layer and to allow

10   for a thinner transition layer.  [*Id.*, 8:28-30, 8:32-35.]  Although the specification

11   notes that the intermediate layer is "generally" of constant composition, there is no

12   requirement that it must always be so.  [*See id.*, 8:54-56.]

13   Infineon nevertheless seeks to interpret "intermediate layer," as requiring "a

14   layer" that has "generally constant composition throughout its thickness."  Neither

15   of these requirements finds support in the Weeks Patents.

16   First, to the extent that Infineon intends to apply its arguments above to argue

17   that an "intermediate layer" must be a single layer without sublayers or component

18   layers, that argument finds no more support here than it did for "compositionally-

19   graded layer"/"compositionally-graded transition layer."  *See* Section III.A, *supra*.

20   Second, there is nothing in the claim language that requires the intermediate

21   layer to have a constant composition.  Indeed, none of the relevant claims calls out

22   a particular composition for the intermediate layer.  And there is no justification for

23   importing a limitation, whether from the specification or otherwise, as to the

24   composition of that layer.  If Infineon argues that the intermediate layer ***must*** have

25   a constant composition because the specification states that it "generally" does so

26   ('417 Patent 8:34-35), its argument cannot be reconciled with the fact that the use

27   of the term "generally" necessarily acknowledges that exceptions to this general

28   rule exist.  Further proving the point, other claims of the Weeks Patents (including

claims that Infineon itself prosecuted) describe an intermediate layer with two different AlN alloys, where the "first aluminum nitride alloy" is "substantially free of gallium," but the "second aluminum nitride alloy" is not necessarily so. ['686 Patent Claims 5, 12; '119 Patent Claim 13; *see also* '034 Patent Claim 12; '335 Patent Claims 12; Schub. ¶40.] In other words, these claims recite intermediate layers that do *not* have a constant composition.

## C.   "substantially matches" ('417 Patent Claim 1; '862 Patent Claim 16; '921 Patent Claim 15)

| MACOM's Proposed Construction: | Defendants' Proposed Construction: |
| --- | --- |
| No construction is needed; the plain and ordinary meaning to one of skill in the art should be applied, including that an intentional difference between two layers greater than those introduced by the manufacturing process can substantially match. | Compositions that are the same, setting aside slight differences introduced by the manufacturing process. |

The plain and ordinary meaning of "substantially matches" does not require *exact* matching or that compositions be "the same" ("setting aside slight differences introduced by the manufacturing process"), as Infineon's proposal would require. Instead, the plain meaning of "substantially matches" to a person of skill, when viewed in light of the specification, includes intentional or accidental mismatches that nonetheless accomplish the goals of the transition layer. Indeed, such a partial mismatch is disclosed in the specification as a key way to effectuate the goals of the invention. ['417 Patent, 4:45-55, 6:46-52.] Infineon's approach also effectively reads the word "substantially" out of the claim language entirely, because manufacturing imperfections are inherent in any process. [Schub. ¶¶41-43.]

The plain and ordinary meaning of "substantially matches" (which is not an engineering term unique to semiconductors nor a term that the patentee specially defined) is broad enough to include intentional differences in composition between the top of the transition layer and the bottom of the GaN material layer. For example, a 2000 version of the New Oxford American Dictionary defines

"substantially" as "to a great or significant extent" or "for the most part; essentially" and "match" as "to correspond or cause to correspond in some essential respect." In other words, "substantially match" means "to a great or significant extent correspond or cause to correspond in some essential respect." [Ex. 13.] Similarly, a contemporaneous Merriam-Webster's Collegiate Dictionary defines "substantial" as "being largely but not wholly that which is specified" and "match" as "a person or thing equal to or similar to another." [Ex. 14.] Combined, "substantial[ly] match" in this dictionary means "being largely but not wholly … equal to or similar to another." This hardly suggests that two compositions need to be "the same" or exactly match in order to "substantially match."

As discussed above, the purpose of the transition layer is to mitigate the material differences in lattice and thermal expansion between the GaN and Si layers. To do so, the transition layer provides an interface that avoids the sharp transition that otherwise exists between the GaN layer and the substrate. Exact matching between the transition layer and the GaN layer is not required to avoid the problems that otherwise arise, as the specification makes clear. The purpose of matching the top of the transition layer to the bottom the GaN material layer, for instance, is to minimize the cracking and defects in the GaN material layer. ['417 Patent, 1:44-56.] Even then, however, the patent makes clear that to be "substantially crack-free" does not mean having no cracks; it is "defined by a crack level of less than $0.0001 \mu\text{m}/\mu\text{m}^2$," equivalent to 0.1 mm/mm$^2$. [*Id.*, 7:14-20.] Similarly, having a "low crack level" requires a crack level of $0.005 \mu\text{m}/\mu\text{m}^2$," equivalent to 5 mm/mm$^2$. [*Id.*] Accordingly, a person of ordinary skill in the art would have understood "substantially matching" does not mean *no* difference, but means a difference that results in no or minimal cracking of the GaN material layer and minimization of other defects. [Schub. ¶¶45-47.]

The patents also disclose embodiments where the composition of the top of the transition layer varies from the composition of the GaN material layer, making

clear that the patentee contemplated embodiments other than the "exact" matching to which Infineon seeks to limit the claims.  ['417 Patent, 4:45-55, 6:46-52 (top of transition layer can have composition of 70% or 80% GaN and 30% or 20% AlN and/or InN, while GaN layer can have composition of GaN—*i.e.*, 100% GaN).] And it is important to note that, from a technical perspective, a 20% composition difference correlates to a much smaller mismatch in lattice constants and thermal expansion coefficients, which are key parameters for matching.  [Schub. ¶48-51.]

Finally, the patents *do* disclose an embodiment where the transition layer *exactly* matches the GaN material layer.  ['417 Patent, 4:53-59.] For that embodiment, however, the specification does *not* use the term "substantially match."  Instead, it says they are the "*same*."  [*Id.*, 4:56-59 ("the same as the composition of gallium nitride material layer").]  The patentee therefore obviously knew how to say that two compounds are the "same" when it wanted to do so.

Infineon's construction should be rejected, and the plain and ordinary meaning of "substantially matches"—which allows for differences between the top of the transition layer and the bottom of the GaN layer beyond than those introduced by imperfections in the manufacturing process—should be adopted.

