Lara J. Dueppen, Bar No. 259075
LDueppen@perkinscoie.com
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, CA 90067-1721
Telephone: 310.788.9900
Facsimile: 310.788.3399

Amanda Tessar (admitted *pro hac vice*)
ATessar@perkinscoie.com
PERKINS COIE LLP
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5255
Telephone: 303.291.2300
Facsimile: 303.291.2400

Ramsey M. Al-Salam, Bar No. 109506
RAlSalam@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue, Suite 4900
Seattle, WA 98101-3099
Telephone: 206.359.6835
Facsimile: 206.359.7385

**ATTORNEYS FOR PLAINTIFFS**
(Additional Counsel Listed on Signature Page)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC., a Delaware corporation, and NITRONEX, LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>INFINEON TECHNOLOGIES AG, a corporation organized under the laws of Germany, and INFINEON TECHNOLOGIES AMERICAS CORP., a Delaware corporation,<br><br>Defendants. | Case No. CV 16-02859 CAS (PLAx)<br><br>**MACOM'S RESPONSIVE CLAIM CONSTRUCTION BRIEF** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................. ii

TABLE OF ABBREVIATIONS AND CONVENTIONS ...................................... iv

I.   INTRODUCTION AND REBUTTAL OF INFINEON'S ERRORS OF LAW .................... 1

II.  DISPUTED TERMS FOR THE WEEKS FAMILY ....................................................... 1

    A.  "compositionally-graded layer" ('034, '335, '686 Patents)/ "compositionally-graded transition layer" ('921, EP '927 Patents) ........... 1

       1.  The Specification Does Not Limit "Layer" To A Single Layer ......... 2

       2.  Infineon's Litigation-Driven Statements During Prosecution Of An As-Yet Unissued Related Application Should Not Be Credited ... 4

       3.  Infineon's Hypothetical Box-Drawing Exercise Ignores The Broader Context Of Different Layers Of The Weeks Patents ......................... 6

    B.  "intermediate layer" ('034, '119, '335, '686, '862, '921, EP '927 Patents) ....................................................................................................................... 6

    C.  "substantially matches" ('417, '862, '921 Patents) ................................... 7

    D.  "a composition of said transition layer at a top surface thereof substantially matches a composition of said [GaN] material layer [III-nitride layer] at a bottom surface thereof" ('417, '862, '921 Patents) ........ 8

       1.  Judicial And Assignee Estoppel Apply Here ..................................... 8

       2.  The Language Of The Disputed Claims Is Not Indefinite ............... 10

    E.  "an alloy of gallium nitride selected from the group consisting of $Al_xIn_yGa_{(1-x-y)}N$, $In_yGa_{(1-y)}N$, and $Al_xGa_{(1-x)}N$" (EP '927 Patent) ............. 11

    F.  "said transition layer is discontinuously graded" ('775 Patent) .............. 12

III. DISPUTED TERMS FOR THE '015, '889, AND '002 PATENTS ............................... 12

    A.  "an amorphous silicon nitride-based material layer formed directly on the entire top surface of the silicon substrate" ('015 Patent) .......................... 12

    B.  "on the entire top surface of the silicon substrate" ('015 Patent) ............. 13

    C.  "a silicon nitride-based material layer formed between the silicon substrate and the III-nitride material region" ('889 Patent) ...................... 14

    D.  "the via is formed through the substrate" ('002 Patent) ........................... 15

## TABLE OF AUTHORITIES

**CASES**

*Avid Tech., Inc. v. Harmonic, Inc.*,
   812 F.3d 1040 (Fed. Cir. 2016) ......................................................... 7

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
   438 F.3d 1374 (Fed. Cir. 2003) ....................................................... 13

*Datamize, LLC v. Plumtree Software, Inc.*,
   417 F.3d 1342 (Fed. Cir. 2005) ......................................................... 4

*Ex Parte Kenichi Miyazaki*,
   89 U.S.P.Q. 2d 1207 ....................................................................... 10

*Ex Parte McAward*,
   App. No. 2015-006416 ..................................................................... 10

*Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*,
   381 F.3d 1111 (2004) ....................................................................... 7

*In re Ark-La-Tex Timber Co.*,
   482 F.3d 319 (5th Cir. 2007) ..................................................... 9fdat

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
   358 F.3d 898 (Fed. Cir. 2004) .................................................. 1, 2, 7

*MIT v. Shire Pharms., Inc.*,
   839 F.3d 1111 (Fed. Cir. 2016) ......................................................... 7

*Nautilus, Inc. v. Biosig Instr., Inc.*,
   134 S. Ct. 2120 (2014) ........................................................... 9, 10, 11

*O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*,
   521 F.3d 1351 (Fed. Cir. 2008) ......................................................... 1

*Phillips v. AWH Corp.*,
   415 F.3d 1303 (Fed. Cir. 2005) (*en banc*) ................................. 1, 2, 7

*Reed Elsevier, Inc. v. Muchnick*,
   559 U.S. 154 (2010) ........................................................................... 9

*Research Corp. Techs., Inc. v. Microsoft Corp.*,
    627 F.3d 859 (Fed. Cir. 2010) ........................................................................ 1, 12

*Rissetto v. Plumbers & Steamfitters Local 343*,
    94 F.3d 597 (9th Cir. 1996) ................................................................................ 9

*Summit 6, LLC v. Samsung Elec. Co.*,
    802 F.3d 1283 (Fed. Cir. 2015) ........................................................................... 1

*Transcend Med., Inc. v. Glaukos Corp*,
    No. 13-830, 2015 WL 5546988 (D. Del. Sept. 18, 2015) ................................. 14

