LINDA M. BURROW, Bar No. 194668
  *lburrow@bsfllp.com*
ALISON M. MACKENZIE, Bar No. 242280
  *amackenzie@bsfllp.com*
BOIES SCHILLER FLEXNER LLP
725 South Figueroa Street 31st Floor
Los Angeles, CA 90017-5524
Telephone: 213-629-9040
Facsimile: 213-629-9022

DAVID G. WILLE (admitted *pro hac vice*)
  *david.wille@bakerbotts.com*
JEFFERY D. BAXTER (admitted *pro hac vice*)
  *jeff.baxter@bakerbotts.com*
BRIAN D. JOHNSTON (admitted *pro hac vice*)
  *brian.johnston@bakerbotts.com*
JAMES C. WILLIAMS (admitted *pro hac vice*)
  *james.williams@bakerbotts.com*
CHARLES YEH (admitted *pro hac vice*)
  *charles.yeh@bakerbotts.com*
BAKER BOTTS L.L.P.
2001 Ross Avenue, Suite 600
Dallas, TX 75201
Telephone:  214.953.6500 / Fax:  214.953.6503

Attorneys for Defendants

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC. and NITRONEX, LLC,<br><br>            Plaintiffs,<br><br>       v.<br><br>INFINEON TECHNOLOGIES AG, *et al*.,<br><br>            Defendants. | Case No. CV 16-02859 CAS (PLAx)<br><br>**DEFENDANTS' RESPONSE TO PLAINTIFFS' OPENING CLAIM CONSTRUCTION BRIEF**<br><br>**Hon. Christina A. Snyder** |

1

## **<u>TABLE OF CONTENTS</u>**

2

3   I.   Weeks Patent Family Disputed Terms ............................................................1

4
        A.   "compositionally-graded layer" / "compositionally graded
5             transition layer"...................................................................................1

6       B.   "intermediate layer" .............................................................................3

7       C.   "substantially matches".........................................................................3

8
        D.   "a composition of said transition layer at a top surface thereof
9             substantially matches a composition of said gallium nitride
10            material layer [or III-nitride layer] at a bottom surface thereof"..........5

11      E.   "an alloy of gallium nitride selected from the group consisting
12            of $Al_xIn_yGa_{(1-x-y)}N$, $In_yGa_{(1-y)}N$, and $Al_xGa_{(1-x)}N$" ................................7

13      F.   "said transition layer is discontinuously graded" ................................8

14  II.  '015 Patent Disputed Term ............................................................................9

15
        A.   "an amorphous silicon nitride-based material layer formed
16            directly on the entire top surface of the silicon substrate"...................9

17  III. '889 Patent Disputed Term ..........................................................................11

18
        A.   "a silicon nitride-based material layer formed between the
19            silicon substrate and the III-nitride material region"..........................11

20  IV.  '002 Patent Disputed Term ..........................................................................13

21      A.   "the via is formed through the substrate" ...........................................13

22  V.   Judicial Estoppel and Assignee Estoppel....................................................13

23
        A.   Plaintiffs fail to present any basis for applying judicial estoppel
24            or assignee estoppel against Infineon AG...........................................13

25      B.   There is no judicial estoppel or assignee estoppel..............................14

26
        C.   Because infringement cannot be determined without a
27            discernable claim construction, the Court must address
28            indefiniteness. ...................................................................................15

1

2

## <u>TABLE OF AUTHORITIES</u>

3

**Page(s)**

4

**CASES**

5

6

*Akzo Nobel Coating, Inc. v. Dow Chemical Co.*,
   811 F.3d 1334 (Fed. Cir. 2016) ............................................................................ 5

7

8

*Alcohol Monitoring Sys., Inc. v. Actsoft, Inc.*,
   No. 07-cv-02261, 2011 WL 5075619 (D. Colo. Oct. 25, 2011) ........................ 14

9

10

*Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*,
   672 F.3d 1335 (Fed. Cir. 2012) ............................................................................ 9

11

*CBT Flint Partners, LLC v. Return Path, Inc.*,
   654 F.3d 1353 (Fed. Cir. 2011) .......................................................................... 11

12

13

*Chamberlain Grp. v. Lear Corp.*,
   516 F.3d 1331 (Fed. Cir. 2008) ............................................................................ 2

14

15

*Chef Am., Inc. v. Lamb-Weston, Inc.*,
   358 F.3d 1371 (Fed. Cir. 2004) .......................................................................... 12

16

*Doral Pharm., Inc. v. Pharm. Generic Developers, Inc.*,
   148 F. Supp. 2d 127 (D.P.R. 2001) .................................................................... 14

17

18

*Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*,
   535 U.S. 722 (2002) ............................................................................................ 10

19

20

*Halliburton Energy Servs., Inc. v. M-I LLC*,
   514 F.3d 1244 (Fed. Cir. 2008) ............................................................................ 7

21

22

*Honeywell Int'l, Inc. v. Int'l Trade Comm'n*,
   341 F.3d 1332 (Fed. Cir. 2003) .......................................................................... 15

23

24

*Honeywell Int'l, Inc. v. ITT Indus., Inc.*,
   452 F.3d 1312 (Fed. Cir. 2006) ............................................................................ 3

25

26

*Innova/Pure Water v. Safari Water Filtration Sys.*,
   381 F.3d 1111 (Fed. Cir. 2004) ............................................................................ 9