**D.    "a composition of said transition layer at a top surface thereof substantially matches a composition of said gallium nitride material layer at a bottom surface thereof" ('417 Patent Claim 1; '921 Patent Claim 15)/"a composition of said transition layer at a top surface thereof substantially matches a composition of said III-nitride layer at a bottom surface thereof" ('862 Patent Claim 16)**

| MACOM's Proposed Construction: No construction is needed; the plain and ordinary meaning to one of skill in the art should be applied.  See above construction for "substantially matches." | Defendants' Proposed Construction: Indefinite |
| --- | --- |

Though Infineon proposes a construction for "substantially matches," Infineon also contends that the broader limitations in which "substantially matches" appears are indefinite.  Infineon is estopped from making invalidity arguments.

-10-

1   This is a sufficient basis for rejecting Infineon's position.  But, to the extent that the

2   Court wishes to reach the merits, the disputed terms are not indefinite.

3   **1.    Infineon Is Estopped From Asserting Its Patents Are Invalid**[4]

4       **a.    Judicial Estoppel Applies To Patents That Infineon
                Prosecuted**

5       First, Infineon is judicially estopped from taking the position that the asserted

6   claims of the '417, '862, and '921 Patents are invalid for indefiniteness.  Infineon's

7   predecessor prosecuted the claims of these patents and successfully convinced the

8   Patent Office that they were directed to a valid invention.

9       To be valid, a claim must comply with the definiteness requirements of 35

10  U.S.C. § 112(b), which requires that a specification "conclude with one or more

11  claims particularly pointing out and distinctly claiming the invention."  As the

12  patent applicant, Infineon had a duty of candor to the Patent Office to disclose any

13  information material to patentability.  37 C.F.R. § 1.56 ("Each individual associated

14  with the filing and prosecution of a patent application has a duty of candor and

15  good faith in dealing with the Office, which includes a duty to disclose to the Office

16  all information known to that individual to be material to patentability as defined in

17  this section.").[5]  By prosecuting the claims to issuance before the Patent Office,

18  Infineon's predecessor (in whose shoes Infineon stands) necessarily represented

19  that they are valid and would be understood by a person of ordinary skill in the art.

20      After successfully convincing the Patent Office to issue the claims, however,

21  Infineon now takes the contrary position and asserts that the claims it prosecuted

22

23  [4]   Indefiniteness is the validity question currently before the Court, but—if not
        estopped—Infineon is poised to make burdensome invalidity arguments (even
24      for patents it prosecuted) based on prior art (and perhaps other bases).  It should
        be estopped from doing so in the future, just as it should be estopped here.
25

26  [5]   Because the patent application process is *ex parte*, the Patent Office relies on the
        representations made by applicants.  *See Revlon, Inc. v. Carson Prods. Co.*, 602
27      F. Supp. 1071, 1100 (S.D.N.Y. 1985) ("[I]t is assumed both that the PTO always
        relies on the representations made to it by the applicant who owes the highest
28      standards of honesty and candor …").

-11-

cannot be understood and so are invalid as indefinite.  But courts, applying equitable principles, do not allow parties to take one position before administrative agencies, such as the Patent Office and then, in litigation, take a contrary position.

"Judicial estoppel, sometimes also known as the doctrine of preclusion of inconsistent positions, precludes a party from gaining an advantage by taking one position, and then seeking a second advantage by taking an incompatible position." *Rissetto v. Plumbers & Steamfitters Local 343*, 94 F.3d 597, 600 (9th Cir. 1996).[6]

The doctrine applies to statements made in administrative proceedings:

> Unsurprisingly given its name, judicial estoppel is often articulated as applying to 'judicial' proceedings.  However, many cases have applied the doctrine where the prior statement was made in an administrative proceeding, and we are not aware of any case refusing to apply the doctrine because the prior proceeding was administrative rather than judicial.

*Rissetto*, 94 F.3d at 604-5 (collecting authorities); *see also Trustees in Bankr. of N. Am. Rubber Thread Co. v. U.S.*, 593 F.3d 1346, 1354 (Fed. Cir. 2010); *Chaveriat v. Williams Pipe Line Co.*, 11 F.3d 1420, 1427 (7th Cir. 1993) ("[T]he doctrine has been applied, rightly in our view, to proceedings in which a party to an administrative proceeding obtains a favorable order that he seeks to repudiate….").

Courts have specifically held that patent owners cannot take positions inconsistent with those taken before the Patent Office.  *See Alcohol Monitoring Sys., Inc. v. ActSoft, Inc.*, No. 07-cv-02261-PAB, 2011 WL 5075619, at *5 (D. Co. 2011) ("Judicial estoppel could apply should plaintiff assert a position that is contrary to the positions plaintiff took in front of the PTO."); *Analog Devices, Inc. v. Linear Tech. Corp.*, 479 F. Supp. 2d 202, 212 (D. Mass. 2007) ("ADI is estopped from arguing that these two circuits it said were not obvious for purposes of patentability [to the PTO] are now mere commercial production details already

---

[6] The Federal Circuit, which hears appeals of patent cases, applies the law of the regional circuit on judicial estoppel.  *Lampi Corp. v. Am. Power Prods., Inc.*, 228 F.3d 1365, 1377 (Fed. Cir. 2000).

familiar to those of ordinary skill in the art.").  Indeed, the Federal Circuit has gone

farther than MACOM asks the Court to go here, holding that a patentee is even

estopped from taking inconsistent positions before the Patent Office and courts for

statements ***not*** clearly necessary to secure allowance of a claim.  *See Forest Labs.,*

*Inc. v. Abbott Labs*, 239 F.3d 1305, 1314 (Fed. Cir. 2001) ("Even if it was ***not***

necessary to secure allowance of the claim, particularly with respect to the water

limitation, such a statement [made to the Patent Office] may operate to preclude the

patentee from claiming otherwise in an infringement suit.") (emphasis added).