*Unique Concepts, Inc. v. Manuel*,
    No. 85 C 4181, 1986 WL 8039 (N.D. Ill. July 16, 1986) ................................. 14

*Vanguard Prod. Corp. v. Parker Hannifin Corp.*,
    234 F.3d 1370 (Fed. Cir. 2000) .................................................................... 12, 15

*Wyler Summit P'ship v. Turner Broad. Sys.*,
    235 F.3d 1184 (9th Cir. 2000) ............................................................................. 9

**OTHER AUTHORITIES**

Manual of Patent Examining Procedure § 2163 ......................................................... 8

## TABLE OF ABBREVIATIONS AND CONVENTIONS

| Term or Issue | Meaning or Convention |
|---|---|
| '417 Patent | U.S. Patent No. 8,344,417, which is a member of the Weeks Family; citations to the shared specification of the Weeks Family Patents in Section III are generally to the specific column/line numbering of the '417 Patent; Ex. 1 |
| '921 Patent | U.S. Patent No. 8,105,921, also a member of the Weeks Family; Ex. 2 |
| '862 Patent | U.S. Patent No. 8,592,862, also a member of the Weeks Family; Ex. 3 |
| '034 Patent | U.S. Patent No. 8,928,034, also a member of the Weeks Family; Ex. 4 |
| '335 Patent | U.S. Patent No. 8,937,335, also a member of the Weeks Family; Ex. 5 |
| '775 Paten | U.S. Patent No. 9,064,775, also a member of the Weeks Family; Ex. 6 |
| '686 Patent | U.S. Patent No. 9,437,686, also a member of the Weeks Family; Ex. 7 |
| '119 Patent | U.S. Patent No. 9,461,119, also a member of the Weeks Family; Ex. 8 |
| EP '927 Patent | European Patent EP1343927, also a member of the Weeks Family; Ex. 9 |
| '015 Patent | U.S. Patent No. 7,352,015; Ex. 10 |
| '889 Patent | U.S. Patent No. 7,247,889; Ex. 11 |
| '002 Patent | U.S. Patent No. 6,611,002; Ex. 12 |
| '287 Patent | U.S. Patent No. 6,649,287, the patent issued from the parent application of the Weeks Family; attached as Ex. 19 filed concurrently herewith |
| Al | Aluminum |
| AlGaN | Aluminum-gallium nitride |
| AlN | Aluminum nitride |

| Term or Issue | Meaning or Convention |
|---|---|
| Emphasis | All emphasis added, unless otherwise indicated |
| Ex. 1-18 | Exhibits to the Declaration of Daniel Keese, filed in support of MACOM's Opening Claim Construction Brief |
| Ex. 19-___ | Exhibits to the Declaration of Daniel Keese, filed concurrently herewith |
| Ga | Gallium |
| GaN | Gallium Nitride |
| GaN-on-Si or GaN/Si | Gallium Nitride on Silicon |
| In | Indium |
| Infineon | Defendants Infineon Technologies Americas Corp. (previously Infineon Technologies North America Corporation) and Infineon Technologies AG |
| Inf. Br. ___ | Infineon's Opening Claim Construction Brief, filed March 2, 2018 |
| Internal quotation marks and citations | All omitted, unless otherwise indicated |
| IR | International Rectifier, the predecessor-in-interest to Infineon; Infineon has represented that IR became Defendant Infineon Technologies Americas Corp. |
| MACOM | Plaintiffs MACOM Technology Solutions Holdings, Inc. and Nitronex, LLC, unless the context dictates otherwise |
| MACOM Br. ___ | MACOM's Opening Claim Construction Brief, filed March 2, 2018 |
| Nitronex | Nitronex Corp. and/or Nitronex LLC |
| Nitronex Patents | Patents and applications transferred from Nitronex to IR under the 2010 Purchase Agreement and 2010 License Agreement and applications that have issued as continuations of the transferred patents and applications |

| Term or Issue | Meaning or Convention |
|---|---|
| Schub., ¶_ | Declaration of Dr. E. Fred Schubert, filed in support of MACOM's Opening Claim Construction Brief |
| Schub. Reb., ¶_ | Rebuttal Declaration of Dr. E. Fred Schubert, filed concurrently herewith |
| Shealy, ¶_ | Declaration of Dr. James R. Shealy Regarding Claim Construction |
| Si | Silicon |
| SiN | Silicon nitride |
| Weeks Patents or Weeks Family | A family of U.S. and foreign Nitronex Patents, including some of the patents listed above; the parent patent in this family is U.S. Patent 6,649,287, so the Weeks Family is sometimes referred to as the Weeks '287 Family; inventor T. Warren Weeks, Jr. is the lead inventor for this patent family |

## I.   INTRODUCTION AND REBUTTAL OF INFINEON'S ERRORS OF LAW

Infineon's unduly narrow constructions graft method limitations onto apparatus claims and limit the claims to particular examples/embodiments.  But, as a matter of law, these approaches are wrong.  Apparatus claims are not limited to particular processes.  *Research Corp. v. Microsoft Corp.*, 627 F.3d 859, 873 (Fed. Cir. 2010) ("Courts must generally take care to avoid reading process limitations into an apparatus claim ... [T]he process by which a product is made is irrelevant to the question of whether that product infringes a pure apparatus claim.").  Similarly, claims are not limited to embodiments in the specification.  *Phillips*, 415 F.3d at 1319-20 (reading limitation into claims from written description is a "cardinal sin of patent law"); *Liebel,* 358 F.3d at 906 ("[W]hen the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope….").