27

28

*Interval Licensing LLC v. AOL, Inc.*,
    766 F.3d 1364 (Fed. Cir. 2014) ........................................................................ 1

*Nordhorn v. Ladish Co.*,
    9 F.3d 1402 (9th Cir. 1993) ........................................................................... 13

*Nystrom v. TREX Co.*,
    424 F.3d 1136 (Fed. Cir. 2005) ....................................................................... 4

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ..................................................................... 11

*Rissetto v. Plumbers and Steamfitters Local 343*,
    94 F.3d 597 (9th Cir. 1996) ........................................................................... 14

*Superior Fireplace Co. v. Majestic Prods. Co.*,
    270 F.3d 1358 (Fed. Cir. 2001) ..................................................................... 12

*Teknowledge Corp. v. Akamai Techs. Inc.*,
    No. 02-05741, 2004 WL 2042864 (N.D. Cal. Sept. 11, 2004) ...................... 12

*TIP Sys., LLC v. Philips & Brooks/Gladwin, Inc.*,
    529 F.3d 1364 (Fed. Cir. 2008) ..................................................................... 10

*Toyo Tire & Rubber Co. v. H.K. Tri-Ace Tire Co.*,
    No. 14-00054, 2017 WL 6547649 (C.D. Cal. Nov. 20, 2017) ....................... 14

*Transcend Med., Inc. v. Glaukos Corp.*,
    No. 13-830, 2015 WL 5546988 (D. Del. Sept. 18, 2015) ......................... 11, 12

*Transclean Corp. v. Jiffy Lube Int'l, Inc.*,
    474 F.3d 1298 (Fed. Cir. 2007) ..................................................................... 14

*Trs. in Bankr. of N. Am. Rubber Thread Co. v. United States*,
    593 F.3d 1346 (Fed. Cir. 2010) ..................................................................... 14

## <u>TABLE OF ABBREVIAITONS AND CONVENTIONS</u>

| Abbreviation | Meaning |
|---|---|
| Al | Aluminum |
| Def. Br. | Defendants' Opening Claim Construction Brief, Docket No. 439 |
| Emphasis | Emphasis in quotations is added unless specified otherwise |
| Ex. [letter] | [A–Q]: Exhibits A–Q filed with Defendants' Opening Claim Construction Brief (Dkt. Nos. 439-3 through 439-19)<br><br>[R–W]: Exhibits R–W filed with this Responsive Brief |
| Ex. [number] | [1–18]: Exhibits 1–18 filed with Plaintiffs' Opening Claim Construction Brief (Dkt. Nos. 440-3 and 440-4) |
| Ga | Gallium |
| GaN | Gallium Nitride |
| In | Indium |
| Infineon AG | Defendant Infineon Technologies AG |
| Infineon Americas | Defendant Infineon Technologies Americas Corp. |
| IR | International Rectifier Corporation |
| MACOM | Plaintiff MACOM Technology Solutions Holdings, Inc. |
| Nitronex | Plaintiff Nitronex, LLC |
| Pl. Br. | Plaintiffs' Opening Claim Construction Brief, Docket No. 440 |
| Schub. ¶ __ | Declaration of Dr. E. Fred Schubert (Plaintiff's expert), Docket No.440-1 |
| Shealy ¶ __ | Declaration of Dr. James R. Shealy (Defendants' expert), Docket No 439-1 |
| Shealy Reb. ¶ __ | Rebuttal Declaration of Dr. James R. Shealy (Defendants' expert), filed concurrently with this responsive brief |
| Si | Silicon |
| SiN | Silicon nitride |

I. **Weeks Patent Family Disputed Terms**

    A.    **"compositionally-graded layer" / "compositionally graded transition layer"**

Plaintiffs contend that a "compositionally-graded layer" need not be a singular layer with grading, as defined in the patent, but can instead be any arbitrary collection of layers, none of which need be graded. Plaintiffs' interpretation improperly disregards the specification's express definition of "compositionally-graded layer." *See* Ex. B at 4:4–8 ("***a layer*** having a composition that varies across at least a portion of the thickness of ***the layer***").[1] Plaintiffs offer no justification for departing from this controlling definition. There is none.

Plaintiffs wrongly contend that "compositionally-graded layer" should be construed to encompass a superlattice. The Weeks patents never describe a superlattice as a "compositionally-graded layer." Shealy Reb. ¶ 1. On the contrary, they repeatedly distinguish between a compositionally-graded layer (a single layer) and a superlattice (a multi-layered structure). *See e.g.,* Ex. B at 2:65–3:5 ("a compositionally-graded transition layer according to one embodiment" and "a superlattice according to another embodiment"); 6:12–17; 8:51–54 ("In embodiments in which transition layer 12 includes a ***single compositionally-graded layer*** and a ***superlattice***, the intermediate layer may be positioned between the ***compositionally-graded layer*** and the ***superlattice***.); Ex. 5 Claim 1 ("a transition layer including at least one ***compositionally-graded layer*** and a ***superlattice***"); Ex. 4 Claim 1 (similar); Ex. S Claim 1 (similar). Even Plaintiffs' expert distinguishes between the two. Schub. ¶ 38 (describing an intermediate layer as "between a compositionally-graded layer and a superlattice"). That Plaintiffs' overbroad interpretation would collapse these distinct concepts confirms that it cannot be correct. *See, e.g.*, *Interval Licensing LLC v. AOL, Inc.*, 766 F.3d 1364, 1376 (Fed.