The courts apply three factors in determining whether estoppel applies:

> "First, a party's later position must be 'clearly inconsistent'
> with its earlier position."  *New Hampshire*, 532 U.S. at 750,
> 121 S.Ct. 1808 (citation omitted).  "Second, courts regularly
> inquire whether the party has succeeded in persuading a court
> to accept that party's earlier position, so that judicial
> acceptance of an inconsistent position in a later proceeding
> would create 'the perception that either the first or the second
> court was misled.'"  *Id.* (citation omitted).  "A third
> consideration is whether the party seeking to assert an
> inconsistent position would derive an unfair advantage or
> impose an unfair detriment on the opposing party if not
> estopped."  *Id.* at 751, 121 S.Ct. 1808.

*Toyo Tire & Rubber Co. Ltd. v. Hong Kong Tri-Ace Tire Co.*, --- F.Supp.3d ---,

2017 WL 6547649, at *5 (C.D. Cal. 2017).

These three factors support the application of estoppel here.  First, Infineon's

position that the claims are indefinite is clearly inconsistent with the position it took

before the Patent Office, when it advocated that the claims were patentable.

Importantly, the standard is not based on specific statements made, but on

"positions" taken before the Patent Office.  *See Toyo*, 2017 WL 6547649, at *5-6.

Infineon cannot plausibly assert that it (through its predecessor) did not take the

position before the Patent Office that the claims are valid.  Second, Infineon was

successful in convincing the Patent Office to issue the claims.  Finally, Infineon

would derive an unfair advantage if it were allowed now to contravene its earlier

-13-

1   position so it can operate in MACOM's exclusive field.

2       Therefore, even if the patent claims identified by Infineon were indefinite

3   (which they are not), it would not matter.  Judicial estoppel turns on the fact that

4   Infineon successfully advocated before the Patent Office that they **were** patentable,

5   and Infineon cannot now take the contrary position during these claim construction

6   proceedings.  *See, e.g.*, *Transclean Corp. v. Jiffy Lube Intern., Inc.*, 474 F.3d 1298,

7   1306 (Fed. Cir. 2007) (holding that the plaintiff's prior representations concerning

8   privity were binding under judicial estoppel, even "when the actual circumstances

9   do not necessarily support that conclusion.").  Accordingly, the Court should

10  preclude Infineon from now arguing that claims it successfully advocated to the

11  PTO were valid are actually indefinite.

12          **b.**     ***Nautilus* Does Not Affect The Judicial Estoppel Analysis**

13      There has been no relevant change in law that justifies not applying estoppel

14  in this case.  *Nautilus* has no impact on the estoppel analysis, even if the patent

15  claims at issue were authored and issued pre-*Nautilus*, because *Nautilus* did not

16  effect any change to the requirements for definiteness applied by the Patent Office.

17      Critically, the Patent Office's requirements for definiteness have ***always been***

18  ***stricter*** than those applied by the courts.  In presenting claims to the Patent Office

19  for patenting, Infineon necessarily represented that those claims comply with the

20  Patent Office's strict standards.  Accordingly, even if *Nautilus* imposes a stricter

21  standard for definiteness than existed previously in the courts, it does not matter to

22  the present analysis.  Because the *Nautilus* standard is less strict than the standard

23  that has always been applied by the Patent Office, Infineon's current position on

24  indefiniteness is necessarily inconsistent with its prior, successful position.[7]

25

26  [7]  To take an analogy, it is as if the Patent Office has always required claims to be
27       bright blue to be valid, while the courts require only that they be blue.  If
         Infineon took the position that the claims were bright blue before the Patent
28       Office, it cannot now argue that they are not blue at all.

There is no question that the Patent Office has always imposed a stricter standard for definiteness when examining patent applications than applied by courts to issued patents, either pre- or post-*Nautilus*.  This is justified by the fact that the applicant has an opportunity to amend or correct the claims at the Patent Office.  *E.g.*, *Ex Parte Kenichi Miyazaki*, 89 U.S.P.Q. 2d 1207 at *6 (BPAI 2008) ("The USPTO is justified in using a lower threshold showing of ambiguity to support a finding of indefiniteness … because the applicant has an opportunity and a duty to amend the claims during prosecution to more clearly and precisely define the metes and bounds of the claimed invention …."); *In re Packard*, 751 F.3d 1307 (Fed. Cir. 2014) (affirming that Patent Office may apply stricter standards than used in district courts).  This approach was recently confirmed in a precedential decision by the Patent Trial and Appeal Board (PTAB).  *Ex Parte McAward*, App. No. 2015-006416 (PTAB Aug. 25, 2017) (attached as Ex. 17).  There, the PTAB held that because the Patent Office has always applied a stricter standard, *Nautilus* had no impact on its approach to examination of patent applications.  *Id.* at 9.  Infineon's current position that the claims are indefinite is accordingly inconsistent with its past position before the Patent Office that the claims were patentable.

Moreover, even if *Nautilus* had changed the relevant indefiniteness standard, which it did not, estoppel should still apply as a matter of policy.  Patent law is constantly evolving in many ways (not just with respect to indefiniteness), and it would be inefficient and unnecessarily burdensome to have to evaluate each of these changes with respect to every one of the various invalidity positions that Infineon would now like to take for more than a dozen patents to avoid its portfolio-wide promise of exclusivity to MACOM.

The doctrine of judicial estoppel is, at core, an equitable one.  The Patent Office relied on Infineon's arguments that the claims are valid in issuing the patents, and Infineon should not be allowed to now plead indefiniteness to undercut the value of the Nitronex Patents and eviscerate its Exclusive License to MACOM.

c.      **Assignee Estoppel Applies To All The Parties**

Assignee estoppel is an independent basis for precluding Infineon from asserting indefiniteness.  MACOM conditioned its assignment of the patents on, among other things, Infineon giving MACOM an exclusive license in its field and pursuing claims against infringers.  Infineon cannot, now that avoiding its license obligation is worth more to it than the transferred patents, assert that the patents are invalid so it can practice them in MACOM's field.  To use a land analogy, Infineon's position is equivalent to a buyer acquiring land conditioned on the promise that it give the seller the exclusive right to occupy a portion of the land, only then to refuse to vacate that portion of the land on the basis that the underlying deed is flawed.  Such a result would be inequitable and justifies the application of assignee estoppel.  *See, e.g., Sybron Transition Corp. v. Nixon, Hargrave, Devans & Doyle*, 770 F.Supp. 803, 811 (W.D.N.Y. 1991) (noting that, absent assignee estoppel, the buyer of a patent could "obtain its benefits and control it and refuse to pay the agreed consideration").