Contrary to Infineon's complaints, it is entirely appropriate to construe a term as having its "plain and ordinary meaning."  *Summit 6, LLC v. Samsung Elec. Co.*, 802 F.3d 1283, 1290-91 (Fed. Cir. 2015) (no error to reject proposed construction and refusing to further construe claim); *Phillips*, 415 F.3d at 1312-13 (Fed. Cir. 2005) ("We have frequently stated that the words of a claim are generally given their ordinary and customer meaning.").  Further, MACOM has not said just "plain meaning," but has also addressed how that plain meaning resolves the parties' disputes.  The Court would not fail to resolve any genuine claim construction disputes by adopting MACOM's approach.  *See 02 Micro*, 521 F.3d at 1360-61.

## II.   DISPUTED TERMS FOR THE WEEKS FAMILY

### A.   "compositionally-graded layer" ('034, '335, '686 Patents)/ "compositionally-graded transition layer" ('921, EP '927 Patents)

Much of Infineon's brief is premised on the assertion that a compositionally-graded transition layer must be formed without stopping, such that it has no component layers or sublayers, while an intermediate layer must have a constant,

non-graded composition.  Otherwise, Infineon argues, a person of skill would be unable to distinguish between an intermediate layer and a graded transition layer.[1] [*E.g.*, Inf. Br., 9:16-12:10.]  But the Weeks Patents do not limit a compositionally-graded (transition) layer to a single layer without sublayers, and a person of skill can distinguish these layers based on their functions.  Infineon's construction wrongly limits the claims to what is, at most, a single embodiment in the patents.

### 1.    The Specification Does Not Limit "Layer" To A Single Layer[2]

Infineon obscures the parties' dispute by pointing to the patent's definition of "compositionally-graded layer" ("a layer having a composition that varies across at least a portion of the thickness …").  But that is not the dispute.  Instead, the dispute is about Infineon's reading of "a layer" as a single layer with ***no*** sublayers.

Infineon acknowledges that a compositionally-graded (transition) layer cannot have a constant composition throughout, but then incorrectly concludes that it must be limited to a "single" layer.  [Inf. Br., 4:8-5:10.]  In short, Infineon assigns "a layer" a meaning that cannot be reconciled with the Weeks Patents or how the terms would have been understood by a person of skill.  [Schub. Reb., ¶¶4-8.]

Infineon relies on a "preferred method" for growing a transition layer—using MOCVD processes—to support its construction.  [Inf. Br., 4:8-5:10 (citing '417 Patent, 9:3-6, 9:67-10:3).]  But it is improper to limit claims to a preferred embodiment, even in situations where the "preferred method" is correctly described.  *See, e.g.*, *Phillips*, 415 F.3d at 1323 ("[W]e have repeatedly warned against confining the claims to those [specific] embodiments."); *Liebel*, 358 F.3d at 906.  And, notably, Infineon misdescribes the example processes here, arguing that the formation reaction of the preferred embodiment "proceeds until a layer of

---

[1]   Infineon's definition of a person of skill in the art is too restrictive, but Dr. Schubert was a person of skill in the art as of 2000 (when the Nitronex Patents were filed) even under Infineon's definition.  [Schub. Reb., ¶3.]

[2]   Infineon cites its tutorial in support of its arguments for this term (Inf. Br., n.1) and for its '015 arguments below (*id.*, 22:21), but tutorials are not evidence.

1    desired thickness is achieved." [Inf. Br. 4:10-5:10 (citing '417 Patent).] The cited

2    examples describe varying the process parameters while growing a transition layer,

3    but they do **not** state that the entire transition layer must be grown without stopping

4    the reaction. ['417 Patent, 8:56-9:6, 9:36-56, 11:13-38; Schub. Reb., ¶¶6-8.]

5            Infineon also imposes its own categorization paradigm on the Weeks Patents

6    that contradicts the disclosures of those patents. Namely, Infineon claims there are

7    three **mutually-exclusive** types of transition layers: a compositionally-graded layer,

8    a superlattice, and a combination of the two. [Inf. Br., 2:22-28, 5:11-12.] Not only

9    does this approach conflate "compositionally-graded transition layer" with

10   "compositionally-graded layer," the distinctions that Infineon draws are also simply

11   wrong. The patents are clear that a compositionally-graded transition layer can **be** a

12   superlattice ('417 Patent, 5:39-50) or a combination of a compositionally-graded

13   layer and a superlattice (*id.*, 6:12-17). Alternatively, the compositionally-graded

14   transition layer can be formed from one or more layers that vary in composition, as

15   shown in Figures 2A-2I. [*See also id.*, 4:14-45, 5:3-6:15.]

16           Infineon claims that the patents never refer to a "compositionally-graded

17   layer" as encompassing multiple sublayers or component layers, but this is not true

18   for a compositionally-graded transition layer. The patent specifically refers to a

19   "strained layer superlattice" with multiple layers as both a "transition layer" and as

20   "compositionally-graded"—in other words, as a compositionally-graded transition

21   layer. ['417 Patent, 4:39-41 ("[T]ransition layer 12 may be a compositionally-

22   graded strained layer superlattice 22….").] In short, the Weeks Patents do not

23   support the reading that the superlattice always encompasses multiple constituent

24   layers, while a compositionally-graded layer never does. To the contrary, the

25   Weeks Patents generally do not distinguish between a compositionally-graded

26   transition layer and the superlattice embodiment, and further do not restrict the

27   compositionally-graded layers depicted in Figures 2A-2I to a single layer.