---

[1] Plaintiffs acknowledge that this definition's reference to "a" layer limits the meaning to a single layer. Pl. Br. at 4:20, 6:3–4.

Cir. 2014); *Chamberlain Grp. v. Lear Corp.*, 516 F.3d 1331, 1339 (Fed. Cir. 2008).

Even more tellingly, Plaintiffs avoid discussing the prosecution history of the Weeks patents, doubtless because it confirms that a "compositionally-graded layer" must be limited to a single layer.[2]   Relying on the specification's definition, the Applicant stated that a "compositionally-graded transition layer" is a single layer to distinguish prior art with multiple layers.  Ex. E 58–60; *see also* Def. Br. at § I.A.2.  Defendants' construction—reciting the specification's own definition—is the only one that comports with the Applicant's statements in the prosecution history.

Contrary to Plaintiffs' criticism, Defendants' construction does not exclude the embodiments of Figures 2A and 2B.  Shealy Reb. ¶ 2.  As Dr. Schubert admits, Figures 2A and 2B show grading across a "single layer," Schub. ¶ 31, and, thus, fall within Defendants' construction.  The construction excludes only Dr. Schubert's hypothetical "alternative" embodiment involving multiple "layer or sublayers," which is nowhere described or depicted in the Weeks patents.  Shealy Reb. ¶ 3.[3]

Although the intrinsic evidence distinguishes between a single layer and multiple individual layers, Plaintiffs wrongly try to minimize their differences as purely semantic.  They are distinct structures with real physical and observable differences that the Applicant relied upon to distinguish prior art.  Shealy Reb. ¶¶ 4–5; Def. Br. at § I.A.2.  If the differences were merely a matter of semantics as Plaintiffs suggest, Plaintiffs would not so strongly oppose Defendants' construction.  Plaintiffs oppose precisely because Defendants' construction—the patent's own definition—properly cabins the claim term to a particular physical structure: a single graded layer.  Schub. ¶ 27 (noting construction "excludes any

---

[2] Instead, Plaintiffs run to extrinsic evidence to suggest that, outside the context of the Weeks patents, layer can refer to a multi-layer structure.  But the cited evidence actually supports Defendants. Shealy Reb. ¶¶ 6–8.

[3] Dr. Schubert admits the Weeks Patents do not use the term "sublayers" or "component layers." Schub. ¶ 33.  According to Dr. Schubert, the only multi-layer structure that the specification "expressly describes" is the superlattice.  Schub. ¶ 32.  But, as described above, that superlattice is not a compositionally graded layer.

transition layer/layers that have multiple sublayers or component layers").

**B.    "intermediate layer"**

The specification is clear: "The composition of the intermediate layer is ***generally constant*** throughout its thickness." Ex. B at 8:34–35.  Plaintiffs try to avoid this clear definition by arguing that "generally" modifies "is" as opposed to "constant."  To the contrary, the specification also states that an intermediate layer is formed by maintaining the process parameters "constant so as to provide a film having a constant composition."  *Id.* at 9:67–10:3; Shealy Reb. ¶¶ 9–13.[4]  Plaintiffs cannot rely on other Weeks Patent claims to change the meaning of this term.[5]

**C.    "substantially matches"**

The Court should reject Plaintiffs' contention that different compositions "substantially match" so long as the overall structure still "accomplishes the goals of the transition layer."  Pl. Br. at 8:16–20.  Accepting Plaintiffs' argument would effectively read "substantially matches" out of the claims by stripping it of any meaning.  Moreover, it distorts the teachings of the specification and is inconsistent with the prosecution history.

Only ***a single passage*** in the entire specification compares the compositions of the relevant structures (the top of the transition layer and bottom of the gallium nitride material layer).  There, the specification states that the two compositions are "the same." Ex. B at 4:52–59.  Because the specification nowhere else compares the composition of those two structures, it never discusses any degree of mismatch, and certainly not a "partial mismatch" as Plaintiffs contend.

Contrary to Plaintiffs' argument, the specification never describes a "partial

---

[4] Confirming that "generally" modifies "constant," the '417 Patent uses the same phrase to describe the gallium nitride material layer, and the patent distinguishes its "generally constant" composition with the graded composition of the compositionally-graded layer 12.  Ex. B at 6:37–40.

[5] Because those claims were added during prosecution, they cannot be used to give "intermediate layer" a broader meaning than the specification supports. *Honeywell Int'l, Inc. v. ITT Indus., Inc.*, 452 F.3d 1312, 1316 (Fed. Cir. 2006).

mismatch" between the compositions of the top surface of the transition layer and the bottom surface of the gallium nitride material layer.  Plaintiffs point to two passages.  Pl. Br. at 8:18–22 (citing Ex. B at 4:45–55; 6:46–52).  But neither discloses any mismatch.  Shealy Reb. ¶¶ 14–15.  The first passage discusses the composition of the transition layer in certain embodiments, without disclosing the corresponding composition of the gallium nitride material layer in those embodiments.  Ex. B at 4:45–52.  Similarly, the second passage discusses the composition of the gallium nitride material layer in other embodiments, but again without describing the corresponding composition of the transition layer in those embodiments.  *Id.* at 6:46–52. Without discussing and comparing the composition of both layers together in the same embodiment, there is no disclosure of a compositional "mismatch" and no indication of how large any mismatch may be.  The specification compares the layers' compositions in only the ***single passage*** cited above, where it describes the compositions as the "same"—not a "partial mismatch." *Id.* at 4:52–59.