The doctrine of assignee estoppel is rarely applied because most patent owners do not try to invalidate their own patents.  But the Federal Circuit (whose law governs here) has acknowledged the continued existence of assignee estoppel after the decision in *Lear, Inc. v. Adkins*, 395 U.S. 653 (1969).  *See Slip Track Sys., Inc. v. Metal Lite, Inc.*, 113 Fed. Appx. 930, 933 (Fed. Cir. 2004) (unpublished) ("Assignee estoppel is an equitable doctrine which, under appropriate circumstances, bars the assignee of a patent from contesting the validity of the assigned patent."); *see also Diamond Sci. Co. v. Ambico, Inc.*, 848 F.2d 1220, 1224 (Fed. Cir. 1988) ("If an assignee of a patent were allowed to challenge the patent, it could be placed in the legally awkward position of simultaneously attacking and defending the validity of the same patent.").

One situation where assignees have tried to invalidate patents they previously acquired is to avoid royalty payments, a situation courts have found justifies the

-16-

application of assignee estoppel. *Slip Track Sys.*, 113 Fed. Appx. at 933

("[C]ircumstance may warrant application of the doctrine to prevent an assignee

from avoiding royalty payments otherwise due under an assignment contract by

challenging the validity").  This case presents an analogous situation that is even

more damaging and unfair to the assignor.  Infineon seeks to avoid its promises to

stay out of the Exclusive Field expressly reserved to MACOM by invalidating the

acquired patents.  If preventing an assignee from avoiding mere royalty payments

justifies the application assignee estoppel, then allowing the assignee to completely

subvert the value of an agreed-to field of use restriction (in addition to depriving it

of royalties that might be collected if the Nitronex Patents were being enforced

against third parties, as they should) should also justify application of the doctrine.

### 2. The Language Of The Disputed Claims Is Not Indefinite

Setting aside the estoppel issue, Infineon's position is internally inconsistent

on the merits.  If "substantially matches" can be construed, as Infineon concedes it

can, then placing that phrase within the context of a wider claim term does not

transform that term into one that cannot be understood.  Infineon has not articulated

anything that is indefinite about the words that surround "substantially matches" in

the larger phrases that it seeks to have construed.  [*See, e.g.*, Dkt. 363-1 at 13:18-19,

14:1-15:3; Dkt. 376 at 15:21-22, 16:2-17:18.]

Regardless, there can be no serious question that the claim terms that

Infineon argues are indefinite are understandable to a person of ordinary skill and

so are not indefinite.  *Nautilus*, 134 S. Ct. at 2124 (patent is not indefinite unless

"its claims, read in light of the specification .... and the prosecution history, fail to

inform, with reasonable certainty, those skilled in the art about the scope of the

invention.").  Preliminarily, as discussed above, both parties agree that

"substantially matches" is understandable to a person of ordinary skill and can be

construed, so that cannot be the basis for Infineon's indefiniteness argument.

To the extent that Infineon's contention of indefiniteness is based on the suggestion that one of skill in the art is unable to identify the "top surface of the transition layer" or the "bottom surface of the gallium nitride material layer," it is simply wrong.  A person of ordinary skill in the art can readily understand the difference between a "transition layer" and a "gallium nitride material layer" based on the specification.  [Schub. ¶¶53-56.]

For instance, the GaN material layer (or III-nitride material layer) is the part of the semiconductor material that has few or no cracks in order to produce effective devices, *e.g.*, transistors (FETs), LEDs, and/or laser diodes.  [*E.g.*, '417 Patent, Fig. 1, Figs. 7-9, 1:37-62, 2:8-11, 3:59-63, 10:4-64.]  The GaN material layer is also part of the active region formed by adding dopants (*e.g.*, impurities that improve conduction) or by adding additional layers on top of the GaN material region "to produce the desired semiconductor structure" for a "semiconductor device."  ['417 Patent, 10:7-12.]

On the other hand, the transition layer is not generally part of the active or device region of the semiconductor.  Its function is to bridge the gap between the substrate and the GaN material layer to minimize cracking and defects in the active GaN material layer.  ['417 Patent, Abstract, 2:1-12.]

Because of the different functions of the transition layer and the GaN material layer and the clear figures and description in the Weeks Patents, a person of ordinary skill would have understood how to distinguish between the two layers and the meaning of "substantially matches."  *See, e.g.*, *One-E-Way*, 859 F.3d at 1062-1064, 1067 (explaining that terms of degree, such as "substantial[ly]" are not indefinite if the bounds of the claim are understandable with reasonable certainty to a person of skill); *Sonix Tech. Co., Ltd. v. Publ'ns Int'l, Ltd.*, 844 F.3d 1370 (Fed. Cir. 2017) (overturning summary judgment of indefiniteness because patent provided exemplary design and examples of the allegedly indefinite term, "visually-negligible").  The limitations at issue are not indefinite.

### E.   "an alloy of gallium nitride selected from the group consisting of $Al_xIn_yGa_{(1-x-y)}N$, $In_yGa_{(1-y)}N$, and $Al_xGa_{(1-x)}N$" (EP '927 Patent Claim 10)

| MACOM's Proposed Construction: | Defendants' Proposed Construction: |
|---|---|
| No construction is needed; the plain and ordinary meaning to one of skill in the art should be applied, including that x may equal zero, y may equal zero, and the sum of (x+y) may equal zero, representing a relative amount of each respective element as a percentage of the total amount of Group III elements (Al, In, Ga). | An alloy of gallium nitride selected from the group consisting of $Al_xIn_yGa_{(1-x-y)}N$, $In_yGa_{(1-y)}N$, and $Al_xGa_{(1-x)}N$, wherein x, y, (1-x-y), (1-x), and (1-y) are decimals greater than 0 and less than 1, representing a relative amount of each respective element as a percentage of the total amount of all Group III elements (Al, In, Ga). |

Infineon seeks to limit the compositions recited in Claim 10 of the EP '927 Patent (a member of the Weeks Family) to only those alloys that have indium ("In") and/or aluminum ("Al"), asserting that "x," "y," and "x+y" ***cannot*** be zero in the chemical formulas of the relevant claim elements. Infineon's proposed construction cannot be reconciled with the disclosures of the Weeks Patents, however, and also violates a core claim construction canon.