28

Infineon argues that lines in Figures 1 and 3A of the patents correspond to physical interfaces created when layers are stopped during the formation reaction, but this is also not correct.  [Schub. Reb., ¶¶9-11.]  Where the composition between the two layers is the same, there generally is no observable interface in the structures.  [*Id.*]  Further, the Weeks Patents do not state that the reaction stops between any of the intermediate layer and transition layer, the transition layer and the GaN layer, or the layers of a superlattice, so the interfaces Dr. Shealy describes might not exist in these locations if Dr. Shealy's approach was credited.  [*Id.*]

### 2.    Infineon's Litigation-Driven Statements During Prosecution Of An As-Yet Unissued Related Application Should Not Be Credited

The prosecution history of a continuation application can often be relevant when construing the claims of an earlier-issued application.  *E.g., Datamize, LLC v. Plumtree Software, Inc.*, 417 F.3d 1342, 1352-53 (Fed. Cir. 2005).  Citing to this line of authority, Infineon relies on the prosecution of its currently pending App. No. 15/240,789 in support of its claim construction here.

The circumstances of this case are unique, however, as Infineon has the unusual power of being able to manipulate the continuing prosecution file history to its litigation advantage.  The prosecution history statements that Infineon cites in support of its claim construction were made in an office action response that ***Infineon*** itself filed on ***April 13, 2017***—over a year after this suit commenced, when MACOM had already asserted (and Infineon had denied) that Infineon was breaching its exclusivity commitments, and while the parties were engaging in discovery to determine if Infineon was violating the preliminary injunction.

In the ordinary case, the accused infringer cannot control the prosecution history.  But here, as the owner of the Nitronex Patents, Infineon both controls prosecution of pending Nitronex applications ***and*** is simultaneously arguing in this case that it is not practicing earlier-issued Nitronex-Patents within the Exclusive Field.  In these circumstances, Infineon's manufactured prosecution history

-4-

statements should be given no weight because they are not a reliable indicator of the meaning of those terms in the earlier-issued Weeks Patents at issue here.[3] Infineon should not be allowed to use statements made now to "backfill" support for claim construction arguments that find no support in the relevant specifications.

Infineon also cites the prosecution history of the EP '927 Patent in support of its arguments, but this history actually supports MACOM's construction, not Infineon's. During prosecution of the EP '927 Patent, the Examiner consistently interpreted "compositionally-graded layer" as encompassing a layer having multiple sublayers. He rejected claims reciting a compositionally-graded transition layer based on Suzuki, which discloses a series of two buffer layers and a mitigation layer (12, 14, and 14) that have different, but non-varying, compositions. [*See* Ex. G, Dkt. No. 439-9 at 105-6.] Nitronex did not contest that three layers could constitute the recited "compositionally-graded layer," but instead argued that "the first and second buffer layers may comprise the material ***having the same composition***, but deposited under different conditions." [*Id.* at 112 (emphasis added).] In other words, Nitronex's argument was not that the claims excluded a layer with sublayers, but that the actual layers in Suzuki were not compositionally-graded because they had the same, not varying, compositions. Regardless, the Examiner did not accept Nitronex's position and ***maintained*** his rejection. [Ex. 20 at 26; Ex. H, Dkt. 439-10, at Claims 4-5, ¶¶19, 25-29.] The Examiner interpreted the claimed compositionally-graded transition layer as encompassing three separate sublayers, each with a constant composition internally, but different compositions between the separate buffer sublayers. [*Id.*] This prosecution history thus supports MACOM's construction here that "a" layer can have sublayers, not Infineon's.

---

[3] Supporting that the file wrapper statements in question were made as part of a larger strategy to manufacture support for Infineon's litigation positions, the statements were unnecessary to distinguish the Shibata reference because the layers of Shibata are active layers, not transition layers. [Schub. Reb., ¶¶12-14.]

### 3. Infineon's Hypothetical Box-Drawing Exercise Ignores The Broader Context Of Different Layers Of The Weeks Patents

Infineon argues that, if the transition layer of the Weeks Patents is not limited to a single layer without component or sublayers, the patents are indefinite because a person of skill would be unable to distinguish between a transition layer and an intermediate layer. [Inf. Br., 9:16-10:28; Shealy, ¶¶35-40.] Infineon and its expert proceed to discuss a hypothetical stack of layers comprising a transition layer and/or intermediate layers, arguing that a person of skill would be unable to distinguish the two under MACOM's approach. [*Id.*]

Infineon is wrong because it ignores the broader context of the patents, which describe the *functions* of the intermediate and transition layer at length and provide examples to guide persons of skill in the art. [Schub. Reb., ¶¶15-20.] A person of skill would understand these disclosures and distinguish between the transition and intermediate layers with reasonable certainty by evaluating the function of each layer in an accused product. [*Id.*, ¶¶17-20.] Infineon's hypothetical injects confusion because it ignores the placement of the layers, their thicknesses, their coefficients of thermal expansion, and the amount of gallium versus other materials. [*Id.* ¶20.] In short, MACOM's construction does not render the patents indefinite.

**B. "intermediate layer" ('034, '119, '335, '686, '862, '921, EP '927 Patents)**

Infineon contests the meaning of "intermediate layer" not because its own products do not have an intermediate layer under its proposed definition (they do). Instead, Infineon's theory as to "intermediate layer" is merely one component of its incorrect, wider view that all Weeks claims require a compositionally-graded layer formed through a single deposition process that results in "a" layer. Under Infineon's view, "intermediate layer" explains the other layers in the embodiments of the patents. In short, when anything but the single, continuous deposition step is used, Infineon categorizes such layers (which are actually component layers or sublayers of the compositionally-graded transition layer) as "intermediate."