Plaintiffs also conveniently ignore the prosecution history regarding the meaning of "substantially matches."  The prosecution history makes clear that the Applicant added this language to claim the specific embodiments with "the same" compositions.  Def. Br. at 13:12–24.   To explain the language added by amendment, the Applicant cited to and described the same ***single passage*** cited above.  Ex. K at 141.  Tellingly, the Applicant did not cite to any other passages, including the passages in which Plaintiffs now purport to find "partial mismatches."

Lacking any support in the specification or prosecution history for their interpretation, Plaintiffs resort to extrinsic evidence.   First, Plaintiffs rely on dictionary definitions. Pl. Br. at 8:23–9:10.  But neither the specification nor the prosecution history supports any interpretation of "substantially matches" broader that the embodiments where the compositions are "the same." *See Nystrom v. TREX Co.*, 424 F.3d 1136, 1144–46 (Fed. Cir. 2005) (patentee "not entitled to a claim

construction divorced from the context of the written description and prosecution history" even if a "broader definition" may be found in a dictionary).

Next, Plaintiffs attempt to use their expert's testimony to broaden "substantially matches" to encompass all differences in composition that "are close enough to accomplish the goals of a transition layer."[6]   Schub. ¶ 46.   That overbroad reading cannot be squared with the specification's teachings.   The transition layer with a substantially matched composition is merely a ***preferred embodiment***—not a required feature necessary to achieve the goals of the invention as a whole.   Shealy Reb. ¶¶ 16–17.

Moreover, Dr. Schubert's definition would effectively write the term "substantially matches" out of the claim entirely because surely all transition layers—including those recited in other claims without any "substantially matching" limitation—"accomplish the goals of a transition layer." *Id.* ¶¶ 18–19. Thus, under Plaintiffs' view, "substantially matches" is improperly rendered surplusage. *See, e.g., Akzo Nobel Coating, Inc. v. Dow Chemical Co.*, 811 F.3d 1334, 1339–40 (Fed. Cir. 2016) (rejecting a construction that renders a claim term "entirely superfluous").   The "substantially matches" claims necessarily cover a narrower subset of transition layers than those other claims without a matching requirement.[7]   Plaintiffs' construction is therefore flawed and should be rejected.

**D.**   **"a composition of said transition layer at a top surface thereof substantially matches a composition of said gallium nitride material layer [or III-nitride layer] at a bottom surface thereof"**

Plaintiffs correctly recognize that claims including this term are indefinite if

---

[6] To buttress his flawed analysis, Dr. Schubert also tries to shift the focus to lattice matching.   Schub. ¶ 48.   But the claims at issue require substantially matching in the "composition" of two layers, not in lattice structure.   Dr. Schubert's discussion of lattice mismatch is thus irrelevant and misleading.   Shealy Reb. ¶¶ 20–23.

[7] To overcome a double patenting rejection during prosecution, the Applicant argued that the claims with the "substantially matching" limitation are narrower than earlier-issued claims without any matching requirement.   Shealy Reb. ¶ 18.

a person skilled in the art cannot identify the two relevant portions of the structure whose compositions must be compared—the "top surface of the transition layer" and the "bottom surface of the gallium nitride material layer" (or III-nitride layer). Pl. Br. at 18:1–4.  As explained in Defendants' opening brief, the specification discusses various different layers—such as a transition layer, a gallium nitride material layer, and an intermediate layer—all of which are described as having the same set of potential chemical compositions.   Def. Br. at 15:19–16:2. The specification does not explain how to distinguish among these layers.

Plaintiffs assert that it is easy to tell the difference between the transition layer and the gallium nitride material layer because they have different functions. Pl. Br. at 18:7–28.  Plaintiffs emphasize that the gallium nitride material layer is "part of the active region formed by adding dopants," in contrast to the transition layer.  Plaintiffs' alleged distinction does not withstand scrutiny, however.  There is no requirement in the specification that the gallium nitride material layer must be doped or be part of the active region.  Shealy Reb. ¶ 25.  At most, that is one possible embodiment.  *See, e.g.*, Ex. B at 10:7–8 ("Doped regions **may** be formed . . . ."), 10:10–12("***In some embodiments***, gallium nitride material layer 16 is doped . . . .").  And even if it were true of all embodiments, being part of the active region would not sufficiently distinguish the gallium nitride material layer from the transition layer under Plaintiffs' interpretation.  Shealy Reb. ¶ 25.  In explaining their proposed distinction, Plaintiffs expressly leave open the possibility that the transition layer could likewise be part of the active region. Pl. Br. at 18:15–18 ("the transition layer is not ***generally*** part of the active or device region").

Even if Plaintiffs' purported distinction between these two layers were sound, it still would not solve the indefiniteness problem.  It entirely fails to account for the further difficulty of distinguishing these two layers from any intermediate layers.  Indeed, Plaintiffs' proposed approach of looking to the function of the layer is of no use because the transition layer and the intermediate

layer are described as having the same functions.  Shealy Reb. ¶ 26.  Both are described as relieving stress in the gallium nitride material layer.  *See, e.g.*, Ex. B at Abstract (transition layer "lower[s] stresses in the gallium nitride material layer") and 8:28–30 (intermediate layer "may further relieve stress in gallium nitride material layer 16").[8]  At deposition, Dr. Schubert conceded that both layers perform this same function.  Ex. R at 8:13-21.  Neither Plaintiffs nor the specification suggest any way to reliably differentiate between these layers in a semiconductor structure.  Consequently, the layers whose compositions must be compared cannot be identified with reasonable certainty, rendering the claims that use this term indefinite.