Preliminarily, the specification of the EP '927 Patent (and the other Weeks Patents) explains that x and y ***can*** be zero. Specifically, the patents recite that the transition layer can be constructed of alloys of GaN such as $Al_xIn_yGa_{(1-x-y)}N$, $In_yGa_{(1-y)}N$, and $Al_xGa_{(1-x)}N$, and that, in some preferred embodiments, the transition layer can have a composition where x+y equals 0. [EP '927 Patent, 6:23-25 ("In some preferred embodiments, the sum of (x + y) = 0 at front surface 20, so that transition layer 12 has a composition of GaN at the front surface.").] In the scenario where x+y equal zero, the compound has ***no*** aluminum ***and no*** indium, since one cannot have negative amounts of a chemical in a compound. [Schub. ¶¶58-59.] If x and y can both be zero, then necessarily either can be zero as well.

It also makes sense that x and y can be zero because, so long as the material contains gallium and nitrogen with other group III elements such as aluminum or indium, then the material is "an alloy of gallium nitride…" regardless of whether

1   the material contains some or no aluminum or indium.  [*Id.* ¶¶60-61.]

2         Further, claims in the related '686 and '775 Patents make crystal clear that x

3   and y may be zero because, in addition to having independent claims that recite a

4   transition layer comprising an "alloy of gallium nitride consisting of $Al_xIn_yGa_{(1-x-y)}N$"—*i.e.*, exactly the same as Claim 10 of the EP '927 Patent does—they also

5   

6   include ***dependent*** claims that expressly say that ***y can be zero***.  [*E.g.*, '686 Patent

7   Claims 1-2 ("The semiconductor structure of claim 1, wherein a value of y of said

8   transition layer is selected from the group consisting of ***zero*** and substantially

9   zero.") (emphasis added); '775 Patent Claims 1-2 (same).]  It is black letter law that

10  these dependent claims must be narrower than the independent claims on which

11  they depend, meaning that y can also be zero in the independent claims.  *See Dahl*

12  *v. Swift Distribs., Inc.*, 757 F. Supp. 2d 976, 981 (C.D. Cal. 2010) (cannot infringe

13  dependent claim without infringing independent claim from which it depends).[8]

14  Infineon's proposal ignores this canon of claim construction.

15        Because x and/or y in the recited formulas can equal zero or substantially

16  zero, Infineon's construction is wrong and should be rejected.

17  **F.**    **"said transition layer is discontinuously graded" ('775 Patent Claim 2)**

| **MACOM's Proposed Construction:** No construction is needed; the plain and ordinary meaning to one of skill in the art should be applied, including that "transition layer" can include multiple layers or sub-layers and that "compositionally-graded" and "transition" are not exact synonyms. | **Defendants' Proposed Construction:** A compositionally-graded layer that is discontinuously graded. |
|---|---|

23        Infineon proposes to substitute "compositionally-graded" for "transition."

24  There is no justification, however, for the swap.  The specification uses "transition

---

8   Claims in related U.S. and foreign patents should be construed the same if there is no difference in foreign law that justifies a departure, which there is not here. *See, e.g.*, *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1290 (Fed. Cir. 2009) (approving consideration of foreign application in interpreting U.S. patent).

layer" in some places, and it uses "compositionally-graded layer" elsewhere. Moreover, there are Weeks Patent claims that recite a "compositionally-graded transition layer," making clear that, when the patentee wanted to incorporate both concepts, it did so. [*E.g.*, '921 Patent, Claims 1, 15.] In short, the two terms— "compositionally-graded" and "transition"—cannot simply be interchanged. The language chosen for the claims is intentional and should be accorded its plain meaning. There is no clarification or ambiguity that gets resolved by swapping the two terms and pretending they are synonyms. *See Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1116 (2004) ("[A] claim construction analysis must begin and remain centered on the claim language itself, for that is the language the patentee has chosen…").

Additionally, as above, Infineon's attempts to exclude layers that are made up of component or sublayers from the claim language should fail. *See* §III.A-B, *supra*. Limiting a transition layer to a single layer would be particularly inappropriate in the context of Claim 2 of the '775 Patent because the transition layer recited in that claim is "discontinuously graded," meaning that it necessarily has portions that have nonvarying compositions, such as a step-graded layer or a superlattice. A discontinuously-graded transition layer is not linearly or constantly varied throughout, as depicted in Figures 2D through 2G, and may have abrupt changes in composition, as depicted in Figures 2A, 2B, 4A through 4B. ['417 Patent Figures 2A-2B, 4A-4B.] Accordingly, in a discontinuously-graded transition layer, such as these, each separate portion can properly be considered part of the "layer." [Schub. ¶¶62-64.]

## IV.  CLAIM DISPUTES FOR THE '015 PATENT

Nitronex also developed other techniques to alleviate the mismatches between the GaN layer and Si substrate beyond those in the Weeks Patents, including the addition of a "strain-absorbing layer." Specifically, the '015 Patent

-21-

(which is ***not*** part of the Weeks Family) discloses a semiconductor structure having: (a) a Si substrate; (b) a thin layer of SiN on top of the substrate (which covers all or a majority of the top of the substrate); (c) an overlying layer of nitride-based material (such as AlN or AlGaN); and (d) a GaN material region.  [Schub. ¶¶66-67; '015 Patent, Fig. 1, Fig. 5, 1:58-2:36, 3:36-52, 7:39-9:24.]  The '015 Patent further describes a preferred embodiment where the semiconductor structure also includes a compositionally-graded transition layer formed over the overlying layer and under the GaN material region.  [*Id.*]  The '015 Patent explains that it is preferred to form a very thin (<100 angstroms thick—*i.e.*, <1/1000 of the thickness of a human hair) layer of amorphous (non-cyrstalline) SiN material "directly on" a Si substrate.  [Schub. ¶¶68-69; '015 Patent, 4:14-23, 4:29-33, 4:44-5:19.]