1   Infineon's proposed construction is wrong.  As discussed, a transition layer
2   can be formed from multiple layers having constant, but differing, compositions.
3   ['417 Patent, Fig. 2A, 2B, 3A-4B, 5:3-54, 5:60-62.]  As also discussed, a person of
4   skill would be able to distinguish between a transition and intermediate layer under
5   MACOM's constructions.  [Schub. Reb., ¶¶15-21.]  For example, the Weeks
6   Patents describe the intermediate layer as allowing a thinner transition layer, as
7   usually being >500 microns thick, and as preferably having a coefficient of thermal
8   expansion relatively close to the substrate.  ['417 Patent, 8:28-47.]

9   **C.      "substantially matches" ('417, '862, '921 Patents)**

10   Infineon's construction of "substantially matches" is inconsistent with the
11   plain language of the claim, renders "substantially" superfluous, and improperly
12   limits the claims to one of multiple embodiments.  The plain language of
13   "substantially matches" is broader than "matches" or "the same."  Even Infineon
14   agrees that a construction rendering a term superfluous is improper.  [*See* Inf. Br. at
15   20 (*citing Innova*, 381 F.3d at 1119).]  Where the patentee meant for the top of the
16   transition layer to have "the same" composition as the GaN layer, it said exactly
17   that ('417 Patent, 4:57-59), rather than using the "substantially matches" language
18   of the relevant claims.  Further, just because perfect matching is disclosed as a
19   preferred embodiment, it does not limit clearly broader claim language to that
20   embodiment.  *See, e.g.*, *Phillips*, 415 F.3d at 1323; *Liebel*, 358 F.3d at 906.

21   Infineon's argument to the contrary relies heavily on a passage from the '921
22   prosecution history.  [Inf. Br., 13:12-24; Shealy ¶¶41-46.]  A patent claim term's
23   ordinary meaning is not limited by prosecution history absent a "clear and
24   unmistakable disclaimer," however.  *MIT v. Shire Pharms., Inc.*, 839 F.3d 1111,
25   1119 (Fed. Cir. 2016); *Avid Tech., Inc. v. Harmonic, Inc.*, 812 F.3d 1040, 1045,
26   (Fed. Cir. 2016) ("Where the alleged disavowal is ambiguous, or even amenable to
27   multiple reasonable interpretations, we have declined to find prosecution
28   disclaimer.").  ***No*** disclaimer—clear or otherwise—occurred here.

-7-

Specifically, Infineon argues that IR "equated" "substantially matches" with exact matching during '921 prosecution.  But there was no statement "equating" these concepts.  The Patent Office requires an applicant seeking to amend claims to point out where the patent specification supports the amendment.  *See* MPEP 2163 ("With respect to … amended claims, applicant should show support in the original disclosure ….") (Ex. 21 at 33).  In the passage in question, IR pointed out where an example of having the top of the transition layer "substantially match" the bottom of the GaN layer was disclosed in the specification—*i.e.*, the example of where they exactly matched.  Just because an exact match is one example of a substantial match, that does not mean "substantially matches" is limited to only exact matches.

**D.    "a composition of said transition layer at a top surface thereof substantially matches a composition of said [GaN] material layer [III-nitride layer] at a bottom surface thereof" ('417, '862, '921 Patents)**

Infineon argues that this term is indefinite and thus that the claims reciting it are invalid.  Infineon is estopped, however, from advocating this position by both judicial and assignee estoppel.  But, even if its arguments are considered, Infineon has not shown by clear and convincing evidence that the claims are invalid.

**1.    Judicial And Assignee Estoppel[4] Apply Here**

Infineon took the position before the Patent Office that the claims met the requirements for patentability, but now takes the opposite position.[5]  As discussed in MACOM's opening brief, courts have consistently prohibited a party from taking inconsistent positions where it was successful in advocating the contrary position before an administrative agency or court in earlier proceedings.  In response, Infineon makes two arguments: (1) estoppel does not apply because it "never argued the indefiniteness issues raised here" before the Patent Office; and (2) any

---

[4]  Infineon did not address assignee estoppel in its brief, so MACOM does not address it further here, although it maintains that it applies.

[5]  Infineon's predecessor, IR, prosecuted the '921, '417, and '862 Patents at the Patent Office, and Infineon has continued to prosecute claims that also include the same limitations it now says are indefinite.  [*See* '119 Patent, Claim 1.]

-8-

1   argument was excused anyway because of the "change of the standard [for

2   indefiniteness] in *Nautilus*." [Inf. Br. at 29-30.] Neither argument has merit.

3        First, there is no requirement that Infineon have expressly uttered the words

4   "this term is definite" during prosecution for estoppel to apply. It is inconsistent

5   ***positions*** that create the estoppel. Infineon successfully advocated before the

6   Patent Office that the claims were patentable—and now takes the opposite position.

7   Judicial estoppel precludes this approach. *Rissetto*, 94 F.3d at 600.

8        The only cases cited by Infineon are inapt. In *Wyler Summit*, for example,

9   the court held that plaintiff had taken no inconsistent position. 235 F.3d at 1190-91

10  ("[T]he fact that Mr. Wyler claimed $50,000 … on his taxes does not … contradict

11  Wyler Summit's current claim…."). In contrast, Infineon has taken inconsistent

12  positions before the Patent Office and here. And, in the only other cases cited by

13  Infineon, the party not estopped was ***unsuccessful*** in advocating an earlier

14  inconsistent position. In *Reed Elsevier*, 559 U.S. at 169-70, for example, the

15  defendant had previously asserted, unsuccessfully, both that the district court did

16  not have subject matter jurisdiction over a class action and that it did have

17  jurisdiction to approve a settlement. The Supreme Court held these ***unsuccessful***

18  positions did not create estoppel. Similarly, in *Ark-LA-Tex Timber*, the Fifth

19  Circuit acknowledged that the "doctrine of judicial estoppel prohibits parties from

20  deliberating changing positions according to the exigencies of the moment …."