### E.   "an alloy of gallium nitride selected from the group consisting of $Al_xIn_yGa_{(1-x-y)}N$, $In_yGa_{(1-y)}N$, and $Al_xGa_{(1-x)}N$"

Claim 10 of the EP '927 Patent recites three different chemical formulas to represent three different gallium nitride alloys—aluminum indium gallium nitride, indium gallium nitride, and aluminum gallium nitride.  Ex. 9 Claim 10.  To represent these three distinct alloys, each chemical element (aluminum, indium and gallium) must be present, meaning that none of the subscripts can be zero.

Plaintiffs wrongly suggest that the subscripts x and y in Claim 10 can be zero because the specification describes a composition in which (x+y) equals zero.  Pl. Br. at 19:15–24.  Plaintiffs, however, fail to recognize that the chemical formulas in Claim 10 represent ***alloys*** of gallium nitride, which are distinct from pure gallium nitride (GaN).  The specification identifies the composition in which (x+y) equals zero as "a composition of ***GaN***," Ex. 9 at 6:23–25, and contrasts that GaN composition with "other cases" involving "an ***alloy*** of GaN," Ex. 9 at 6:29–33.  Thus, the cited specification passage actually supports Defendants' position that x

---

[8] Furthermore, it is not clear that these functional descriptions are even limiting, as opposed to merely descriptions of particular embodiments.  Moreover, Plaintiffs' cannot resort to "conveniently functional language at the exact point of novelty" to save the claims from indefiniteness.  *Halliburton Energy Servs., Inc. v. M-I LLC*, 514 F.3d 1244, 1255 (Fed. Cir. 2008).

1   and y cannot be zero in Claim 10, which is limited to GaN alloys.  Shealy Reb.

2   ¶¶ 27–28.

3         Plaintiffs' reliance on claims of other patents—Claims 1 and 2 of the '686

4   Patent and Claim 1 and 2 of the '775 Patent—is misplaced because those claims are

5   significantly different from the limitation in dispute here.  Pl. Br. at 20:2–14.  The

6   language in those claims ("an alloy of gallium nitride consisting of

7   $Al_xIn_yGa_{(1-x-y)}N$") would still make sense if the indium content (y) were zero,

8   because the sole formula in those claims could still represent an **alloy** of GaN

9   (namely, AlGaN).  Shealy Reb. ¶ 29.  In contrast, the limitations at issue include

10  formulas that would ***not*** represent GaN alloys if any subscripts could be zero. *Id.*

11  ¶ 30.  For example, if y were zero, the chemical formula $In_yGa_{(1-y)}N$ would be pure

12  GaN, ***not*** a GaN alloy. *Id.*

13        Moreover, the limitation at issue recites ***three*** different formulas unlike the

14  ***single*** formula found in the '686 and '775 claims.  As the specification

15  demonstrates, when different formulas are used together, those formulas represent

16  distinct alloys.  Def. Br. at 18:16–19:15.  To avoid improper redundancy in the

17  limitation at issue, the three formulas $Al_xIn_yGa_{(1-x-y)}N$, $In_yGa_{(1-y)}N$, and $Al_xGa_{(1-x)}N$

18  must represent aluminum indium gallium nitride, indium gallium nitride, and

19  aluminum gallium nitride, respectively—which means that each chemical element

20  (aluminum, indium and gallium) must be present and thus the corresponding

21  subscripts cannot be zero. *Id.* ¶¶ 32–33.  By contrast, the single formula in the '686

22  and '775 claims may represent different alloys without raising this same

23  redundancy issue. *Id.* ¶ 34.

24        **F.    "said transition layer is discontinuously graded"**

25        Contrary to Plaintiffs' mischaracterization, Defendants are not arguing that

26  the terms "transition layer" and "compositionally-graded transition layer" are

27  always interchangeable.  Rather, Defendants' construction is context-specific and

28  accounts for Claim 2's requirement that, in that claim, the transition layer must be

"discontinuously graded." Def. Br. at 21:13–22:2. Plaintiffs fail to recognize that, consistent with the understanding of those skilled in the art, the specification uses the modifier "continuous" and "discontinuous" to describe grading across the thickness of a single, compositionally-graded layer. *Id.* Thus, the discontinuously-graded transition layer of Claim 2 must be a compositionally-graded layer.

## II.  '015 Patent Disputed Term

### A.  "an amorphous silicon nitride-based material layer formed directly on the entire top surface of the silicon substrate"

Plaintiffs assert that Claim 41 uses the phrase "formed directly on the substrate" (one of the four phrases that the specification defines to encompass deposition and conversion). Pl. Br. at 23:10–24:1. That is wrong. Instead, Claim 41 recites "formed directly *on the . . . top surface* of the silicon substrate." Ex. O at 16:41–44. Consistent with the presumption that different claim terms should be given different meanings, this claim language limits Claim 41 to deposition because only deposition results in a silicon nitride layer formed *on the top surface* of the substrate. Def. Br. at 23:4–24:8. Plaintiffs improperly seek to read the words "top surface" out of the claim. *Innova/Pure Water v. Safari Water Filtration Sys.*, 381 F.3d 1111, 1119 (Fed. Cir. 2004); *Aspex Eyewear, Inc. v. Marchon Eyewear, Inc.*, 672 F.3d 1335, 1348 (Fed. Cir. 2012).