The '015 Patent describes ***two*** methods of forming a layer of SiN "directly on" the substrate: (1) nitridation (which Infineon has referred to as "conversion" or converting the top surface of the substrate); and (2) deposition.  [Schub. ¶¶70-73; '015 Patent, 5:37-50, 12:4-26, 12:36-61, 14:10-37.]  The '015 Patent focuses on the nitridation method for forming a layer of SiN directly on the Si substrate, even explaining the tool settings for forming such a layer.  [Schub. ¶¶71-73;. '015 Patent, 2:20-36, 12:4-26, 12:36-61, 14:10-37.]  Infineon, however, wrongly attempts to limit the '015 Patent to ***only*** the deposition process, contrary to the teachings of the patent.  Its construction also ignores the physical realities of the fabrication process.

**A.   "an amorphous silicon nitride-based material layer formed directly on the entire top surface of the silicon substrate" ('015 Patent Claim 41)**

| **MACOM's Proposed Construction:** A non-crystalline silicon nitride-based material layer formed on essentially the entire top surface of the silicon substrate, with no intervening layer, although minor defects might exist. | **Defendants' Proposed Construction:** An amorphous silicon nitride-based material deposited as a separate layer on the entire top surface of the substrate rather than converting the top surface of the substrate to silicon nitride-based material. |
|---|---|

MACOM's proposed construction for this term captures the plain and ordinary meaning of the phrase in the art, while simultaneously helping the

adjudicator understand words and processes that may be unclear to laypeople, like "amorphous" (*i.e.*, non-crystalline). Infineon's proposed construction, by contrast, excludes the preferred embodiment of the '015 Patent and is not warranted by the claim language or the patent disclosure.

The parties have two disputes with respect to this claim limitation: (1) whether the term is limited to only deposition (*i.e.*, not nitridation) processes for forming a SiN layer on a Si substrate,[9] and (2) whether the phrase "on the entire top surface of the substrate" must be construed to exclude any defects. The former issue is discussed in this Section, and the latter issue is discussed in § IV.B. below.

It is inconsistent with the '015 Patent's specification to exclude nitridation from the claims. The specification specifically explains that a layer of SiN material "formed directly on the substrate" *includes* layers formed by nitridation:

> [I]n some embodiments, the strain-absorbing layer may be formed by nitridating a top surface region of a silicon substrate. That is, the surface region of the substrate may be converted from silicon to a silicon nitride-based material to form the strain-absorbing layer. ***It should be understood that***, as used herein, ***such strain-absorbing layers may be referred to as being*** … ***"formed directly on the substrate"*** and as "covering the substrate." Such phrases ***also*** refer to strain-absorbing layers that are formed ***by depositing a separate layer*** (*e.g.*, using a separate nitrogen source and silicon source) on the top surface of the substrate and are not formed by converting a surface region of the substrate.

['015 Patent, 5:37-50 (emphasis added).] The '015 Patent specification thus expressly defines a SiN layer formed by nitridation as a layer "formed directly on the substrate" and makes clear that the invention includes wafers formed by ***either*** method. Infineon's construction contradicts the patent's express definition that

---

[9]   Infineon's Proposed Term 9 appears in Claim 41 of the '015 Patent, which includes the limitations of independent Claim 36. However, the dispute regarding whether the claims exclude nitridation processes also applies to all other claims of the '015 Patent, including asserted Claim 14.

1    layers formed by nitridation are layers "formed directly on the substrate."

2    Infineon's construction further excludes the preferred embodiment for

3    forming SiN strain-absorbing layers, which is nitridation.  Specifically, the patent

4    discusses at length how to perform a nitridation process to create a desired SiN-

5    based material layer on Si substrate, and there is no correspondingly detailed

6    discussion of how to form a SiN layer by other processes that do not convert the

7    upper portion of the substrate.  [*E.g.*, *id.*, 2:20-36, 12:5-54, 14:10-23.]  For

8    example, the patent describes forming a SiN layer on the top surface of a Si

9    substrate using nitridation by exposing a Si substrate to a single gaseous source of

10   nitrogen (such as ammonia) at high temperature.  [*id.*, 12:5-26.]  The specification

11   explains that, after the nitridation step, overlying layers composed of AlN can then

12   be formed by introducing a second source gas that provides aluminum (*e.g.*,

13   trimethylaluminum) to react the aluminum source with the nitrogen source, creating

14   and depositing a layer of AlN.  [*Id.*, 12:34-54.]  Similarly, the Example 1 process in

15   column 14 of the '015 specification also describes a process where a layer of SiN is

16   formed by nitridation by introducing a nitrogen source (ammonia) alone into a

17   reaction chamber.  [*Id.*, 14:10-23.]  While the '015 Patent specification mentions

18   that the SiN layer might be deposited as a separate layer using a separate source of

19   nitrogen and silicon (*id.*, 12:26-30), this technique is not explained in detail, is not

20   the preferred embodiment, and is in no way limiting.

21   Nothing in Claim 41 of the '015 Patent limits the claimed ***structure*** to ones

22   formed by a particular process.  Dr. Schubert concurs in this assessment.  [Schub.

23   ¶¶74-77.]  Indeed, the originally-filed claims of the '015 Patent make clear that

24   those structure claims are broad enough to include SiN layers formed by nitridation

25   because they included method claims expressly directed to nitridation processes.

26   [Ex. 18 ('015 FH, 4/1/05 App. Claims 32 and 41).]  Although the Patent Examiner

27   later required Nitronex to choose (elect) between the device claims and the method

28

claims, those original claims serve to further reinforce that the "formed directly on" language of the '015 claims include nitridation (conversion) processes.

### B.     "on the entire top surface of the silicon substrate" ('015 Patent Claim 41)

| MACOM's Proposed Construction: | Defendants' Proposed Construction: |
|---|---|
| On essentially the entire top surface of the silicon substrate, although minor defects might exist. | *See* constructions of "silicon substrate" and "an amorphous silicon nitride-based material layer formed directly on the entire top surface of the silicon substrate." |

The parties dispute whether Claim 41 is understood by a person of skill in the art to allow for minor defects in the SiN layer caused by, for instance, a speck of dirt or the clamps used to secure the structure in the formation chamber. The '015 specification does not expressly address this issue. As discussed above, however, the '015 Patent describes two processes to form a SiN layer on a Si substrate (nitridation and deposition). In either case, the process creates a layer formed directly on the entire top surface of the substrate, save for locations where the top of the substrate is blocked, for example, by clamps or a defect. [Schub. ¶¶78-81.]