21  482 F.3d at 332-33. The court did not apply judicial estoppel, however, because the

22  party to be estopped "was not successful in persuading the [court] to accept its

23  earlier position," and because the "failure to assert a particular position does not

24  trigger estoppel." *Id.* at 332-33 (also noting that estoppel applies to ***positions***

25  taken). These situations are clearly distinct from the instant case, where Infineon

26  ***did prevail*** that the claims were patentable and their current position creates the

27  "perception that [the Patent Office] was misled." *Reed Elsevier,* 559 U.S. at 170.

28       Further, as explained in MACOM's opening brief, reliance on *Nautilus* is a

red herring.  The Patent Office standard for definiteness has been stricter than that for district courts at all relevant times.  *See Ex Parte Kenichi Miyazaki*, 89 U.S.P.Q. 2d 1207 at \*6; *Ex Parte McAward*, App. No. 2015-006416.  *Nautilus* did not affect the Patent Office standard for definiteness.  In essence, Infineon advocated to the Patent Office that the claims are "very, very" definite, but now takes the position that they are not definite at all.  This is precisely what judicial estoppel prohibits.

### 2.    The Language Of The Disputed Claims Is Not Indefinite

Infineon's claim of indefiniteness is also wrong.  A person of ordinary skill can readily determine where the GaN material layer begins and where the transition layer ends in the accused products.  Infineon focuses its analysis solely on the compositions of layers, rather than their functions, injecting confusion that a person of skill would not suffer.  [Inf. Br., 15:19-17:4; Shealy ¶¶49-55.]

Although it is true that each of the layers (transition, intermediate, and GaN material) may be composed of GaN alloys, that is ***not*** their only characteristic.  The Weeks Patents explain the differences between the transition, intermediate (where present), and GaN material layers.  [Schub. Reb., ¶¶16-21, 26-30.]  The purpose of the transition layer is to transition and bridge the lattice and thermal expansion mismatch between the substrate and the GaN active layer.  [Schub., ¶¶53-56; Schub. Reb., ¶¶17, 27.]  The purpose of the intermediate layer is to relieve stress, allow for a thinner transition layer, and more closely match the thermal expansion rate of the Si substrate.  ['417 Patent, 8:23-47; Schub. Reb., ¶¶18, 30.]  The purpose of the GaN layer is to function in the device or active layer with few or no cracks.  ['417 Patent, 6:53-7:20, 7:25-30, 10:5-11:2; Schub. Reb., ¶27.]  When these points are considered, it is readily apparent that there is no indefiniteness problem.

In the hypothetical structure imagined by Infineon, a person of skill would recognize that Layer 5 is a GaN material layer (assuming it functions as an active or device layer).  [*Id.*, ¶¶29-30.]  Based on the position, thickness, doping, and other characteristics of the other layers, it would be clear to a person of skill whether each

layer was a GaN material (active/device) layer or part of the transition layer.  [*Id.*, ¶¶27-30.]  In other words, depending on those omitted factors that Infineon ignores, Layer 4 might be another GaN material (active) layer or it could be part of the transition layer, but a person of skill would be able to determine whether the transition layer ended at Layer 3 or Layer 4.  [*Id.*, ¶¶28-30.]  Similarly based on the position, thickness, composition, matching of characteristics of the substrate (such as the coefficient of thermal expansion), and other factors, a person of skill could determine if any of Layers 1-4 was an intermediate layer.  [*Id.*]

Infineon's argument is analogous to asserting that a claim for a car (reciting, *e.g.*, a "front part with an engine, middle part with seats, and rear part with a trunk") is indefinite because it is not clear whether the front includes the dashboard.  But the precise boundary between the car parts (or, here, the layers) is immaterial so long as a person of skill would know whether the claim reads on a specific product—whether that product is a limo or pick-up.  *Nautilus*, 134 S.Ct. at 2129 (claim just must be precise enough to discern if accused products are within it).  That standard is more than met here, despite Infineon's attempt to muddy the water.

## E.   "an alloy of gallium nitride selected from the group consisting of $Al_xIn_yGa_{(1-x-y)}N$, $In_yGa_{(1-y)}N$, and $Al_xGa_{(1-x)}N$" (EP '927 Patent)

If the patentee's intent was that x and y could not be zero, it would have been easy to say so, but it did not.  The specification is clear that an alloy of GaN can have zero In and or Al.  [EP '927 Patent, 2:29-51, 5:43-55, 6:17-25; Schub., ¶¶58-61.]  Other Weeks claims make this point as well.  For example, the '287 Patent (the patent issued from the parent Weeks application) includes Claim 31, which recites that "$0 \leqq x \leqq 1$ and $0 \leqq y \leqq 1$," and Claim 34, which recites that "$0 \leqq x \leqq 1$."  [Ex. 19.]  Similarly, Claim 37 recites that "x and y are greater than *or equal to 0* and less than or equal to 1."  [*Id.*]  Accordingly, it is clear that "x" and/or "y" can be 0.