Plaintiffs also wrongly contend that Claim 41 must be interpreted to encompass conversion (or nitridation, in Plaintiffs' terminology) because that is a preferred embodiment. First, the specification never expresses any preference for conversion over deposition. Moreover, contrary to Plaintiffs' characterization, Nitronex chose to pursue the claims at issue[9] over a separate group of claims that expressly covered conversion (Application Claims 32–41). During prosecution, the PTO concluded that these two groups of claims were directed to ***different***

---

[9] Independent claims 1 and 36 of the '015 Patent correspond to Application Claims 1 and 31. Ex. T at 39–44, 49–50.

inventions, and it required Nitronex to choose which claims to pursue.  Ex. T at 34; *see generally* Ex. 18 at 360–364.  Nitronex cancelled the conversion claims so that it could pursue the claims at issue, which cover deposition instead.  Ex. T at 37–44.[10]

As to the meaning of "entire," Plaintiffs rely solely on expert testimony to justify their wholesale rewriting of Claim 41.   Dr. Schubert states that manufacturing processes do not "typically" cover the entire substrate, apparently conceding that it is possible to make a silicon nitride layer that covers the entire substrate.[11]  Schub. ¶ 78.  Plaintiffs, however, cite no rule requiring that a claim be interpreted to cover alleged "typical" embodiments, especially where, as here, other broader claims (such as Claim 1) plainly cover those embodiments.

Plaintiffs' proposed interpretation is also improper because it is inconsistent with Applicants' amendment during prosecution.  As originally filed, Claim 41 referred to "substantially the entire top surface."   Ex. 18 at 364.[12]   During prosecution, the Applicants deleted "substantially," narrowing the scope of the claim.   Ex. T at 42.  Plaintiffs' interpretation would improperly recapture the broader claim scope given up during prosecution, because their interpretation ("essentially") would have the same effect as the deleted "substantially" language.[13] *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 736–37, 739–

---

[10] Also contrary to Plaintiffs' argument, Defendants' claim construction does not leave the conversion embodiment unclaimed.  Other claims in related patents use the terms defined in the specification to broadly encompass a silicon nitride layer formed using either conversion or deposition.  *See, e.g.,* Ex. P Claim 1.  There is no requirement that every claim cover every embodiment.  *TIP Sys., LLC v. Philips & Brooks/Gladwin, Inc.*, 529 F.3d 1364, 1373 (Fed. Cir. 2008).

[11] Indeed, manufacturing processes were known at the time that would not block portions of the substrate. Shealy Reb. ¶ 35.

[12] Application Claim 31 corresponds to independent Claim 36, from which Claim 41 depends.

[13] Plaintiffs also offer no support other than the opinion of Dr. Schubert that the phrase "although minor defects might exist" should be injected into the claim.  Plaintiffs do not identify any support in the intrinsic record.  Furthermore, Plaintiffs offer no explanation for what this phrase means, so the language merely adds ambiguity rather than resolving any actual disputes as to claim scope.

40 (2002) ("A patentee who narrows a claim as a condition for obtaining a patent disavows his claim to the broader subject matter").

## III.    '889 Patent Disputed Term

### A.    "a silicon nitride-based material layer formed between the silicon substrate and the III-nitride material region"

This term is indefinite because the specification uses the phrase "formed between" in inconsistent ways, rendering its meaning uncertain.  Def. Br. at 25:5–26:13.    Plaintiffs concede that the specification, as written, includes an inconsistency that affects the meaning of the term in dispute.  Plaintiffs do not argue that the Court can generally ignore inconsistent portions of the specification.[14]  Rather, Plaintiffs argue that the Court can ignore this inconsistency because it is an "obvious drafting error."  Pl. Br. at 28:12–29:8.

Plaintiffs improperly rely on cases involving grammatical errors.  *CBT Flint Partners* involved inserting an "and" between the adjacent verbs "detect" and "analyze" to correct a grammatical mistake ("the computer being programmed to ***detect analyze*** the electronic mail").  *CBT Flint Partners, LLC v. Return Path, Inc.*, 654 F.3d 1353, 1358–59 (Fed. Cir. 2011).[15]  In contrast, the sentence at issue here does not include any grammatical mistake.  The sentence reads, "Thus, in these cases, the III-nitride material region may be formed directly on the substrate."  Ex. M at 5:3–6.  Rather than correct a grammatical error, Plaintiffs seek to substitute "layer" for "substrate" to change the ***meaning*** of the sentence.[16]  None of the cases

[14] Claims must be read in view of the specification.  *Phillips v. AWH Corp.*, 415 F.3d 1303, 1313 (Fed. Cir. 2005).  Thus, the specification's inconsistent use of a term renders the term indefinite.  *Transcend Med., Inc. v. Glaukos Corp.*, No. 13-830, 2015 WL 5546988, at *5–*7 (D. Del. Sept. 18, 2015).