Notably, clamps or other devices that cover at least a portion of the edge of the substrate are conventionally used for both processes, and defects occur with either. [*Id.* ¶¶79-80.] This is well known and understood in the art and is not particularly controversial. [*Id.*] A person of skill in the art therefore would have understood that the layer of SiN formed directly "on the entire top surface of the silicon substrate" not just might, but very likely would, include minor defects over the surface. [*Id.* ¶79-81.] Accordingly, the proper construction, based on the patent disclosure, acknowledges the physical reality that there may be minor exceptions that are unlikely to affect performance.

### V.     THE '889 PATENT

The '889 Patent, which issued in 2007, is directed to III-nitride-on-Si structures that minimize the formation of a parasitic channel at the top of a highly-

resistive substrate by reducing the concentration of free electronic carriers or dopants at the top of the substrate.[10]  [Schub. ¶¶83-84, 86-87.]  Specifically, the '889 Patent discloses a semiconductor with a III-nitride region that may include a number of layers, such as a GaN layer, a transition layer, and/or an intermediate layer, formed over a Si substrate.  [*Id.* ¶¶85, 88; '889 Patent, Fig. 1, 2:56-64).]

The '889 Patent explains that including a barrier layer of material (preferably SiN) between the substrate and the III-nitride material layer can prevent dopants from entering the substrate.  [Schub. ¶¶86-87; '889 Patent, Fig. 1, 2:56-61, 4:57-5:33.]  This barrier layer blocks dopant diffusion into the substrate, lowering the concentration of free carriers in the substrate and minimizing parasitic losses.  [Schub. ¶¶86-87; '889 Patent, 4:61-67.]  Nitronex also disclosed, as discussed in more detail above, that a very thin and amorphous layer of SiN can serve as a strain-absorbing layer.  [Schub. ¶88; '889 Patent, 5:24-33.]

**A.    "a silicon nitride-based material layer formed between the silicon substrate and the III-nitride material region" ('889 Patent Claim 9)**

| MACOM's Proposed Construction: | Defendants' Proposed Construction: |
|---|---|
| No construction is needed; the plain and ordinary meaning to one of skill in the art should be applied. | Indefinite. |

Infineon's indefiniteness argument here is barred by assignee estoppel.  *See* §III.D.1.c, *supra*.  Even if that were not so, however, Claim 9 of the '889 Patent is not indefinite because it is directed to structures clearly explained in the patent.

Claim 1 of the '889 Patent, on which Claim 9 depends, recites the structure of the specification described above: a III-nitride (*e.g.*, GaN) semiconductor with a

---

[10]  Parasitic losses are when energy is dissipated through undesirable mechanisms in high frequency devices ('889 Patent, 1:42-46), and can occur when a "parasitic conducting channel" forms at the top of a highly-resistive Si substrate.  [*Id.*, 2:41-48.]  This parasitic channel provides a pathway for electrical current to flow through the channel, which undesirably dissipates power and reduces efficiency.  [*Id.*, 2:64-3:3.]

III-nitride material region formed over a Si substrate having high resistivity and a low peak free carrier concentration (*i.e.*, a low concentration of dopants). ['889 Patent Claim 1.] Claim 9 also requires a layer of SiN-based material "between" the substrate and the III-nitride material region. [*Id.*, Claim 9.] This means that the SiN layer is over the substrate, but below the III-nitride material region.

Figure 1 of the '889 Patent depicts the structure recited in Claim 9—a semiconductor device (10), having a Si substrate (14), with a III-nitride material region (12) over the substrate, and a layer (16), preferably made of a SiN-based material, that is over the substrate but below the III-nitride material region (12). ['889 Patent, Figure 1, 2:56-64, 5:9-14.]



Fig. 1

The specification explains that layer (16) in the figure is "formed between," meaning it is located between, the substrate (14) and the III-nitride material region (12): "Structure 10 includes a III-nitride material region 12 formed on a silicon substrate 14. As shown, one or more layers (*e.g.*, layer 16) may be *formed between* the substrate and the III-nitride material region." ['889 Patent 2:57-61 (emphasis added).] In other words, "formed between," in the '889 Patent denotes a structure where the layer is above one layer and below the other layer.

The specification further explains that, in preferred embodiments, layer (16) is formed directly on the substrate and below the III-nitride material layer to serve as a barrier layer that prevents reactive elements (like Al or Ga) from the overlying III-nitride layer from entering the substrate. ['889 Patent, 4:57-5:2.] Thus, at least part of the purpose of the layer (16) is to reduce the free carriers at the top of the substrate. It is necessary for the layer to be located (formed) above the substrate and below the III-nitride material region layers to serve this barrier function.

[Schub. ¶¶91-92.]  A person of skill would have well understood that Claim 9 is directed to the structure in Figure 1.  [*Id.*]

Despite this clarity, Infineon claims that Claim 9 is indefinite, meaning that a person of skill in the art is supposedly unable to understand the scope of the claim with reasonable certainty. *Nautilus*, 134 S. Ct. at 2124.  MACOM can only guess as to Infineon's theory at this stage, but suspects that Infineon will rely as its support for its position on an obvious drafting error that occurs in only one sentence in the specification.  Specifically, the '015 specification states in one place that: "Structures of the invention may include a layer formed between the substrate and the III-nitride material region.  Thus, in these cases, the III-nitride material region may be formed directly on the ***substrate***." [*Id.*, 5:3-6 (emphasis added).]

What is meant, obviously, since the sentence before refers to the layer "between" the substrate and the III-nitride material region, is that the III-nitride material region is formed directly on the ***layer***.  This correction also reflects the structure depicted in Figure 1 and described in column 6, "[a]s shown, III-nitride material region 12 is formed on layer 16." ['889 Patent, 6:16-17.]  Indeed, the process disclosed in the '889 Patent forms a SiN layer between the substrate and the SiN layer by nitridating the Si substrate and then introduces a second source gas to form the intermediate layer portion of the III-nitride material region over the SiN-based material layer.  [*Id.*, 11:48-59.]