This is in keeping with the understanding of a person of skill, as well as references in the field, which show that an alloy of GaN can be composed solely of

Ga and N.  [Schub. Reb., ¶¶31, 33.]  Infineon argues that MACOM's proposed

construction renders "alloy" meaningless "because gallium nitride … is not an alloy

of gallium nitride." [Inf. Br. at 20].  But this is wrong.  An alloy of GaN

encompasses compositions of Ga and N, and no other elements or substances, as

well as compositions of Ga, N, and other elements.  [Schub. Reb., ¶¶31-34.]

**F.     "said transition layer is discontinuously graded" ('775 Patent)**

Infineon's construction improperly conflates "transition layer" with

"compositionally-graded layer" and further improperly limits "transition layer" to a

single layer.  This construction should be rejected for the reasons discussed above.

Infineon claims that the term "discontinuously graded" is only used in the

Weeks Patents for a single-layer embodiment.  Not so.  The Weeks Patents provide

multiple examples of discontinuous grading where at least a portion of the

transition layer is not graded, such as for the flat portion of the line in Figure 2H.

Figures 2A and 2B and the superlattice embodiments further show where individual

sublayers are not graded.  ['417 Patent, Figs. 2A-2B, 3A, 4A, 5:46-51; Schub. Reb.,

¶¶35-36.]  A person of skill would understand that a superlattice transition layer

with layers of constant composition *is* discontinuously graded.  [*See id.*, ¶36.]

**III.     DISPUTED TERMS FOR THE '015, '889, AND '002 PATENTS**

**A.     "an amorphous silicon nitride-based material layer formed directly on
the entire top surface of the silicon substrate" ('015 Patent)**

Infineon's construction limits an apparatus claim to a specific process, which

the Federal Circuit has repeatedly held is improper.  *Research Corp.*, 627 F.3d at

873 ("Courts must generally take care to avoid reading process limitations into an

apparatus claim…."); *Vanguard Prod. v. Parker Hannifin*, 234 F.3d 1370, 1372

(Fed. Cir. 2000) ("A … product that meets the criteria of patentability is not limited

to the process by which it was made.").  It should be rejected for that reason alone.

MACOM's construction, by contrast, captures the plain meaning of "formed

directly on" the Si substrate, which Infineon admits applies to nitridation processes.

[Inf. Br., 22:21-23:7.]  The '015 Patent defines a layer of SiN-based material "formed directly on the substrate" as including layers formed by nitridation, and the '015 Patent specification focuses almost exclusively on nitridation over deposition.

Infineon contends that "directly on the … top surface of the silicon substrate" means something different than "directly on the substrate" by virtue of the use of the phrase "top surface of the."  Infineon can point to nothing in the specification that supports its argument that "directly on the… *top surface* of the … substrate" is meant to exclude nitridation processes.  [Inf. Br., 23:7-24:8.]  Infineon argues that nitridation forms a layer of SiN material that is supposedly below the top surface of the substrate, but this ignores the specification, which repeatedly uses the phrases "on" or "covering" "the top surface of the … substrate" ('015 Patent, 1:59-62, 1:65-2:1, 2:5-8) and then explains that the nitridation process converts a portion of the substrate to form a layer *directly on the* surface of the remaining substrate.  ['015 Patent, 5:37-45, 12:5-26, 12:34-54, 14:10-23; Schub. Reb., ¶38.]  The phrase "top surface" merely clarifies that the SiN layer is formed on the top surface of the substrate, rather than, *e.g.*, the bottom surface.  [*Id.*, ¶¶39-40.]

Infineon also argues that it meant to distinguish the claims of the '015 Patent from claims that appear in a later-issued related patent, the '298 Patent, based on claim differentiation.  [Inf. Br., 23:7-19.]  The doctrine of claim differentiation imposes a presumption, "not a rigid rule," that claims (particularly independent v. dependent claims) within the *same patent* must have different scope.  *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380-81 (Fed. Cir. 2006).  Infineon's claim differentiation argument is inapt here where: (a) the claims Infineon compares are independent claims from *different* patents; and (b) the '298 claims are directed to methods, rather than the structures recited in the '015 Patent.  [*Compare* '015 Patent, Claims 36 & 41, *with* Ex. P, Dkt. 439-18, at Claims 1 & 15.]

**B.    "on the entire top surface of the silicon substrate" ('015 Patent)**

In the context of other claim terms, Infineon endorses the non-controversial

-13-

1    proposition that manufacturing processes necessarily introduce imperfections.  [Inf.

2    Br., 13:25-14:8 ("[E]ven if two layers were designed to have precisely the same

3    composition, variations could occur during the manufacturing process.").]  When it

4    comes to the "entire top surface," however, Infineon pivots 180 degrees.

5            Claim differentiation does not justify Infineon's reversal.  Infineon argues

6    that the '015 Patent has separate claims that cover "the majority of the top surface

7    of the silicon substrate"—*i.e.*, more than 50%.  ['015 Patent, 5:54-57.]  But that is

8    consistent with MACOM's proposed construction for the "entire top surface," since

9    manufacturing defects cannot reasonably be understood to result in 50% coverage.

10   [Schub. Reb. ¶¶42-43.]  The '015 Patent expressly distinguishes between an

11   embodiment that covers "substantially the entire top surface of the substrate" and

12   "other embodiments" that cover ***only the majority of the substrate***.  ['015 Patent,

13   5:51-57.]  Thus, even if MACOM's construction was "on substantially the entire

14   top surface…," this would not cause any claim differentiation problem.