[15] Plaintiffs also cite *DCG Systems*, which involved an error in a mathematical equation, akin to a grammatical error albeit in numerical form.  There is no mathematical error here.  And *California Institute of Technology* does not even involve correcting any error.  It merely stands for the unremarkable proposition that terms should be viewed as they would by one skilled in the art.

[16] Defendants dispute that Plaintiffs' proposed rewrite was clearly what the patentee intended.  The sentence at issue refers to embodiments in which the III-nitride material region is "formed directly on the ***substrate***" and thus there is no

cited by Plaintiffs authorize a court to substitute one word for another to change a sentence's meaning when the sentence, on its face, includes no grammatical error. *See Superior Fireplace Co. v. Majestic Prods. Co.*, 270 F.3d 1358, 1373–75 (Fed. Cir. 2001) (finding "no grammatical error that suggests a mistake" and that "syntactically correct" language "on its face raises no question of a mistake," and "is, therefore, not a clerical or typographical mistake").

It would be improper to do what Plaintiffs propose—to rewrite language without any grammatical mistakes even if its meaning is nonsensical in view of the rest of the specification.  In *Chef America*, the Federal Circuit confronted claim language requiring that dough be heated "to" a temperature in the range of 400° F. to 850° F.  *Chef Am., Inc. v. Lamb-Weston, Inc.*, 358 F.3d 1371, 1373 (Fed. Cir. 2004).  The patentee submitted an expert declaration stating that a person skilled in the art would understand this limitation to refer to "oven temperature, not product temperature," because otherwise the dough would be "burned to a crisp" and resemble a "charcoal briquet" as opposed to the "light flaky crispy texture" described in the patent  *Id.* at 1373, 1375.  The Federal Circuit held that, although the claim language leads to a "nonsensical result," it must be interpreted just as written.  *Id.* at 1374–75; *see also Teknowledge Corp. v. Akamai Techs. Inc.*, No. 02-05741, 2004 WL 2042864, at *7 (N.D. Cal. Sept. 11, 2004) (refusing to substitute one word for another to avoid a "nonsensical result").

Here, as in *Chef America*, the meaning of the sentence Plaintiffs now find problematic is clear to one of skill in the art.  Shealy Reb. ¶¶ 36–38.  The Court should reject Plaintiffs' proposal to "impermissibly rewrite[] the specification" contrary to its plain meaning to avoid indefiniteness.  *Transcend*, 2015 WL 5546988, at *7.

---

intervening layer between them.  The following sentence then refers to contrasting embodiments with layers in "between the ***substrate*** and the III nitride material region," indicating that the sentence at issue purposely referred to "substrate."

## IV.    '002 Patent Disputed Term

### A.    "the via is formed through the substrate"

Plaintiffs fail to point to any intrinsic evidence that would justify interpreting the claimed via as encompassing a topside via.  As Defendants pointed out, all the intrinsic evidence compels the conclusion that the claim—and indeed the invention—is directed to a backside via (*i.e.*, a via formed from the bottom surface of a device).  Def. Br. at 26:22–29:16; Shealy Reb. ¶¶ 42–45.  Plaintiffs rely on the passage at column 9, lines 7–15, but that passage makes clear that the invention is directed to "backside vias and backside contacts."  The passage does not describe any via formed from the topside. *Id.* ¶ 40.  Although Plaintiffs' expert Dr. Schubert states that "it would be advantageous to etch from the topside," he fails to identify any portion of the specification that describes forming a via by etching from the topside.    *Id.* ¶¶ 41–47.   Rather, the '002 Patent repeatedly and exclusively describes vias formed from the backside.  Def. Br. at 27:7–28:16.

## V.    Judicial Estoppel and Assignee Estoppel

### A.    Plaintiffs fail to present any basis for applying judicial estoppel or assignee estoppel against Infineon AG.

No judicial estoppel can apply against Infineon AG based on the prosecution of the Weeks Patents[17] because Infineon AG was not involved in that prosecution.  IR—not Infineon AG—was the party prosecuting the Week Patents.  During that prosecution, Infineon AG and IR were competitors.  Thus, IR's prosecution could not create any estoppel against Infineon AG.  *See Nordhorn v. Ladish Co.*, 9 F.3d 1402, 1405–06 (9th Cir. 1993) (refusing to apply estoppel where two companies were affiliated but not at the time of the prior litigation alleged to create estoppel).  Even if IR and Infineon AG had been affiliates during the prosecution, Plaintiffs would also have to show that Infineon AG exercised control over its competitor

---

[17] The Weeks Patents at issue are the '417, '921, and '862 Patents.  Plaintiffs are not arguing judicial estoppel as to the '889 Patent because its prosecution was completed by Nitronex before IR bought the Nitronex patents in 2010.

1  IR's prosecution of the Weeks Patents.  *See Doral Pharm., Inc. v. Pharm. Generic*
2  *Developers, Inc.*, 148 F. Supp. 2d 127, 132–33 (D.P.R. 2001) (refusing to apply
3  judicial estoppel because defendant did not establish that plaintiff exercised control
4  over an affiliated company's prior litigation).  Plaintiffs cannot possibly do so.

5       Additionally, Plaintiffs have failed to explain why assignee estoppel should
6  be applied to Infineon AG, who are not now and have never been an assignee of the
7  patents at issue.  Defendants rely on their prior briefing on this point.  *See* Dkt. No.
8  352.