As Dr. Schubert explains, this drafting error in this sentence would be apparent to a person of ordinary skill in the art. [Schub. ¶¶93-94.]  Courts consistently ignore obvious typographical or similar errors when the overall disclosure is clear to a person of skill in the art. *E.g.*, *DCG Sys., Inc. v. Checkpoint Tech., LLC*, No. 11-CV-03792-PSG, 2012 WL 4937969, at **2-3, *3 n 27 (N.D. Cal Oct 17, 2012) (claim ***not*** indefinite where mistaken equation in specification only applied to certain embodiments in claim and where a person of skill "would further understand whether and how to correct" equation in specification); *Cal. Inst.*

1   *of Tech. v. Hughes Comm'ns Inc.*, 35 F. Supp. 3d 1176, 1189-90 (C.D. Cal. 2014)

2   ("Hughes' indefiniteness arguments focus primarily on alleged shortcomings of the

3   specification.  But in its analysis, Hughes disregards the hypothetical reader of the

4   specification....  This person has pre-existing knowledge of the art and can refer to

5   this knowledge while reading the patent."); *CBT Flint Partners, LLC v. Return*

6   *Path, Inc.*, 654 F.3d 1353, 1358 (Fed. Cir. 2011) (court "may correct an obvious

7   error in a patent claim").  Here, a person skilled in the art would have recognized

8   that "substrate" should have been "layer."[11]

9         In view of the specification, a person of ordinary skill would know that "a

10   SiN-based material layer formed between the substrate and the III-nitride material

11   region" describes the structure depicted in Figure 1 and described throughout the

12   patent: a III-nitride material layer above a SiN-based material layer, where the SiN-

13   based material layer is above a substrate.  Because a person of skill would have

14   understood the meaning of Claim 9, it is not indefinite.

15                    **VI.    THE '002 PATENT**

16         The '002 Patent discloses semiconductor devices having vias (*i.e.*, vertical

17   interconnect accesses, which are pathways through layers of a device that allow for

18   electrical connections to be made from above one or more particular layers to below

19   the particular layers) that provide conduction from the top to the bottom of the

20   device.  [Schub. ¶¶95-97; '002 Patent, Abstract.]  Specifically, the '002 Patent is

21   directed to semiconductor devices with vias from the back (at the bottom of the

22   substrate) partially or fully to the top of the devices.  [Schub. ¶¶98-99; '002 Patent,

23   Figs. 1, 3, 9:7-15.]  Backside contacts enable smaller devices because the device

24   _____

25   [11]   Additionally, the language of the sentence in question is optional ("may be")

26   and only applies to certain embodiments.  Thus, even if the statement is taken at face value, ignoring the error, it hardly undermines the disclosure of the rest of

27   the specification, which demonstrates that a layer "formed between" the substrate and the overlying III-nitride material region means that the "layer" is

28   situated above the substrate and below the overlying region.

can have external contacts that can be connected to the terminals of a power supply both above and below the substrate.  [Schub. ¶100; '002 Patent, 1:36-58.]

### A.    "the via is formed through the substrate" ('002 Patent Claim 8)

| MACOM's Proposed Construction: | Defendants' Proposed Construction: |
|---|---|
| No construction is needed; the plain and ordinary meaning to one of skill in the art should be applied, including that the via forms a vertical conducting path through the substrate and that the via need not be created using a particular manufacturing process (*e.g.*, this claim is not limited to vias that are etched from the backside of the substrate to the front side of the substrate). | The opening is etched from the bottom surface to at least the top surface of the substrate. |

This term requires only that a via or opening be "formed" through the substrate.  But Infineon seeks to require that it be formed in a specific manner—*i.e.*, etched from the bottom to the top.  There is nothing in the claim language or the specification which justifies reading this limitation into the claim.

Claim 8 of the '002 Patent is directed to a device with a certain structure; it is not directed to a method of making or manufacturing the device.  Indeed, the '002 specification does not define a via as being formed by etching in a particular matter. [Schub. ¶¶102-104.]  Instead, the '002 Patent discloses details about the via's structure, such as that it might extend all the way through the device (including through the substrate), to connect the top and bottom of the device.  ['002 Patent, 9:12-15 ("[B]ackside contact 20 may extend substantially through the thickness of the device so that the backside contact also forms a contact on topside 18 of the device.").]  Especially in this embodiment, where the via and the contact extends through the entire device, it makes no difference whether the via is etched from the top to the bottom or vice-versa.  [*See* Schub. ¶¶104-105.]  Infineon's unduly limiting construction should be rejected.

DATED:  March 2, 2018

**PERKINS COIE LLP**

By:/s/ *Amanda Tessar*

Lara J. Dueppen, Bar No. 259075
LDueppen@perkinscoie.com
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, CA 90067-1721
Telephone:  310.788.9900
Facsimile:  310.788.3399

Amanda Tessar (*pro hac vice*)
ATessar@perkinscoie.com
Elizabeth Banzhoff (*pro hac vice*)
EBanzhoff@perkinscoie.com
PERKINS COIE LLP
1900 Sixteenth Street, Suite 1400
Denver, CO  80202-5255
Telephone:  303.291.2357
Facsimile:  303.291.2457

Ramsey M. Al-Salam, Bar No. 109506
RAlSalam@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone:  206.359.6835
Facsimile:  206.359.7385

Philip A. Morin, Bar No. 256864
PMorin@perkinscoie.com
PERKINS COIE LLP
11988 El Camino Real, Suite 350
San Diego, CA  92130-2594
Telephone:  858.720.5700
Facsimile:  858.720.5799

Daniel T. Keese, Bar No. 280683
DKeese@perkinscoie.com
PERKINS COIE LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Telephone:  503.727.2000
Facsimile:  503.727.2222

Morgan Chu (State Bar No. 70446)
(mchu@irell.com)
Joseph M. Lipner (State Bar No. 155735)

-31-

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

(jlipner@irell.com)
Ellisen Turner (State Bar No. 224842)
(eturner@irell.com)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276
Telephone:  310-277-1010
Facsimile:  310-203-7199

Nima Hefazi (State Bar No. 272816)
(nhefazi@irell.com)
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA  92660
Telephone:  949-760-0991
Facsimile:  949-760-5200

**ATTORNEYS FOR PLAINTIFFS**