15   **C.    "a silicon nitride-based material layer formed between the silicon
        substrate and the III-nitride material region" ('889 Patent)**

16

17          Even if Infineon were not estopped from arguing indefiniteness, which it

18   should be, Infineon's argument is wrong.  Infineon relies only on a typo in support

19   of its argument, which is insufficient to invalidate a claim.[6]  [MACOM Br., 26-28.]

20          The cases cited by Infineon are not to the contrary.  *Unique Concepts* did not

21   find a claim indefinite; it instead construed a claim (narrowly, admittedly) in the

22   preliminary injunction context.  1986 WL 8039, at *6-*7.  And, in *Transcend*, 2015

23   WL 5546988, at *5-*7, the patentee had expressly defined a term in inconsistent

24   ways in the patent and then compounded the problem by arguing conflicting

25   _____

26   [6]   Even if the relevant sentence is taken at face value, it still does not support
         Infineon: "Thus, in these cases, the III-nitride material region ***may be*** formed
27       directly on the substrate." ['889 Patent, 5:5-6.]  This language is permissive and
         does not apply to all embodiments.  And, despite the typo, a person of skill
28       would be able to discern what it means for a layer to be "between" the substrate
         and III-nitride region in other contexts.  [*Id.* at Fig. 1; Schub. Reb., ¶¶45-46.]

definitions at the Patent Office to get the claims allowed, which is hardly the situation here.  Instead, the mistake in the '889 specification went unnoticed until now and was never relied on by anyone.  Indeed, if Infineon was acting in good faith, it would have simply filed a certificate of correction to fix the mistake.

**D.**     **"the via is formed through the substrate" ('002 Patent)**

Infineon's arguments confuse the location of the claimed via (extending from the backside of the substrate through the substrate) with a particular technique for creating that via (etching the via by starting at the backside).  Method limits should not be imported into an apparatus claim, however.  *Vanguard*, 234 F.3d at 1372.

Infineon emphasizes repeatedly that the invention is a "backside via."  That is true, but misses the point.  Backside vias, although they must extend to the backside of the substrate, ***do not need to be created by etching from the backside to the front side of the device***.  In fact, it was well known in the art at the time of the '002 Patent that a via connecting the top side of the device to the backside of a substrate might ***preferably*** be formed in the opposite direction, which has the advantage of allowing more accurate placement on the top side.  [*See* '002 Patent, 9:7-15; Schub., ¶¶99-100, 104-105; Schub. Reb., ¶¶47-49.]

Infineon's construction finds no support in the specification.  As Infineon admits, the '002 Patent says that the via can be formed by "conventional etching techniques."  [Inf. Br., 27:25-28:4.]  Infineon nevertheless makes a leap of logic, jumping to the conclusion (without explanation) that the patent is limited to one method only.  [*Id.* at 28:4-16.]  But the specification does not define an order for etching.  ['002 Patent, 8:31-36 ("Different etching techniques may be utilized when etching through different layers …. For example, a fluorine-based RIE process may be used to etch through substrate 12 and a chlorine-based RIE process may be used to etch through [GaN] device region 14 and/or non-conducting layers 15."); Schub. Reb., ¶¶47-48.]  Use of the conjunction "and" between the two etching processes, rather than "then," makes clear that this does not define an order of steps.

DATED:  March 23, 2018          **PERKINS COIE LLP**

By:/s/ *Amanda Tessar*
    Lara J. Dueppen, Bar No. 259075
    LDueppen@perkinscoie.com
    PERKINS COIE LLP
    1888 Century Park East, Suite 1700
    Los Angeles, CA 90067-1721
    Telephone:  310.788.9900
    Facsimile:  310.788.3399

    Amanda Tessar (*pro hac vice*)
    ATessar@perkinscoie.com
    Elizabeth Banzhoff (*pro hac vice*)
    EBanzhoff@perkinscoie.com
    PERKINS COIE LLP
    1900 Sixteenth Street, Suite 1400
    Denver, CO  80202-5255
    Telephone:  303.291.2357
    Facsimile:  303.291.2457

    Ramsey M. Al-Salam, Bar No. 109506
    RAlSalam@perkinscoie.com
    PERKINS COIE LLP
    1201 Third Avenue, Suite 4900
    Seattle, WA 98101-3099
    Telephone:  206.359.6835
    Facsimile:  206.359.7385

    Philip A. Morin, Bar No. 256864
    PMorin@perkinscoie.com
    PERKINS COIE LLP
    11988 El Camino Real, Suite 350
    San Diego, CA  92130-2594
    Telephone:  858.720.5700
    Facsimile:  858.720.5799

    Daniel T. Keese, Bar No. 280683
    DKeese@perkinscoie.com
    PERKINS COIE LLP
    1120 N.W. Couch Street, 10th Floor
    Portland, OR  97209-4128
    Telephone:  503.727.2000
    Facsimile:  503.727.2222

    Morgan Chu (State Bar No. 70446)
    (mchu@irell.com)
    Ellisen Turner (State Bar No. 224842)

(eturner@irell.com)
IRELL & MANELLA LLP
1800 Avenue of the Stars, Suite 900
Los Angeles, CA 90067-4276
Telephone:  310-277-1010
Facsimile:  310-203-7199

Nima Hefazi (State Bar No. 272816)
(nhefazi@irell.com)
IRELL & MANELLA LLP
840 Newport Center Drive, Suite 400
Newport Beach, CA  92660
Telephone:  949-760-0991
Facsimile:  949-760-5200

**ATTORNEYS FOR PLAINTIFFS**