9       Because judicial estoppel and assignee estoppel cannot apply against
10  Infineon AG, the Court must address the indefiniteness issues in dispute regardless
11  of whether estoppel applies to Infineon Americas.   Thus, Plaintiffs' estoppel
12  arguments against Infineon Americas need not be addressed at this time.

13       **B.      There is no judicial estoppel or assignee estoppel.**

14       Plaintiffs fail to show judicial estoppel.  Plaintiffs' cases applying judicial
15  estoppel uniformly involve affirmative statements or arguments.[18]  Judicial estoppel
16  cannot apply in the absence of an affirmative assertion.[19]  Def. Br. at 29:23–30:5.
17  Plaintiffs fail to identify any affirmative assertions made during prosecution
18  inconsistent with Defendants' indefiniteness argument.  Because the PTO never

19
20       [18] *See Rissetto v. Plumbers and Steamfitters Local 343*, 94 F.3d 597, 605–06
    (9th Cir. 1996) (worker's prior statements that she had an "inability to work" and a
21  "total inability to earn income"); *Trs. in Bankr. of N. Am. Rubber Thread Co. v.
    United States*, 593 F.3d 1346, 1356–57 (Fed. Cir. 2010) (party's affirmative
22  arguments identifying the revocation date of an order in dispute); *Transclean Corp.
    v. Jiffy Lube Int'l, Inc.*, 474 F.3d 1298, 1307 (Fed. Cir. 2007) (party's prior
    concessions regarding privity); *Alcohol Monitoring Sys., Inc. v. Actsoft, Inc.*, No.
23  07-cv-02261, 2011 WL 5075619, at *5–*6 (D. Colo. Oct. 25, 2011) (affirmative
    arguments); *Toyo Tire & Rubber Co. v. H.K. Tri-Ace Tire Co.*, No. 14-00054, 2017
24  WL 6547649, at *5–*7 (C.D. Cal. Nov. 20, 2017) (party's express stipulation).

25       [19] Plaintiffs wrongly conflate judicial estoppel with prosecution history
    estoppel.  They are different doctrines and serve different purposes.  Judicial
26  estoppel is based on preserving the integrity of the courts.   Prosecution history
    estoppel is based on the public's right to rely on the file history to determine the
27  meaning of claim terms.  Thus, Plaintiffs' prosecution history estoppel cases, such
    as *Forest Labs* and *Analog Devices*, do not apply here.  In any case, those cases also
28  involve affirmative statements or arguments.

raised indefiniteness during prosecution of the Weeks Patents,[20] IR never took any position on indefiniteness.

Plaintiffs also fail to show assignee estoppel.  The Court previously denied Plaintiffs' assignee estoppel arguments, finding that the record was not sufficiently developed to decide the issue of assignee estoppel.  Dkt. No. 354.  Plaintiffs fail to identify any changed circumstance that would warrant reconsideration of the Court's prior decision.  Thus, Defendants rely on the prior briefing.  Dkt. No. 352.[21]

### C.   Because infringement cannot be determined without a discernable claim construction, the Court must address indefiniteness.

Even if estoppel were to apply to prevent *validity* challenges, the Court still must construe the claims at issue in order to resolve the parties' dispute regarding *infringement*.   Infringement cannot be determined without a discernable claim construction.  *Honeywell Int'l, Inc. v. Int'l Trade Comm'n*, 341 F.3d 1332, 1342 (Fed. Cir. 2003) ("Without a discernable claim construction, an infringement analysis cannot be performed.").  Thus, the Court necessarily must grapple with the indefiniteness issues that Defendants raise.  *Id.* (vacating finding of infringement when the claims could not be construed due to indefiniteness).  Consequently, there is no need to decide the estoppel issues before construing the claims.

---

[20] Even though *Nautilus* lowered the bar for showing indefiniteness, Plaintiffs try to minimize the impact of this change in the law by arguing that the PTO uses "a lower threshold" for showing ambiguity than courts do in litigation.  Pl. Br. at 15:6.  Plaintiffs appear to concede that it was incumbent on the PTO—not the applicant—to raise indefiniteness.

[21] Contrary to Plaintiffs' accusations, Infineon Americas is not relying on invalidity to avoid any contractual obligations.  Pl. Br. at 16:2–7.  The proper scope and validity of the patent claims *define* the contours of Infineon Americas's contractual obligations under the License Agreement.  Plaintiffs' land analogy (Pl. Br. at 16:7–15) is misleading because patent rights do not guarantee the rights holder anything equivalent to sole possession of land.  Before Nitronex sold the patents at issue, anyone could have used the patented inventions and avoided liability for infringement by showing that Nitronex's patents are invalid.  Nitronex did not obtain the ability to enforce invalid patent rights, simply by selling some of its patent rights to Infineon Americas.  Unlike Nitronex, Infineon Americas never promised to refrain from challenging validity.  *Compare* License Agreement (Dkt. No. 170-2) at § 3.4 *with* IP Purchase Agreement (Dkt. No. 170-1) § 8.04(i).

1

2  DATED: March 23, 2018          JEFFERY D. BAXTER
                                  BAKER BOTTS LLP
3

4

5                                 By   */s/ Jeffery D. Baxter*
6                                      Jeffery D. Baxter
                                       Attorney for Defendants
7                                      Infineon Technologies AG and Infineon
                                       Technologies Americas Corp.
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28