Amanda Tessar (admitted *pro hac vice*)
ATessar@perkinscoie.com
PERKINS COIE LLP
1900 Sixteenth Street, Suite 1400
Denver, CO 80202-5255
Telephone: 303.291.2300
Facsimile: 303.291.2400

Ramsey Al-Salam
RAlsalam@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue Suite 4900 - Mailstop 43-52
Seattle, WA 98101-3099
Telephone: 206.359.6385
Facsimile: 206.359.7385

**ATTORNEYS FOR PLAINTIFFS**
(Additional Counsel Listed on Signature Page)

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
WESTERN DIVISION

| | |
|---|---|
| MACOM TECHNOLOGY SOLUTIONS HOLDINGS, INC., a Delaware corporation, and NITRONEX, LLC, a Delaware limited liability company,<br><br>Plaintiffs,<br><br>v.<br><br>INFINEON TECHNOLOGIES AG, a corporation organized under the laws of Germany, and INFINEON TECHNOLOGIES AMERICAS CORP., a Delaware corporation,<br><br>Defendants. | Case No. CV 16-02859 CAS (PLAx)<br><br>**FOURTH AMENDED COMPLAINT FOR BREACH OF CONTRACT AND DECLARATORY JUDGMENT**<br><br>**REDACTED VERSION OF DOCUMENT FILED UNDER SEAL PURSUANT TO ORDER OF THE COURT DATED MAY 22, 2018** |

Plaintiffs MACOM Technology Solutions Holdings, Inc. ("MACOM") and Nitronex, LLC ("Nitronex") (collectively, "Plaintiffs") file this Fourth Amended Complaint for Breach of Contract and Declaratory Judgment against Defendant Infineon Technologies Americas Corp. ("Infineon Americas") and for Intentional Interference with Contract and Unfair Competition against Defendant Infineon Technologies AG ("Infineon AG") (collectively with Infineon Americas, "Infineon" or "Defendants"), stating as follows:[1]

### SUMMARY OF THE CASE

1.     Beginning in the late 1990s, Nitronex Corporation developed and pioneered the use of gallium nitride ("GaN") in the design and manufacture of semiconductor chips, focusing specifically on the use of gallium nitride-on-silicon ("GaN-on-Si") for radio frequency ("RF") products.  As a result of its innovations, Nitronex was awarded approximately three dozen United States patents covering the use of gallium nitride in semiconductor products.

2.     In 2010, Nitronex Corporation (the predecessor-in-interest to MACOM) and International Rectifier Corporation (the predecessor to Infineon) entered into an intellectual property purchase agreement (the "2010 IP Purchase Agreement") and a license agreement (the "2010 License Agreement") under which (a) Nitronex sold its patents and patent applications relating to GaN-on-Si semiconductor technology ("Nitronex Patents") to International Rectifier, (b) International Rectifier granted back to Nitronex licenses to continue to use the

---

[1]  Plaintiffs' original Complaint and First Amended Complaint alleged breach of contract and declaratory judgment claims against both Infineon AG and Infineon Americas and an alternative claim for intentional interference with contract against Infineon AG.  The Court's order dated October 31, 2016, granted without prejudice Infineon AG's motion to dismiss the breach of contract and declaratory judgment claims against it for lack of subject matter jurisdiction. Plaintiffs reserve the right to further amend the complaint to add Infineon AG as a party to the contract and declaratory judgment claims if facts later show Infineon AG to be an appropriate party to such claims.

1  Nitronex Patents to develop and sell GaN-on-Si RF products, including an

2  ***exclusive*** license to use the Nitronex Patents to develop and sell GaN-on-Si RF

3  products in certain market segments, (c) International Rectifier expressly promised

4  that it would ***not*** directly or indirectly market, sell or service products in Nitronex's

5  exclusive market segments; and (d) ████████████████████████████

6  ████████████████████████████████████████████

7  ████████████████████  The agreements also called for International

8  Rectifier and Nitronex ████████████████████████████████

9  ████████████████  and to cooperate in ████████████████

10  ████  the licensing and enforcement of the Nitronex Patents.

11     3.     For several years thereafter, Nitronex (and, after its acquisition of

12  Nitronex, MACOM) and International Rectifier had a cooperative working

13  relationship, with Nitronex/MACOM using the patented technology developed by

14  Nitronex for continued development and sales of GaN-on-Si RF products and

15  International Rectifier using the patented technology to develop its permitted GaN-

16  on-Si power management products.

17     4.     In 2015, however, Infineon AG, a very large German semiconductor

18  company that produces both power management ***and*** RF products, purchased

19  International Rectifier.  Almost immediately after the completion of its acquisition

20  of International Rectifier, Infineon began to try to "renegotiate" the agreements

21  between Nitronex and International Rectifier to obtain rights to use the Nitronex

22  Patents to develop GaN-on-Si RF products in MACOM's exclusive field.  Infineon

23  repeatedly demanded that MACOM give up its exclusive rights to use the Nitronex

24  Patents in certain burgeoning GaN-on-Si RF markets so that Infineon could use the

25  Nitronex Patents to enter those markets.  MACOM consistently made it clear to

26  Infineon that it was unwilling to give up its exclusive rights.

27     5.     Infineon was not willing to take no for an answer, however.  Thus, on

28  February 2, 2016, Infineon notified MACOM that MACOM had supposedly

-2-

committed a "material breach" of the 2010 License Agreement because it was

selling an entirely different category of products than those addressed in the

Nitronex-International Rectifier agreements—GaN-on-silicon **carbide** ("GaN-on-

SiC") products.  Without identifying any specific MACOM GaN-on-SiC products,

Infineon further took the position that MACOM's sales of GaN-on-SiC products

purportedly infringed one or more unidentified Nitronex Patents, which Infineon

was now broadly reading to cover products beyond just GaN-on-Si products.  On

February 11, 2016, MACOM responded that it had not committed any breach of the

agreements because:  (a) the agreements did not prohibit MACOM from selling

GaN-on-SiC; (b) even if the complained-of MACOM conduct could be considered

a breach, it was at most a *de minimis* breach due to the low volume of MACOM's

GaN-on-SiC sales; and (c) in any event, any alleged breach had been cured because

the third-party supplier of the wafers for MACOM's GaN-on-SiC products had

notified MACOM that it would no longer manufacture products for MACOM.

MACOM offered to provide Infineon with copies of its sales figures for GaN-on-

SiC under an NDA so that Infineon could confirm the *de minimis* sales volumes for

those products.  Infineon never responded to MACOM's offer.  Instead, without

further communication or discussion with MACOM, Infineon sent MACOM a

letter on March 22, 2016, stating that Infineon was "terminating" the 2010 License

Agreement.

6.      MACOM has not breached its agreements with Infineon.  Infineon's

claim of "breach" is nothing more than a bad faith pretext for Infineon to harm

MACOM and claim that MACOM no longer has any rights to use the Nitronex

Patents and that Infineon is now free to use the patents to develop GaN-on-Si RF

products in MACOM's exclusive fields.

7.      Infineon's purported "termination" of MACOM's rights with respect

to the Nitronex Patents is without cause or basis and was done in bad faith and thus

is itself a material breach of the agreements between MACOM/Nitronex and International Rectifier.

8.      Accordingly, Plaintiffs brought this action seeking a declaration that Infineon Americas' purported termination of the 2010 License Agreement is not valid and is without effect, and that the agreement is still in full force and effect, including MACOM's exclusive rights to use the patents for certain GaN-on-Si RF products.  Plaintiffs also seek a declaration that their development and sale of GaN-on-Si RF products does not infringe the Nitronex Patents because MACOM's activities are licensed under the 2010 License Agreement.  Plaintiffs also bring claims for breach of contract and breach of the covenant of good faith and fair dealing against Infineon Americas for Infineon Americas' wrongful and pretextual "termination" of the 2010 License Agreement.

9.      Infineon AG and Infineon Americas have, separately and collectively, engaged in numerous other activities that have breached the Agreements, breached the implied covenant of good faith and fair dealing, undermined the value of MACOM's contractual rights, and harmed MACOM.  These actions include, but are not limited to:

- Infineon has designed, developed, and marketed GaN-on-Si RF products and technologies for use in cellular base station applications—*i.e.*, products squarely in MACOM's exclusive field that Infineon promised that it would not market and sell.  Moreover, Infineon has marketed these products to key base station customers.

- Since entry of the injunction in this case, Infineon Americas—at the direction and instruction of Infineon AG—made the decision to ostensibly exit the RF Power business that developed, marketed, and sold RF base station products.  It did so in a bad faith manner designed to circumvent its obligations under the 2010 License Agreement, however, and in a manner that enabled its corporate affiliates to pick up precisely where it had left off with respect to GaN-on-Si RF base station products.  Namely, Infineon Americas ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

Meanwhile, having artificially maximized the value of the remnants of

its RF Power business (*i.e.*, the GaN-on-SiC and LDMOS pieces of that business) through its breaches of its Agreements with MACOM (and market confusion it sowed relating to them), it sold those businesses at an inflated price to a third-party buyer.  Specifically, on March 8, 2018, Infineon announced the sale of those businesses to Cree, Inc. for $430 million (€345 million).

▪ Infineon has further breached the agreements between the parties by failing to take steps to address infringement of certain of the Nitronex Patents, as required by the IP Purchase Agreement.  By the terms of the agreements, if Infineon fails to take timely action to address infringement, it must assign back to MACOM the relevant patents so that MACOM can enforce them.  MACOM has identified actual infringement of many of the Nitronex Patents (including by Infineon AG), but Infineon has failed to address that infringement within the time period required by the parties' agreements and has failed to assign back to MACOM the relevant patents.

▪ Additionally, in December of 2015, prior to the filing of this suit, Infineon gave MACOM notice that it intended to assign certain Nitronex Patents to an undisclosed third party.  MACOM objected to that proposed action as being a breach of the parties' agreements.  Unbeknownst to MACOM at the time, and as only disclosed by Infineon two years into this litigation, Infineon Americas then instead ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ just before this suit was filed. ▮▮▮▮▮▮▮▮▮▮ Although Infineon Americas is allowed by the terms of the Agreements to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, it is ***not*** allowed to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  Nevertheless, Infineon purported to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  Moreover, Infineon had ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  On information and belief, these actions were taken in bad faith.  Notably, Infineon did not disclose the existence of the relevant agreement until late March 2018, more than two years after it was signed.

▪ Additionally, Infineon is undermining the value of the Nitronex Patents and MACOM's rights under the 2010 License and IP Purchase Agreements by taking the position that many or all of the Nitronex Patents are invalid, including even those patents that International Rectifier and Infineon itself prosecuted from the patent applications transferred by Nitronex.  Infineon's predecessor paid ▮▮▮▮▮▮ for these patents and applications, and it induced MACOM's predecessor

-5-

to part with them based on promises of exclusivity in certain fields thereafter. Now, Infineon would rather have the patents declared invalid, so that it is not barred from practicing them, than honor its commitments to MACOM. But such attempts by Infineon to avoid its contractual obligations constitute breaches of the duty of good faith and fair dealing implied in every California contract.

10.     Plaintiffs also state a claim for intentional interference with contract under California state law against Infineon AG, based on, among other actions, Infineon AG's acts to cause Infineon Americas to: purport to terminate the 2010 License and IP Agreements; ███████████████████████████████ ████████████; fail to enforce the Nitronex Patents against entities practicing them (including Infineon AG itself); engage in licensing activity for the Nitronex Patents in contravention of the 2010 License and IP Agreements and without proper notice or consent, consideration, or royalty-sharing; sell aspects of its RF power business at an inflated rate based on Infineon's wrongful acts; attempt to sell Nitronex Patents in violation of the 2010 License and IP Agreements; and minimize the value of Nitronex Patents by arguing that they are invalid. These unlawful activities additionally constitute the basis for unfair competition in violation of California Business and Professions Code §17200 *et seq*., asserted against Infineon AG.

## PARTIES

11.     Plaintiff MACOM is a Delaware corporation having its principal place of business and headquarters at 100 Chelmsford Street, Lowell, Massachusetts.

12.     Plaintiff Nitronex, LLC is a Delaware limited liability company with its principal place of business at 100 Chelmsford Street, Lowell, Massachusetts. Nitronex, LLC is the successor to Nitronex Corporation and is a wholly-owned subsidiary of MACOM.

13.     Defendant Infineon Technologies AG ("Infineon AG") is a type of German corporation, an Aktiengesellschaft, having its headquarters and principal place of business at Am Campeon 1-12 85579 Neubiberg, Bavaria, Germany.

14.     Defendant Infineon Technologies Americas Corp. ("Infineon Americas") is a Delaware corporation having its headquarters and principal place of business at the former International Rectifier Corporation ("International Rectifier") headquarters at 101 N. Sepulveda Boulevard, El Segundo, California.  Infineon Americas is a wholly-owned subsidiary of Infineon AG.[2]

## JURISDICTION AND VENUE

15.     This Fourth Amended Complaint includes a count for declaratory relief under the patent laws of the United States, 35 U.S.C. §§ 1, *et seq.*

16.     Plaintiffs seek declaratory relief under 28 U.S.C. §§ 2201 and 2202.

17.     This Court has subject matter jurisdiction over the claims alleged in this action under 28 U.S.C. §§ 1331, 1338, 1367(a), 2201, and 2202 because this Court has exclusive jurisdiction over declaratory judgment claims arising under the patent laws of the United States pursuant to 28 U.S.C. §§ 1331, 1338, 2201, and 2202.  This Court has jurisdiction over the remaining claims pleaded in this action

---

[2]  MACOM's original complaint named another defendant, International Rectifier Corporation, based on the fact that the United States Patent & Trademark Office ("PTO") assignment database showed that International Rectifier was still the identified assignee/owner of most of the Nitronex Patents.  Infineon has now represented in its litigation filings to this Court that International Rectifier no longer exists as an entity, having changed its name to Infineon Technologies Americas Corp.  (Dkt. No. 56 at 2:24-3:8.)  The PTO records do contain an assignment by International Rectifier to Infineon Americas of a fraction of the Nitronex Patents.  Nevertheless, as of the date of the filing of this Fourth Amended Complaint, the PTO's Patent and Trademark Assignment Database continues to list International Rectifier Corporation as the assignee of many of the Nitronex Patents.  While MACOM accepts Infineon's representations that International Rectifier no longer exists or owns the Nitronex Patents, MACOM also reserves its rights to amend the complaint to re-name International Rectifier as a defendant if the facts later show that International Rectifier is still an ongoing entity that owns any of the Nitronex Patents or maintains any rights or obligations with respect to the Nitronex-International Rectifier agreements that are the subject of MACOM's claims.

1   that do not arise under the patent laws pursuant to 28 U.S.C. § 1367, insofar as they

2   are related to the other claims in the action and form part of the same case or

3   controversy, as well as pursuant to the Declaratory Judgment Act, 28 U.S.C.

4   § 2201(a).

5                                   *Infineon Americas*

6          18.    This Court has personal jurisdiction over Infineon Americas because it

7   maintains a principal place of business in El Segundo, Los Angeles County,

8   California, maintains research and development offices in this District in Torrance,

9   California and a production facility in this District in Temecula, California, and has

10  purposefully availed itself of the privilege of conducting business in this District

11  such that it should reasonably and fairly anticipate being brought into court in this

12  District.  Further, based on the representation to this Court by Defendants that

13  International Rectifier changed its name to Infineon Technologies Americas Corp.

14  and succeeded to International Rectifier's rights and obligations under the

15  Nitronex-International Rectifier agreements, including the 2010 License Agreement

16  and the 2010 IP Purchase Agreement, Infineon Americas has consented to the

17  personal jurisdiction and venue of the courts located in Los Angeles County,

18  California because both agreements contain provisions stating all disputes relating

19  to the agreements should be heard by the federal and state courts of Los Angeles

20  County and consenting to personal jurisdiction in those courts.

21                                      *Infineon AG*

22         19.    This Court has personal jurisdiction over Infineon AG because it has

23  intentionally engaged in actions within this District that form the basis of Plaintiffs'

24  claims against Infineon AG and/or has directed to this District the actions that form

25  the basis of Plaintiffs' claims against Infineon AG and intentionally caused harm it

26  knew would be felt in this District.

27         20.    Infineon AG directs and controls all activities relating to the GaN

28  business of Infineon Americas and other Infineon affiliates, including the actions at

issue in this matter.  On information and belief, Infineon AG exercises control over
Infineon Americas' day-to-day activities, including product development, sales,
contracts, and intellectual property.

21.    For example, Infineon AG's Annual Report from 2015 (available at:
http://www.infineon.com/dgdl/Jahresfinanzbericht_zum_30._September_2015_%2
8EN%29.pdf?fileId=5546d46150cc1eda015142a4caeb04f7) states that Infineon
"acquired International Rectifier with the goal to systematically combine the
strengths of the two groups [International Rectifier and Infineon]."  Infineon further
stated that the "sales structures of the two businesses" were merged by the end of
March 2015.  Infineon's annual report also states that "effective October 1, 2015,
International Rectifier has been fully absorbed within three segments" of Infineon's
business (specifically, Automotive, Industrial Power Control, and Power
Management & Multimarket).  Infineon went on in this report to investors to
highlight the role that acquiring and integrating International Rectifier's GaN
technology played in the acquisition: "[A]nother important aspect of integrating
International Rectifier is to combine all development activities relating to GaN-
based power semiconductors.  International Rectifier is a global leader in applying
GaN layers onto standard silicon wafers."

22.    In its 2015 Annual Report, Infineon AG also reports revenue, assets,
and liabilities for International Rectifier (now Infineon Americas) on a fully-
integrated basis with the revenues, assets, and liabilities for Infineon AG and all
other Infineon AG subsidiaries.  Infineon AG similarly includes International
Rectifier's employees (now Infineon Americas' employees) in its discussion of
Infineon AG employees.  It also states that production of some of International
Rectifier products will be transferred to Infineon AG plants, including plants in
Dresden, Germany.  On information and belief, the transferred products include at
least some and perhaps all of International Rectifier's GaN-on-Si power
management products.

23.     Additionally, on January 13, 2015, Infineon AG stated in a press release that International Rectifier "has become part of Infineon," subject to necessary regulatory and shareholder approvals, and prominently features a photo of Infineon AG's executive team of A. Mittal, R. Ploss, and D. Asam for use with the press release (available at: http://www.infineon.com/cms/en/about-infineon/press/press-releases/2015/INFXX201501-020.html).  On information and belief, Infineon AG's and the former International Rectifier's GaN business is now part of Infineon AG's Power Management and Multimarket (PMM) group.  On information and belief, the PMM division is headquartered in Germany and most, if not all, of the PMM division's management board members are employees of Infineon AG and work in Germany.  Further, in its 2015 Annual Report, Infineon AG stated that it was "combin[ing] all [of Infineon AG's and International Rectifier's] development activity relating to GaN-based power semiconductors."

24.     On information and belief, Infineon Americas does not have a separate website or offer different products from Infineon AG.  Instead, both Infineon AG and Infineon Americas share the website www.infineon.com, which prominently features the Infineon logo (without indication of which affiliate that it is associated with) and which repeatedly and consistently refers to "Infineon" generically, without differentiation between Infineon AG, on the one hand, and any of its various subsidiaries and affiliates, on the other.

25.     Infineon AG also states in its 2015 Annual Report that its patent portfolio includes the patents it acquired through the acquisition of International Rectifier.  On information and belief, this includes the patents assigned to International Rectifier by Nitronex that are the subject of MACOM's claim for declaratory judgment of noninfringement below.

26.     On September 8, 2015, Infineon AG stated in a press release that it had a "broadened patent portfolio related to GaN" due to its acquisition of International Rectifier (available at: http://www.infineon.com/cms/en/about-infineon/press/press-

1  releases/2015/INFPMM201509-077.html).  On information and belief, this includes

2  the patents assigned to International Rectifier by Nitronex that are the subject of

3  MACOM's claim for declaratory judgment of noninfringement.

4        27.     Moreover, on information and belief, Infineon AG directs, controls, or

5  acts in concert with Infineon Americas to control the disposition and enforcement

6  of the Nitronex Patents, as well as the licensing and purported assignments of rights

7  relating to the same; Infineon AG portrays itself in the market as having such

8  direction and control; and Infineon AG does not and has not permitted Infineon

9  Americas to act unilaterally or independently with respect to the Nitronex Patents.

10 Even if Infineon AG does not formally have title to the Nitronex Patents, to the

11 extent that Infineon AG or its subsidiaries other than Infineon Americas have

12 engaged in the design and manufacture of GaN-on-Si products, ████████████

13 ████████████████████████████████████████████████████████

14 ████████████████████████████████████████████████

15 ████████████████

16        28.     Infineon AG employees in Germany, along with Infineon Americas

17 employees in California, participated by phone in the 2015 and 2016 negotiations

18 with MACOM regarding the Nitronex-International Rectifier agreements, and

19 Infineon Americas employees told MACOM that Infineon AG had the decision-

20 making authority regarding those agreements.

21        29.     Confirming Infineon AG's interest in the Nitronex Patents and the

22 Nitronex-International Rectifier agreements as a whole, as well as Infineon AG's

23 failure to respect corporate formalities and divisions, Infineon AG—not Infineon

24 Americas—signed the parties' Common Interest Agreement in 2015 when

25 MACOM and Infineon agreed to work together, ████████████████████████

26 ████████████████████████████████  in connection with patent

27 prosecution issues for ongoing continuation applications in the Nitronex Patent

28 families.  Infineon AG stated in the Common Interest Agreement that its signature

-11-

1    was both "for themselves and on behalf of any affiliates involved in the prosecution

2    of the patent applications that are the subject of this Agreement."

3        30.    Similarly,



11       31.    Infineon AG's control over Infineon Americas is so pervasive and

12   continuous that Infineon Americas is nothing more than an agent or instrumentality

13   of Infineon AG.  Consistent with Infineon AG's direction and control over all

14   aspects of Infineon Americas' GaN business and other Infineon affiliates, Infineon

15   AG made, directed, and/or controlled the decisions that led to the acts alleged in

16   this Fourth Amended Complaint, including the decisions to: (a) wrongfully and

17   pretextually terminate the 2010 License Agreement; (b) develop and market (or to

18   continue developing and marketing and/or transfer activities from Infineon

19   Americas to other Infineon affiliates for) GaN-on-Si RF products within

20   MACOM's exclusive field under the 2010 License Agreement, despite

21   International Rectifier's promise not to do so; (c) refuse to take action against

22   infringers of the Nitronex Patents; (d) after failing to take such action, refuse to

23   assign back to MACOM certain of the Nitronex Patents; (e) purport to assign away

24   certain enforcement rights for the Nitronex Patents in contravention of Section 4.02

25   of the IP Purchase Agreement; and (f) take the position that the Nitronex Patents

26   are invalid.

27       32.    As described above, Infineon Americas functions as Infineon AG's

28   representative/agent and performs services for Infineon AG that are sufficiently

important such that, if Infineon Americas did not perform them, Infineon AG's own officials would undertake to perform substantially similar services.

33.     On information and belief, for the reasons as described above, there is such unity of interest and ownership between Infineon AG and Infineon Americas that the separate personalities of the two entities no longer exist.

34.     Infineon's actions alleged in this Fourth Amended Complaint were taken in bad faith, with an improper purpose, and by improper means.  Failure to disregard Infineon AG and Infineon Americas' purportedly separate identities would result in an injustice to MACOM.

35.     Infineon AG intentionally acquired a California corporation precisely because of the very GaN products and GaN business that are the subject of MACOM's claims here, renamed the entity through a merger with a subsidiary, and, on information and belief, directed its new subsidiary to wrongfully terminate its contracts with MACOM.  On information and belief, Infineon AG's actions were all intended to disrupt the promises made by International Rectifier to Nitronex/MACOM.

36.     On information and belief, based on the timing of Infineon's attempts to disrupt the International Rectifier-Nitronex agreements, it appears that Infineon AG must have planned to do so even before its $3 billion acquisition of International Rectifier and that, indeed, the acquisition was motivated by a wrongful desire to usurp MACOM's exclusive rights and markets.

37.     In the alternative, Infineon AG's actions described herein indicate a ratification or intent by Infineon AG to be bound by the Nitronex-International Rectifier agreements, including the 2010 IP Purchase Agreement and the 2010 License Agreement.  Infineon AG ratified these agreements by taking them over, attempting to renegotiate their terms, and then purporting to terminate the 2010 License Agreement.

38.     Infineon AG has succeeded to the rights and obligations of Infineon Americas under the 2010 License Agreement and the 2010 IP Purchase Agreement through ratification and/or because Infineon Americas is merely the alter ego or acting as an agent of Infineon AG.  Through such succession and through all the conduct described above by which Infineon AG directed Infineon AG's own or Infineon Americas' actions regarding the Nitronex-International Rectifier agreements (including the 2010 IP Purchase Agreement and the 2010 License Agreement) into this District, Infineon AG consented to the personal jurisdiction and venue of the courts located in Los Angeles County, California because both agreements contain provisions stating all disputes relating to the agreements should be heard by the federal and state courts of Los Angeles County and consenting to personal jurisdiction in those courts.

39.     Further, to the extent that Infineon AG has not succeeded to International Rectifier's rights under the 2010 IP Purchase and License Agreements,[3] it has purposefully submitted itself to the jurisdiction of the courts of this District by intentionally engaging in conduct aimed at this District and resulting in harm it knew was likely to be felt in this District, including intentionally interfering with contracts of Infineon Americas, who is located in this District, and MACOM, who has offices in this district, which contracts Infineon AG additionally knew had forum selection causes requiring disputes about those contracts to be resolved in the federal and state courts of Los Angeles County.

***Venue***

---

[3]  To the extent that Infineon AG has not succeeded to International Rectifier's rights and obligations, then Infineon Americas succeeded to International Rectifier's rights and obligations in the 2010 License Agreement at the insistence of and under the control of Infineon AG, and it did so as Infineon AG's agent.

40.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1400(b) and 1391 for the reasons stated above and because the parties have consented to the personal jurisdiction and venue of the courts located in the Los Angeles County, California.

## FACTUAL BACKGROUND

41.     The causes of action in this Fourth Amended Complaint relate to contractual obligations arising from the transfer of patents from Nitronex Corporation to International Rectifier in 2010 and the licensing of certain rights in those patents back to Nitronex Corporation.

42.     Nitronex Corporation was formed and incorporated in February 1999 by graduates of the "wide bandgap" semiconductors program at North Carolina State University.  It was headquartered in Durham, North Carolina.

43.     A semiconductor is a material that conducts electrical current only under certain conditions, such as when a sufficient voltage is applied to a semiconductor device.  Semiconductors are used extensively in the electronic circuits necessary for all modern electronics.  Wide bandgap semiconductors specifically are made from materials that have higher energy electronic "band gaps" (meaning more energy is required for an electron to transition or "jump" from the valence band to the conduction band, allowing the electron to "flow" through a circuit) than the traditional semiconductor material: silicon.

44.     Wide bandgap materials are useful because they can tolerate higher temperatures than traditional semiconductor materials and have a higher power density, meaning that they can handle more power in a smaller device and effectively transmit high-frequency signals.

45.     Some of the most important wide bandgap materials are so-called III-V semiconductors.  These are materials that are made from the combination of an element from row III of the periodic table and an element from row V of the periodic table, as well as alloys of such materials.  Examples include aluminum

nitride (made of aluminum and nitrogen), gallium nitride (made of gallium and nitrogen), and gallium arsenide (made of gallium and arsenic), as well as alloys of such materials. Other high bandgap materials include silicon carbide (formed of silicon and carbon) and diamond.

46. Gallium nitride in particular is a highly useful material for creating high power and high-frequency RF devices (*i.e.*, devices that operate at radio frequencies of the electromagnetic spectrum), high-power and small form factor power management devices, and for creating certain types of light emitting diodes, as its wide bandgap and high breakdown characteristics allow it to transmit more power at a higher voltage and frequency, with a smaller form factor, and because gallium nitride and its alloys can naturally emit colors between red and ultra-violet wavelengths without any frequency modification.

47. Although wide (or "high") bandgap semiconductors, including gallium nitride, have many desirable characteristics, one significant downside to them is that they are significantly more expensive to manufacture than silicon-based semiconductors.

48. This difference in material cost is especially important for the portion of semiconductor devices known as the "substrate," or the wafer, which is the base on which most electronic devices (transistors, diodes, integrated circuits, etc.) are created.

49. While silicon substrates or wafers are a ubiquitous and relatively inexpensive commodity in today's economy, wafers made of more exotic high-bandgap materials, such as gallium nitride, silicon carbide, or diamond can be hundreds of times more expensive than traditional silicon wafers.

50. Because of this difference in expense, it is highly desirable to form epitaxial (*i.e.*, deposited) layers of wide bandgap materials, including gallium nitride, on less expensive substrates, such as silicon, to the extent possible.

51.     There are significant technical difficulties, however, in building certain wide bandgap semiconductors (including GaN) on silicon substrates.  This is because the mismatch in the crystalline structure between, for example, gallium nitride and silicon leads to stress between the deposited gallium nitride material and the silicon substrate—and consequently the generation of crystalline lattice defects.  Additionally, the thermal expansion coefficients (a representation of the amount by which a material expands as a function of temperature) between GaN and silicon are mismatched, which can result in additional stresses in the GaN-on-Si wafers, when heated or cooled, causing unacceptable wafer warp and bow or causing devices to crack.  These problems reduce the yield (the percentage of functioning devices) for gallium nitride devices produced on silicon wafers.

52.     One solution to the crystalline mismatch problem is to simply use a substrate that has less mismatch with gallium nitride.  For example, one could use silicon carbide ("SiC"), which has a crystalline structure that is much closer to gallium nitride's structure, as the substrate ("GaN-on-SiC").  Alternatively, one could use gallium nitride as both the substrate material and the epitaxial layer ("GaN-on-GaN"), so that there is no mismatch.  The disadvantage of using silicon carbide or gallium nitride substrates is that the cost of these materials is much higher than the cost of silicon substrates, leading to higher overall cost devices and an ultimate price point unsuited to many target markets.

## NITRONEX PIONEERED NUMEROUS FOUNDATIONAL GALLIUM NITRIDE TECHNOLOGIES

53.     Nitronex was an innovative startup company that pioneered technologies that enabled the creation of high-performance GaN-on-Si semiconductor solutions.  Specifically, Nitronex focused on high-performance gallium nitride devices formed on silicon substrates for RF applications.

54.     Critical to Nitronex's success in creating gallium nitride semiconductor devices was the development of a method for reducing the effects of

-17-

the physical crystal lattice and thermal expansion mismatches between gallium nitride active layers and the silicon substrates that Nitronex desired to use as the base for its devices.

55.     Rather than forming gallium nitride layers directly on the silicon substrate, which had been unsuccessful, Nitronex instead placed a graded "transition layer" between the silicon substrate and the active gallium nitride layers. This transition layer mitigates the strain caused by the mismatch in crystalline lattice spacing and thermal expansion coefficients between the gallium nitride devices and the silicon substrate below.

56.     Nitronex used this solution and developed a proprietary GaN-on-Si manufacturing process, called the SIGANTIC® process, which solved many of the problems associated with GaN-on-Si devices, allowing high-performance GaN semiconductors to be formed on cost-effective silicon substrates.  Nitronex used the SIGANTIC® process to produce numerous RF GaN-on-Si devices.

57.     Nitronex's technology was groundbreaking and ahead of its time.

58.     Nitronex not only pioneered a solution to solve the crystalline and thermal expansion mismatch between gallium nitride devices and silicon substrates, but also developed other important technologies that improved the functionality of gallium nitride RF devices.

59.     Using its technology, Nitronex first demonstrated the capability to form High Electron Mobility Transistors on 4-inch GaN-on-Si wafers in 2001. This proved that Nitronex's technology worked to create transistor devices using gallium nitride active layers formed on silicon substrates.

60.     Later in 2001, Nitronex also demonstrated that its technology worked for another important technology application of gallium nitride materials, producing GaN-on-Si light emitting diode ("LED") devices.

61.     Nitronex also pioneered the use of GaN-on-Si devices in high-frequency RF products.  Accurately predicting the future, Nitronex developed GaN-

on-Si RF products specifically designed for mobile communications.  For example, in 2003, Nitronex began sending sample GaN-on-Si RF products designed for the WCDMA standard to customers.  In 2004, Nitronex demonstrated the first-ever GaN-on-Si monolithic microwave integrated circuit ("MMIC"), a type of circuit that is often used in cellular devices to operate in a portion of the RF spectrum known as the microwave range (300 MHz to 300 GHz).  Following that, in 2005, Nitronex introduced its GaN-on-Si product line for the WiMAX standard.

62.     Nitronex's successes in creating GaN-on-Si devices and innovations and the potential for these technologies to improve the functionality of various technology fields, including RF and satellite communications, led to recognition and funding from NASA and the Department of Defense.  NASA and the Department of Defense awarded Nitronex twenty-three grants, amounting to more than $9,000,000 in total funding between 1999 and 2012.

63.     Nitronex also developed a significant patent portfolio based on its innovations in GaN-on-Si technology.

64.     Nitronex's first patent, U.S. Patent 6,611,002, entitled "Gallium Nitride Material Devices and Methods Including Backside Vias," issued on August 26, 2003.  Shortly thereafter, on September 9, 2003, Nitronex received its second patent, U.S. Patent number 6,617,060, entitled "Gallium Nitride Materials and Methods."

65.     To date, more than forty United States patents have issued based on the foundational and groundbreaking GaN work done by Nitronex.

## NITRONEX AND INTERNATIONAL RECTIFIER FORM A WORKING RELATIONSHIP

66.     Early in its existence, Nitronex began exploring the prospect of licensing some aspects of its groundbreaking technology to raise capital.

-19-

67.     At the same time, however, Nitronex wanted to ensure that it retained exclusive rights to the GaN-on-Si technologies for applications that it believed were the most critical—specifically, GaN-on-Si RF applications.

68.     Nitronex therefore sought a licensing and collaboration partner who desired rights to use GaN-on-Si technology in other fields of use besides RF.

69.     As of 2004, International Rectifier was a well-established company in the power management space.  By 2004, International Rectifier was also working to develop and to introduce gallium nitride power management devices specifically, having recently acquired GaNRose, a company focused on gallium nitride devices, but it was encountering technical challenges that limited its ability to produce functioning GaN-on-Si power management products in bulk.  It needed help to break through these challenges to make its products successful.

70.     In 2004, each party found what it was seeking.  Nitronex found funding and a partner who was focused on the power management field (not RF), and International Rectifier found the expertise in executing on GaN-on-Si products that it was seeking.

71.     Specifically, in early 2004, International Rectifier approached Nitronex to evaluate the Nitronex GaN-on-Si technology for potential use in the GaN-based power management market.  As International Rectifier had no internal capability or know-how to manufacture its own GaN-on-Si wafers, Nitronex provided GaN-on-Si devices to International Rectifier for evaluation.

72.     International Rectifier and Nitronex formalized their working relationship in a License Agreement ("2004 License Agreement") and Technology Transfer Agreement.

73.     The 2004 License Agreement granted International Rectifier the exclusive right to practice certain of the Nitronex Patents in only International Rectifier's field of use (power management).  It also explicitly required Nitronex

and International Rectifier to work together to transfer much of Nitronex's GaN-on-Si technology to International Rectifier.

74.     Throughout 2005 and into 2006, ████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████████████████████████████████████████████
███████████████████

75.     Additionally, Nitronex ████████████████████████████
███████████████████████████████████████████████████████████
██████████████████████████████████████. Nitronex and International Rectifier partnered in a working business relationship that lasted for years thereafter, with each party operating in its chosen field—power management for International Rectifier and RF for Nitronex.  International Rectifier, and later Infineon, benefitted from their relationship with Nitronex (which was later acquired by MACOM).  The relationship was valued so much by International Rectifier that, prior to Nitronex closing on a series A-1 Preferred Stock Financing in May of 2006 with a new investor syndicate led by Alloy Ventures, International Rectifier made a failed bid at acquiring Nitronex, which was turned down by the Nitronex Board of Directors in favor of new venture financing.

### TRANSFER OF PATENTS FROM NITRONEX TO INTERNATIONAL RECTIFIER IN 2010

76.     In 2008, with the benefit of Nitronex's patented technology and knowhow, International Rectifier began commercially selling GaN-on-Si power

devices, announcing that they were offering this technology as their "GaNpowIR" products.

77.     By 2010, International Rectifier was producing significant quantities of its GaN-on-Si power devices, its devices having won several awards in 2009 for its GaNpowIR technology.

78.     By 2010, Nitronex was producing commercial GaN-on-Si RF products, with most of Nitronex's sales to aerospace and defense customers. Nitronex's technology remained ahead of the mainstream, but Nitronex again needed an influx of money to continue operating its business.

79.     In 2010, Nitronex again sought to raise funding.  In doing so, one of Nitronex's main goals was, again, to ensure that it retained exclusive rights to RF applications using GaN-on-Si technologies.  It was also important to Nitronex that it retain rights to enforce its patent portfolio against infringement.

80.     With those goals expressly in mind and cognizant of the relationship it had already developed with International Rectifier over the years, Nitronex negotiated a series of agreements with International Rectifier that resulted in the transfer of the Nitronex Patents to International Rectifier, including an IP Purchase Agreement and a new License Agreement (respectively, as discussed above, the "2010 IP Purchase Agreement" and the "2010 License Agreement").

### THE 2010 IP PURCHASE AGREEMENT

81.     The 2010 IP Purchase Agreement provides that in return for ████████████████████████████████████, executing the 2010 License Agreement back to Nitronex, ████████████████████████████████ ████████████████████████████████████████████ Nitronex would assign to International Rectifier fifty-four U.S. and international patents and applications, as well as the right to file related applications.  *See* Exhibit 1 (under seal), at Sections 1.01, 2.01, 2.02.

82.     The 2010 IP Purchase Agreement requires that International Rectifier and Nitronex work together regarding enforcement of the Nitronex Patents. ▓

▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

further requiring International Rectifier to proceed against the infringers of which it is aware:



Exhibit 1, at Section 4.02 (emphasis added); *see id.* at Section 1.01.

83.     Section 4.02 further provides that if International Rectifier fails to pursue in an infringement action or otherwise resolve infringement concerns in the manner prescribed within three months of the notice, then Nitronex shall have the right to sue the infringer and International Rectifier must take all actions requested by Nitronex (including assigning back to Nitronex any patents that are subject to a notice of infringement) to enable Nitronex to exercise its rights under Section 4.02:



Exhibit 1 at Section 4.02 (emphasis added); *see id.* at Section 1.01.

*Id.*, at Section 4.01 (emphasis added).

86.    Since the closing of the 2010 IP Purchase Agreement, International Rectifier (and then Infineon) have filed at least twenty more applications related to the thirty-two United States patents and applications that claim priority to such Nitronex filings and has received at least fifteen patents based on the related applications that it has filed.

87.    Together, the thirty-two United States patents and applications, as well as the related applications later filed by International Rectifier and Infineon, and any additional patents that issued from these applications, comprise the "Nitronex

Patents," including specifically at least U.S. Patents and U.S. Patent Applications Nos.: 6,649,287, 6,617,060, 8,105,921, 8,344,417, 8,592,862, 8,937,335, 8,928,034, 8,928,035, 9,064,775, 9,437,686, 9,461,119, 9,437,687, 14/926,279, 6,611,002, 7,233,028, 6,956,250, 7,135,720, 7,352,016, 7,569,871, 7,994,540, 7,071,498, 7,361,946, 7,339,205, 7,352,015, 12/023,480, 8,748,298, 7,247,889, 7,365,374, 7,791,106, 7,566,913, 8,067,786, 8,343,856, 8,859,400, 8,350,288, 8,680,570, 8,946,765, 7,687,827, 8,368,117, 9,608,102, 8,026,596, 7,745,848, 8,026,581, 8,358,005, 8,343,824, 8,629,453, 11/261,942, 11/543,010, 9,318,417, 15/240,789, and 15/433,473.

88.     The 2010 IP Purchase Agreement specifies that it will be governed by the laws of California, ████████████████████████████████████████ ███████████████████

████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████

Exhibit 1, at Section 12.02 (emphasis added).

## THE 2010 LICENSE AGREEMENT

89.     When Nitronex sold the Nitronex Patents to International Rectifier, it negotiated for and obtained rights to continue to use the Nitronex Patents to develop, manufacture, and sell GaN-on-Si RF products, including the exclusive

right to develop, manufacture, and sell GaN-on-Si RF products for certain applications, such as cellular base stations.

90.    The 2010 License Agreement, which formed part of the consideration for the 2010 IP Purchase Agreement, provides to Nitronex a license back to the Nitronex Patents—with sole rights to sublicense—allowing both Nitronex and International Rectifier (but no one else) to practice in certain parts of the "Field of Use" of GaN-on-Si RF devices.  "Field of Use" and "GaN on Silicon Technology" are defined by the agreement as follows:



*See* Exhibit 2 (under seal), at §§ 1.3, 1.4 and 2.1.

91.    The 2010 License Agreement further provides that Nitronex would have the ***exclusive*** right to practice the Nitronex Patents, ***even against International Rectifier***, within Nitronex's Exclusive Field, which included most RF applications in the Field of Use, except those that operate solely below 100MHz in frequency:

        2.1.  IR hereby grants to Nitronex the following: a) a worldwide, royalty-free, fully paid exclusive license in the Field of Use only, with right to sublicense in the Field of Use only, to use the Licensed Patents to design, develop, make, have made, use, offer to sell, sell and

service Products

*Id.* at § 2.1; *see also id.* at §§ 1.2 – 1.2.9 and 1.8.

92.    Specifically, the 2010 License Agreement granted Nitronex exclusive rights to develop and sell GaN-on-Si products for many of the most valuable RF applications, including cellular telephone infrastructure base stations and repeaters:

-28-

*Id.* at § 1.2 (emphasis added).

93.     Notably, International Rectifier agreed in an express negative covenant that MACOM's exclusive rights in the Exclusive Field were truly exclusive, even as against International Rectifier, and not just third parties, stating, "IR itself may *not* directly or indirectly market, sell or service Products in the Exclusive Field." *See* Section 2.1 of the 2010 License Agreement.

94.     Nowhere in the 2010 License Agreement does Nitronex expressly or impliedly promise to refrain from practicing the Nitronex Patents outside of its fields of use; instead, the 2010 License Agreement merely specifies the extent to

which Nitronex may practice the Nitronex Patents without fear of suit for
infringement.  This stands in stark contrast to the express negative covenant
confirmed by International Rectifier in Section 2.1 of the 2010 License Agreement,
where International Rectifier agreed not to practice in MACOM's Exclusive Field.
This makes it clear that the drafters of the agreement knew how to specify in a
negative covenant what each party was prohibited from doing by the terms of the
agreement, when they wanted to do so and a meeting of the minds had been reached
in that regard.  There was no meeting of the minds as to a prohibition on Nitronex's
use of GaN-on-SiC.

95.     The licenses to Nitronex (and then MACOM) in the 2010 License
Agreement were put in place specifically to cover existing Nitronex GaN-on-Si RF
products and other such products to be developed in the future, and thus to protect
Nitronex (and then MACOM) from patent infringement allegations following the
sale of the Nitronex Patents.

96.



97.     Section 7.1 provides that the 2010 License Agreement can only be
terminated for a breach that is both material and which is not cured within 30 days
of receipt of written notice of such a breach:



*Id.* at § 7.1.

98. [redacted]

99. [redacted]

100.   Both International Rectifier and Nitronex continued to develop and manufacture devices in their chosen fields— [redacted]

**MACOM ACQUIRES NITRONEX**

101.   In June of 2012, Nitronex Corporation was acquired by investment firm GaAs Labs, a company then (but no longer) having a common controlling stockholder with MACOM.  Nitronex Corporation was thereafter converted from a corporation to a limited liability company and renamed Nitronex, LLC.

102.   MACOM is a semiconductor company that designs and manufactures custom devices, integrated circuits, components, modules, and assemblies for high-performance applications, including satellite, radar, wireless networks and mobile devices, and is a leading provider of high performance analog RF and photonic semiconductor products.

103.   On February 13, 2014, MACOM announced the purchase of Nitronex, LLC from GaAs Labs, and Nitronex, LLC became a wholly-owned subsidiary of MACOM.

104.   MACOM acquired Nitronex because it wanted to invest its business and product development efforts on the promising GaN-on-Si market.  In other words, MACOM recognized that GaN-on-Si RF devices have a lower cost structure than other competing technologies, making them suitable for cost-sensitive commercial applications, such as mobile wireless communications network base stations and commercial RF applications.

105.   MACOM expects GaN-on-Si RF devices will be a core component of its business in years to come and further believes GaN-on-Si devices may be the future of commercial RF applications, bringing the high-performance of gallium nitride devices together with the lower cost structure of silicon substrates, providing significantly improved performance as compared to the silicon LDMOS technologies that currently are common in RF chips used in mobile wireless communications network base stations.  Industry analysts project that GaN-on-Si devices will capture a significant portion of the RF market—and that this market will grow to *hundreds of millions of dollars in sales per year* by 2020.  Infineon itself predicts that the GaN-on-Si RF cellular infrastructure market (*i.e.*, base stations) will grow to $110 million by 2020 and $460 million by 2025.  (*See* http://www.infineon.com/dgdl/2016-07-14_Infineon+to+acquire+Wolfspeed_ Investor+Presentation.pdf?fileId=5546d46155dd90e10155e8859aae01d5, at 11, last visited by MACOM on July 19, 2016.)

106.   Nitronex assigned certain of its rights under the 2010 IP Purchase Agreement to MACOM.  It also sublicensed its rights under the 2010 License Agreement to MACOM.

107.   After Nitronex was acquired by GaAs Labs and later MACOM, Nitronex, and then MACOM, continued—without problems—to work in parallel

with International Rectifier toward achieving common goals with respect to the
Nitronex Patents and GaN-on-Si technologies.  To the best of MACOM's
knowledge at the time, each company continued to operate in its designated field(s)
of use.

## INFINEON ACQUIRES INTERNATIONAL RECTIFIER

108.   On August 20, 2014, Infineon Technologies AG and International
Rectifier announced that they had entered into an agreement for Infineon to acquire
International Rectifier.

109.   On information and belief, Infineon historically has produced both
power management and RF semiconductor devices using technologies other than
GaN-on-Si.  Infineon's acquisition of International Rectifier signaled its desire to
expand its product offerings into GaN-on-Si.  Indeed, Infineon's announcement of
the acquisition specifically highlighted the important role of GaN-on-Si technology
for Infineon:

> Integration complements Infineon's expertise in power
> semiconductors and adds system know-how in power
> conversion, while expanding its expertise in compound
> semiconductors (Gallium Nitride on Silicon) and driving
> greater economies of scale in production.
>
> ************************************************
>
> With International Rectifier, Infineon acquires an
> advanced manufacturer in Gallium Nitride on Silicon
> (GaN) based power semiconductors.  This combination
> will accelerate and solidify Infineon's position in GaN
> discretes and GaN system solutions, improving its ability
> to pursue this strategically important technology platform
> with significant future growth potential.
>
> The transaction will result in a broad range of products
> creating a comprehensive provider in the market for
> silicon-, silicon-carbide- and gallium-nitride-based power
> devices and integrated circuits (ICs).

(*See* http://www.infineon.com/cms/en/about-infineon/press/press-
releases/2014/INFXX201408-056.html.)

-33-

110.   Similarly, an Infineon press release related to the acquisition described International Rectifier as:

> International Rectifier is highly complementary to Infineon: the combined company gains greater scope in product portfolio and regions, especially with small and medium enterprise customers in the US and Asia.  The merger taps additional system know-how in power management.  It expands the expertise in power semiconductors, also combining leading knowledge in compound semiconductors, namely Gallium Nitride. Furthermore, the acquisition will drive greater economies of scale in production, strengthening the competitiveness of the combined company.

*See* http://www.infineon.com/cms/en/about-infineon/press/press-releases/2015/INFXX201501-020.html.

111.   On January 13, 2015, Infineon Technologies AG announced that it had closed the acquisition of International Rectifier.

112.   Based on Infineon's representations, International Rectifier ceased to exist as an operating entity in mid-2015.  International Rectifier manufactured power management semiconductor devices and products prior to and for at least for some time after its acquisition by Infineon, on information and belief, including GaN-on-Si power management products.  Infineon has continued to produce at least some of these and possibly other GaN-on-Si power management products after the acquisition.

113.   United States PTO records continue to list International Rectifier as the current assignee of most of the Nitronex Patents.  Based on Infineon's representations, however, title to the Nitronex Patents has actually now passed to Infineon Americas, regardless of what the PTO's records reflect.

114.   On information and belief, Infineon AG spent approximately $3 billion to acquire International Rectifier not only because it wanted to continue producing the GaN-on-Si power management devices that International Rectifier already had in its portfolio at the time, but also to disrupt and thwart the purposes of the

Nitronex-International Rectifier agreements and expand into MACOM's (and formerly Nitronex's) core GaN-on-Si business area, RF products, including MACOM's exclusive field of cellular base stations.

115.   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Infineon AG knew at the time it acquired International Rectifier that it was impossible to make and sell GaN-on-Si in any commercially practical way without practicing the Nitronex Patents.

116.   Infineon has stated that GaN-on-Si will be the technology having the largest share of the RF power cellular infrastructure market by 2025 ($460M, compared to only $380M for GaN-on-SiC and $280M for Si (LDMOS)).

**INFINEON ATTEMPTS TO DISRUPT AND RENEGOTIATE THE IR/NITRONEX AGREEMENTS**

117.   Almost immediately after Infineon AG acquired International Rectifier, it continued to execute on its plan to disrupt or "renegotiate" the Nitronex-International Rectifier agreements in order to gain rights to use the Nitronex Patents to develop GaN-on-Si products within MACOM's Exclusive Field.  Infineon consistently attempted to thwart the purposes of the 2010 IP Purchase Agreement and the 2010 License Agreement.

118.   For instance, just two weeks after the acquisition had closed, Infineon sent MACOM a letter complaining about the contents of a year-old press release that MACOM had previously issued without any protest (or even comment) by International Rectifier.  That press release, dated April 1, 2014, merely announced that MACOM had reached an agreement with a supplier of its GaN-on-Si wafers for RF applications that included a license to MACOM's intellectual property rights—exactly as permitted by the underlying 2010 License Agreement with International Rectifier.

119.   Infineon's letter nevertheless accused MACOM of acting outside of the 2010 License Agreement.

120.   Though these accusations were completely without basis, as MACOM explained in a response letter to Infineon and International Rectifier, Infineon and International Rectifier also sent a letter to MACOM's supplier, complaining of the potential "proliferation of [International Rectifier's] patented technology" and asking MACOM's supplier to discuss "the legal basis upon which [it] intends to operate."  This was the first, but not the last instance, of Infineon making pretextual and contrived arguments and threats in an illegitimate attempt to "chill" MACOM's legitimate practice of its rights in accordance with the terms of the Nitronex-International Rectifier agreements, including the 2010 IP Purchase Agreement and the 2010 License Agreement.

121.   On information and belief, Infineon's predominant purpose in sending these letters was to interfere with MACOM's abilities to produce GaN-on-Si RF devices and to disrupt MACOM's ongoing business relationship with its supplier.

122.   After Infineon's letters to MACOM and its supplier, the relationship between MACOM, on the one hand, and Infineon and its subsidiaries, on the other, became contentious, even though Infineon never further pursued (or even referred to) the spurious allegations made in its January 2015 letters to MACOM and its supplier.

123.   For instance, later during 2015, MACOM repeatedly tried to engage with Infineon regarding enforcement of the Nitronex Patents against ongoing infringement.  The parties had several discussions on the subject, but Infineon ultimately was not interested in working with MACOM in good faith on this topic.

124.   Instead, Infineon repeatedly raised the prospect of renegotiating the 2010 License and IP Purchase Agreements such that MACOM would lose its exclusive rights in the RF field.  Although MACOM was willing to discuss possible mutually-beneficial modifications to the Nitronex-International Rectifier agreements, it repeatedly made clear that it was not willing to agree to any

modifications to the agreements that would allow Infineon rights in MACOM's exclusive GaN-on-Si RF fields.

125.    Infineon's representatives on multiple phone conversations regarding the 2010 License and IP Purchase Agreements included Infineon in-house lawyers in Germany, who are employed by Infineon AG.  Indeed, in several instances, phone calls were specifically scheduled at times early in the day Pacific time to accommodate the time change so that these Infineon AG employees in Germany could participate.  In some instances, only MACOM's counsel and Infineon AG employees were on calls to discuss issues relating to the International Rectifier-Nitronex agreements, whereas both Infineon AG and Infineon Americas in-house counsel joined other calls.  Further, Infineon Americas in-house lawyers in the U.S. indicated on several occasions when MACOM's lawyers called them directly (or vice versa) that decisions regarding patent matters were controlled by Infineon in Germany.  MACOM understood these references to refer to Infineon AG because, on information and belief, Infineon Americas does not have its own offices and employees in Germany separate from Infineon AG's.

126.    On information and belief, Infineon AG is the decision-maker with respect to its subsidiaries' activities relating to the Nitronex Patents and the 2010 IP Purchase and License Agreements.  Neither the in-house lawyers for Infineon AG nor the in-house lawyers for Infineon Americas who participated in the calls about the Nitronex-International Rectifier agreements described above ever said anything (or wrote anything in the parties' many exchanged letters) to suggest that the Infineon AG lawyers participating in these calls were acting as counsel to Infineon Americas or as agents of Infineon Americas.  All of these communications directly related to the conduct from which many of MACOM's claims arise.

127.    All of Americas' unlawful acts, including its breaches of the 2010 License Agreement, were committed at the insistence and under the control of Infineon AG and as Infineon AG's agent.

128.   There was one instance when MACOM and Infineon managed to cooperate with respect to the Nitronex-International Rectifier agreements.  In that instance, MACOM and Infineon agreed to enter into a common interest agreement to cooperate in the prosecution of the Nitronex Patents, ███████████ ███████████████████████████████████████████████.  Notably, Infineon AG itself signed onto the Common Interest Agreement on behalf of itself and its affiliates, confirming Infineon AG's interest in the Nitronex Patents and the underlying 2010 Nitronex-International Rectifier agreements and that Infineon AG controlled all matters relating to the Nitronex Patents and the 2010 Agreements.  In fact, two separate employees of Infineon AG—the very same people who were involved for Infineon AG in all of the negotiations with MACOM relating to the Nitronex-International Rectifier agreements—signed the common interest agreement on behalf of Infineon AG.  *See* Exhibit 3 at 5.

## INFINEON RAISES ALLEGED GAN-ON-SIC INFRINGEMENT TO INCREASE ITS NEGOTIATION LEVERAGE

129.   On its calls with MACOM, Infineon's representatives (including Infineon AG's representatives) stated, without providing any specifics or identifying particular patents, that Infineon believed MACOM was infringing unidentified Nitronex Patents by selling gallium nitride-on-silicon *carbide* ("GaN-on-SiC")[4] devices.  MACOM had not previously been aware that Infineon would take the position that the Nitronex Patents could be read to cover not just GaN-on-Si products, but also GaN-on-SiC products.

130.   To the best of MACOM's knowledge, neither International Rectifier nor Infineon has ever previously (or since) claimed that any company selling GaN-on-SiC products infringes the Nitronex Patents other than MACOM.  This is true

---

[4]   As discussed above, GaN-on-Si**C** must be distinguished from GaN-on-Si, which is a different (although in some cases competing) technology employing a substrate made from silicon carbide, rather than one made from silicon.

even though other sellers of these products have both far larger sales than MACOM
and have been making those sales publicly for many more years than MACOM.

131.   Beginning in 2011, well before its acquisition of Nitronex—and
separate and apart from the GaN-on-Si product lines, technology, and know-how it
acquired from Nitronex—MACOM has at various times sold and offered to sell
GaN-on-SiC products.  Those MACOM GaN-on-SiC products have historically
used semiconductor wafers supplied by a third party.  MACOM's sales from these
product lines have always been low in volume and revenue, and MACOM's GaN-
on-SiC third-party wafer supplier notified MACOM in 2015 (completely separate
from any of MACOM's discussions with Infineon about the Nitronex-International
Rectifier agreements) that it would no longer supply the wafers necessary to the
manufacture of MACOM's GaN-on-SiC products.

132.   Infineon's allegations regarding GaN-on-SiC therefore coincidentally
came at a time when MACOM's existing GaN-on-SiC products were being
discontinued anyway.

133.   Moreover, International Rectifier never complained about MACOM's
limited GaN-on-SiC sales prior to being acquired by Infineon.

134.   MACOM repeatedly informed Infineon through both legal and
business channels of its low sales and the fact that its current GaN-on-SiC products
were being discontinued due to loss of its third-party supplier.  MACOM had
further repeatedly offered to share its sales figures with International Rectifier
under an NDA—and even provided a draft of an NDA to Infineon.  Infineon did not
express any interest in reviewing MACOM's sales data.

### INFINEON ATTEMPTS TO SELL A PORTION OF THE
### NITRONEX PATENTS TO AN UNDISCLOSED BUYER

135.   In late 2015, Infineon informed MACOM that International Rectifier
and/or Infineon was contemplating assigning a small number of the Nitronex

1  Patents (not the entire portfolio) to an undisclosed third party for an undisclosed

2  sum.

3       136.   Infineon took the position that International Rectifier and/or Infineon

4  did not need MACOM's consent to proceed with the assignment, despite

5  MACOM's unequivocal disagreement with that reading of the parties' obligations

6  under the 2010 IP Purchase and License Agreements.  *See id.*  Infineon further

7  refused to identify the proposed buyer(s) or provide its position as to what would

8  happen with respect to the provisions of the agreements ██████████████████

9  ████████████████████████████████████████████

10 ████████████████████████████████████████████

11 ████████████████████████████████████████████

12 ██████.  Infineon also refused to respond to repeated questions about whether the

13 buyer had been informed of Nitronex and MACOM's rights under the 2010 IP

14 Purchase and License Agreements.  MACOM was also left wholly uncertain as to

15 Infineon and International Rectifier's position with respect to whether the third-

16 party buyer would be permitted to practice in the fields of use that Nitronex and

17 International Rectifier shared under the 2010 License Agreement, where only

18 Nitronex (and not Defendants) had rights to sublicense.

19      137.   Section 12.12 of the 2010 IP Purchase Agreement recites, "Neither

20 Party may assign, sell, hypothecate or otherwise transfer any interest in or

21 obligation under this Agreement without the prior written consent of the other

22 Party; … Any assignment made in violation of this Section 12.12 shall be void."

23 *See* Exhibit 1 at Section 12.12.

24      138.   Infineon's assignment of the Nitronex Patents without MACOM's

25 consent would be a breach of the 2010 IP Purchase Agreement.

26      139.   Given that no assignment for any Nitronex Patents was ultimately filed

27 with the Patent and Trademark Office, MACOM understood that Infineon had, at

28 least temporarily, abandoned its late 2015 plan to assign the Nitronex Patents to a

1   third party.  It now appears, however, that 

2

3

4       140.  Two years into this litigation, at the deadline for substantial

5   completion of document productions in late March 2018, Infineon for the first time

6   produced

7

8       141.

9

10

11

12

13

14

15

16       142.

17

18

19

20

21

22

23

24       143.

25

26

27

28

144. ███████████████████████████
██████████████████████████████
████████████████████████████
██████████████████████████████
███████████████████████████████.

145. ████████████████████████████
██████████████████████████████
██████████████████████████████
███████████████████████████████
████████.

146.   On information and belief, Infineon acted in bad faith to ███████
██████████████████████████████████
██████████████.

147.   On information and belief, Infineon acted in bad faith in ███████
███████████████████████████████████
█████████.

148.   Infineon never notified MACOM of ██████████████
███████████████, and MACOM only discovered these documents
more than two years later in this litigation, when Infineon was forced to produce
them due to the deadline for substantial completion of document productions.

149.   On information and belief, Infineon Americas acted under the control
of Infineon AG to ████████████████████████████████████

**MACOM PROVIDES NOTICE OF INFRINGEMENT
BY THIRD PARTIES**

150.   After MACOM's oral requests that Infineon and MACOM work
together to identify infringers and begin to enforce the Nitronex Patents were
repeatedly ignored, MACOM sent Infineon and International Rectifier letters on

-42-

January 15, 2016, May 19, 2016, May 25, 2016, June 10, 2016, June 17, 2016, June 24, 2016, May 15, 2017, and July 14, 2017, formally notifying them under the 2010 IP Purchase Agreement of infringement of twenty Nitronex Patents.

151.   Specifically, MACOM provided formal notice under Section 4.02 of the IP Purchase Agreement to Infineon and International Rectifier that an identified party was infringing at least one claim of each of U.S. Patents 6,649,287, 6,617,060, 8,105,921, 8,344,417, 8,592,862, 9,064,775, 7,596,871, 7,071,498, 7,687,827, 8,368,117, 6,956,250, 8,937,335, 8,928,034, 8,928,035, 8,026,596, 9,461,119, 9,437,686, 7,135,720, 7,352,016, and 7,994,540 by making and selling GaN-on-Si products.  The MACOM letters also identified specific products made by the identified parties as infringing and provided a detailed reverse engineering analysis for each identified product, unequivocally demonstrating a reasonable basis for the allegation of infringement.

152.   The identified patents included some for which, unbeknownst to MACOM, Infineon had purported to ███████████████████████████ Infineon's responses to the notice letters relating to the Nitronex Patents that ███████████████████████████ did not indicate that Infineon had already ████████████████████████ for those Nitronex Patents. Infineon remained entirely silent on that issue.

153.   MACOM also stated that it would deem the January 15th, 2016, May 19, 2016, May 25, 2016, June 10, 2016, June 17, 2016, June 24, 2016, May 15, 2017, and July 14, 2017 letters from MACOM to be notice by International Rectifier (which is now Infineon) as required by the first sentence of Section 4.02 of the 2010 IP Purchase Agreement because MACOM already knew of the infringement, despite International Rectifier's or Infineon's failure to provide prompt notice as required by Section 4.02 of the 2010 IP Purchase Agreement.

154.   MACOM also reminded Infineon and International Rectifier that, if they should fail to pursue an infringement suit or to settle the claims in good faith

-43-

within three months, then Section 4.02 of the IP Purchase Agreement requires International Rectifier (which is now Infineon) to allow Nitronex (now MACOM) to file suit regardless of the field of use in which the infringement occurs and further requires International Rectifier (which is now Infineon) to take all actions requested by Nitronex to enable Nitronex to exercise its rights to pursue infringement (including assigning the patents back to Nitronex).

155.   The three-month time period for Infineon to either (a) pursue a claim of infringement against the third-parties identified in MACOM's January 15, 2016, May 19, 2016, May 25, 2016, June 10, 2016, June 17, 2016, June 24, 2016, May 15, 2017, and July 14, 2017 letters, (b) successfully persuade the identified infringers to stop infringing, or (c) to enter a settlement agreement with the identified infringers has expired.

156.   On April 15, 2016, August 23, 2016, August 26, 2016, September 12, 2016, September 19, 2016, September 26, 2016, September 12, 2017, and October 16, 2017, MACOM wrote letters to Infineon concerning Defendants' failure to satisfy any of the three conditions set forth above and demanded that Defendants comply with their obligations under Section 4.02 and assign U.S. Patents 6,649,287, 6,617,060, 8,105,921, 8,344,417, 8,592,862, 9,064,775, 7,596,871, 7,071,498, 7,687,827, 8,368,117, 6,956,250, 8,937,335, 8,928,034, 8,928,035, 8,026,596, 9,461,119, 9,437,686, 7,135,720, 7,352,016, and 7,994,540 back to MACOM.  Absent that, MACOM would not have standing to bring suit against infringing third parties.

157.   Defendants have not assigned U.S. Patents 6,649,287, 6,617,060, 8,105,921, 8,344,417, 8,592,862, 9,064,775, 7,596,871, 7,071,498, 7,687,827, 8,368,117, 6,956,250, 8,937,335, 8,928,034, 8,928,035, 8,026,596, 9,461,119, 9,437,686, 7,135,720, 7,352,016, and 7,994,540 to MACOM.

158.    In November 2017, as part of interrogatory responses in this litigation, MACOM provided Infineon detailed infringement charts evidencing both Infineon Americas' and Infineon AG's practice of a long list of Nitronex Patents. Specifically, the identified patents were:  U.S. Patent Nos. 6,611,002; 7,071,498; 7,233,028; 7,247,889; 7,352,015; 7,569,871; 8,105,921; 8,344,417; 8,592,862; 8,928,034; 8,937,335; 8,946,765; 9,064,775; 9,437,686; 9,437,687; and 9,461,119; and European Patent No. 1343927 B1/DE60128134.  To the extent that Infineon takes the position that Infineon AG is not bound by the 2010 License and IP Agreements, these claim charts unequivocally put Infineon Americas on notice of infringement of the Nitronex Patents by Infineon AG.

159.    Given Infineon's position in this litigation that Infineon AG is not bound by the 2010 License and IP Agreement, Infineon Americas is required under Section 4.02 of the IP Purchase Agreement to either enforce the Nitronex Patents against Infineon AG or assign them back to MACOM for enforcement.

160.    On March 16, 2018, MACOM wrote to Infineon to explain that more than 90 days had elapsed since the claim charts evidencing Infineon AG's infringement had been served and that Infineon Americas had not enforced the patents under Section 4.02 (and could not license Infineon AG's activities in MACOM's Exclusive Field), so the relevant patents needed to be assigned back to MACOM for enforcement.

161.    In a letter dated April 11, 2018, Infineon Americas refused to do so.

**INFINEON PURPORTS TO TERMINATE THE 2010 LICENSE AGREEMENT**

162.    In response to MACOM's original January 15, 2016 notice of infringement, Infineon again raised MACOM's GaN-on-SiC sales, now in a formal letter to MACOM dated February 2, 2016.

163.    Infineon still did not identify any specific MACOM products that it alleged were infringing, any specific patents it alleged were infringed (much less

1   any specific claims in those patents), leaving its allegations of infringement vague
2   and ambiguous.

3        164.   Infineon further asserted for the first time that MACOM's sales of
4   GaN-on-SiC products were a material breach of the 2010 License Agreement that,
5   if not remedied within 30 days, would allow Infineon to terminate that agreement
6   for material breach pursuant to its Section 7.1.  In other words, Infineon in this
7   communication for the first time took the position that MACOM's GaN-on-SiC
8   activities not only were an alleged patent infringement, but also a breach of
9   contract.

10        165.   Prior to Infineon's 2015 attempts to renegotiate the 2010 License
11   Agreement, neither Infineon nor International Rectifier had previously complained
12   regarding MACOM's manufacture of limited quantities of GaN-on-SiC devices
13   during the over four years MACOM had provided them, including before
14   MACOM's acquisition of Nitronex, as well as the entire time after Nitronex's
15   acquisition, showing that neither Infineon nor International Rectifier considered this
16   activity as either infringing, material, or prohibited by the License Agreement.
17   Indeed, neither Infineon nor International Rectifier had ever suggested previously
18   that they intended to enforce the Nitronex Patents against any GaN-on-SiC sellers,
19   much less MACOM, which was a relatively small player in a GaN-on-SiC market
20   that was already mature and which already had multiple other competitors when
21   MACOM temporarily joined it.

22        166.   MACOM responded to Infineon promptly, stating that Infineon's
23   allegations were not specific enough to allow MACOM to respond on the merits,
24   but that, even assuming infringement for the sake of argument, practicing licensed
25   patents beyond the scope of one's license was generally (and here) not a breach of
26   the license agreement, but instead simple patent infringement.  In other words,
27   MACOM's sales of GaN-on-SiC products could not, as a matter of law, be a breach
28   of the 2010 License Agreement, much less a material one.

-46-

167.   Furthermore, MACOM emphasized that its sales of GaN-on-SiC devices were *de minimis*, such that they could not constitute a material breach of the 2010 License Agreement (even if such sales were a breach in the first place), and that the MACOM products had further been end-of-lifed (referring to the supply cut off by MACOM's third party supplier), which cured the breach in any case.

168.   Rather than engaging with MACOM regarding these issues or the ███████████████ that it had meanwhile executed in contravention of the 2010 IP Purchase Agreement or its refusal to enforce the Nitronex Patents against infringers, Infineon instead simply purported to terminate the 2010 License Agreement.  Notably, in Infineon's purported termination letter, dated March 22, 2016, Infineon for the first time finally identified specific patents and a single MACOM GaN-on-SiC product that Infineon alleged to be infringing, a move seemingly calculated to allow MACOM no time for evaluation and response before Infineon's pretextual "termination" had already been effected.

169.   Infineon's purported termination was without basis or cause, was done in bad faith, and was pretextual.  Its purpose was to attempt to wrongfully harm MACOM by (i) rescinding MACOM/Nitronex's exclusive license to GaN-on-Si RF products and allowing Infineon to itself engage in GaN-on-Si RF activities prohibited by the 2010 License Agreement, (ii) escaping its obligations to jointly enforce the Nitronex Patents against infringers ████████████████ ████████, and (iii) making it easier for Infineon to sell or otherwise convey rights that it was not permitted to assign for a portion of the Nitronex portfolio with less encumbrance.

170.   On information and belief, Infineon AG directed Infineon Americas to terminate or controlled Infineon Americas' termination of the 2010 License Agreement.

171.   MACOM responded to Infineon's purported termination letter on April 1, 2016, explaining that Infineon's purported termination of the 2010 License

-47-

1  Agreement was without any basis and without effect.  MACOM further informed

2  Infineon that it would continue to exercise its full rights under the 2010 License

3  Agreement.

4       172.  MACOM has been and continues to produce and offer to sell, or is on

5  the cusp of producing and/or offering to sell, GaN-on-Si products with the

6  following MACOM part numbers: NPT1004D, NPT25015D, NPT35015D,

7  NPTB00050B, NPTB00025B, NPTB00025AB, NPTB00004D, NPTB00004A,

8  NPT35050AB, NPT25100P, NPT25100B, NPT2024, NPT2022, NPT2021,

9  NPT2020, NPT2018, NPT2010, NPT1015B, NPT1012B, NPT1010P, NPT1010B,

10  NPT1007B, NPA1008, NPA1007, NPA1006, NPA1003QA, MATR-GSHC03-

11  160150, MAGx-0011086, MAGe-102425-300, MAGX-100027-002, MAGX-

12  100027-005, MAGX-100027-010, MAGX-100027-015, MAGX-100027-050,

13  MAGX-100027-055, MAGX-100027-100, MAGX-100027-300, MAGe-102425-

14  030, MAGe-102425-050, MAGe-102425-100, MAGe-102425-200, MAGe-

15  102425-300, MAGe-102425-300G, MAGe-102425-300G0P, MAGe-100809-030,

16  MAGe-100809-500, MAGe-100809-600, MAGe-100809-1K0, MAGX-100912-

17  500, MAGX-100914-125, MAGX-100914-250, MAGX-100914-500, MAGX-

18  100914-650, MAGX-101214-1K1, MAGX-101214-500, MAMG-102933-060,

19  MAMG-102735-085, MAGX-103135-145, MAGX-103135-180, MAGX-102730-

20  400, MAGX-102731-180, MAGX-100027-010, MAMG-102733-085, MAMG-

21  102933-030, MAMG-103135-085, MAPG-10102729-400, MAGB-102527-

22  220A0P, MAGB-100025-080B0S, MAGB-100710-030S0P, MAGB-100710-

23  550S0S, MAGB-101819-750A0S, MAGB-101822-020S0P, MAGB-101822-

24  025B0P, MAGB-101822-090A0P, MAGB-101822-160A0P, MAGB-101822-

25  170B0P, MAGB-101822-220S0S, MAGB-101822-240B0P, MAGB-101822-

26  240B0S, MAGB-101822-270A0P, MAGB-101822-360A0P, MAGB-101822-

27  360S0P, MAGB-101822-380A0P, MAGB-101822-720S0S, MAGB-102122-

28  550A0S, MAGB-102324-220A0P, MAGB-102324-240B0S, MAGB-102324-

270A0P, MAGB-102324-300A0S, MAGB-102324-360A0P, MAGB-102324-750A0S, MAGB-102325-025B0P, MAGB-102327-020S0P, MAGB-102327-025B0P, MAGB-102527-025S0M, MAGB-102527-030S0P, MAGB-102527-050B0P, MAGB-102527-050B0S, MAGB-102527-050S0P, MAGB-102527-110S0S, MAGB-102527-180B0P, MAGB-102527-180B0S, MAGB-102527-270A0P, MAGB-102527-270A0S, MAGB-102527-360A0P, MAGB-102527-360A0S, MAGB-102527-450A0S, MAGB-102527-750A0S, MAGB-103436-025B0P, MAGB-103436-025S0M, MAGB-103436-030S0P, MAGB-103436-100B0S, MAGB-103436-110S0S, MAGB-103438-020B0S, MAGB-103438-020S0P, MAGB-103537-100B0S, MAGB-200710-550S0S, MAGB-200910-750A0S, MAGB-201822-550A0S, MAGB-202527-110S0S, MAGM-101822-050A0P, MAGM-103436-040A0P, MAGM-103438-003B0P, and MAGM-103438-040A0P.

173.   MACOM's GaN-on-Si products are discrete RF power transistors and RF amplifiers that are based on GaN-on-Si HEMT technology—the very types of technologies that are the subject of the foundational Nitronex Patents.  When it sold the Nitronex Patents to International Rectifier, Nitronex secured continuing rights to use the Nitronex Patents specifically to ensure that its GaN-on-Si RF products would never be the subject of infringement allegations by International Rectifier or any successor to International Rectifier.  The same GaN-on-Si technologies developed by Nitronex continue to be used in MACOM's products today. Plaintiffs' license was put in place specifically to cover such products and protect them from patent infringement allegations (which was an obvious concern in the context of the sale of a company's entire patent portfolio), so Infineon's termination of the 2010 License Agreement necessarily puts MACOM and its current products at risk of an infringement suit and puts MACOM's customers in the apprehension that they may be sued for patent infringement if they purchase and use MACOM's products.  Infineon's purported termination of the 2010 License Agreement in these

circumstances constitutes an express or implied threat to MACOM that it is at risk

of a patent infringement suit.  MACOM's business, including its sales of all of the

GaN-on-Si products identified above, hangs under a cloud of uncertainty because of

the possibility of an infringement suit by Infineon.

174.   MACOM and Nitronex spent millions of dollars and invested the time

and attention of key employees on the development and design of GaN-on-Si

products and in equipment and processes for the production of its GaN-on-Si RF

products.

175.   MACOM considers its GaN-on-Si RF product lines to be of the

highest importance for its growth as a company and to open new and expand

existing customer relationships.  It has long been MACOM's intent to make GaN-

on-Si RF products, especially in the wireless communications field, one of the

principal focuses of its business.

### INFINEON'S ATTEMPTS TO STEAL MARKET SHARE BY MARKETING GAN-ON-SI RF PRODUCTS TO MACOM CUSTOMERS

176.   After Infineon purported to terminate the 2010 License Agreement,

causing MACOM to file its Original Complaint, dated April 26, 2016, MACOM

obtained confirmation that Infineon intends to enter the GaN-on-Si RF market and

has been working towards that goal ████████ or even earlier.

177.   As set forth above, the 2010 License Agreement prohibits Infineon

from directly or indirectly marketing or selling GaN-on-Si RF products within the

Exclusive Field reserved for Nitronex/MACOM, including GaN-on-Si RF products

for cellular base stations.

178.   After MACOM filed its Original Complaint, MACOM learned from

several of its base station customers, and then confirmed through discovery, that

Infineon has been promoting and marketing GaN-on-Si RF products for use in

cellular base station applications.  These activities by Infineon are prohibited by the

2010 License Agreement.  Moreover, these customers have informed MACOM that

1    Infineon was, at one point, promising to provide them with samples of its GaN-on-

2    Si RF base station products before the end of 2016, although it since appears that

3    timeline has been delayed.

4           179.   Upon initial receipt of a customer report that Infineon was promoting

5    GaN-on-Si RF base station products, MACOM contacted Infineon in May of 2016

6    to ask if Infineon was "designing and/or manufacturing GaN-on-Si RF base station

7    products, or discussing, demonstrating, sampling or otherwise communicating with

8    customer or potential customers regarding such products."  After several letters

9    back-and-forth, Infineon still had not provided MACOM the assurance it sought

10   that Infineon was not engaging in most of these activities.

11          180.   Despite its refusal to engage in meaningful discussion with MACOM

12   on this topic, Infineon made public statements on July 14, 2016 indicating that it is

13   in the process of developing GaN-on-Si products for cellular applications (*i.e.*, base

14   stations).

15          181.   Specifically, in the context of a July 14, 2016 announcement of an

16   acquisition of a GaN-on-SiC company, Infineon released investor presentation

17   slides where it stated that "Infineon [is] the only player with the full suite of RF

18   power technologies necessary for 5G" and that it has "GaN-on-Si" RF products in

19   development for this market.  Infineon further stated that, in the future, Infineon

20   will be the "Cost-performance leader in GaN RF components" and will have the

21   "Most comprehensive portfolio."  Infineon predicted that the GaN-on-Si RF cellular

22   infrastructure market (*i.e.*, base stations) will grow to $110 million by 2020 and

23   $460 million by 2025.  The slides for the July 14, 2016 presentation are currently

24   accessible at https://www.infineon.com/dgdl/2016-07-

25   14_Infineon+to+acquire+Wolfspeed_Investor+Presentation.pdf?fileId=5546d46155

26   dd90e10155e8859aae01d5.

27          182.   Infineon intends to enter the GaN-on-Si RF market.

28

183.   Infineon has been working towards the goal of entering the GaN-on-Si RF market since before it sent the March 22, 2016 letter stating that Infineon was terminating MACOM's license.  Indeed, it turns out that ███████████████████ ███████████████████████████████████████████████████████████ ████████████████, long before it acquired International Rectifier, although it appears that Infineon struggled to get its home-grown technology to work without the know-how and technology that it acquired through International Rectifier.

184.   Infineon has been promoting and/or marketing GaN-on-Si RF products for use in cellular base station applications since before it sent the March 22, 2016 letter stating that Infineon was terminating MACOM's license.

185.   Based on the above-described customer reports, as confirmed by Infineon's public statements and discovery, it is clear that Infineon has engaged and is engaging in activities within MACOM's Exclusive Field that are expressly prohibited by the 2010 License Agreement, that Infineon began those activities well before it purported to terminate the 2010 License Agreement, and that Infineon's termination of the 2010 License Agreement was a pretext that it hoped would allow to continue with unauthorized activities in violation of its obligations to Plaintiffs.

186.   To the extent that Infineon Americas itself has not performed any of the activities described in Paragraphs 158 to 167 above, it has expressly or impliedly authorized its affiliates to do so, in breach of the License Agreement provisions that give MACOM the sole right to sublicense the Nitronex Patents in the Field of Use.

**INFINEON'S ATTEMPTS TO ESCAPE ALLEGATIONS OF BREACH BY CLAIMING THAT THE NITRONEX PATENTS ARE INVALID**

187.   Since the filing of this litigation, Infineon Americas has filed counterclaims of patent infringement against MACOM that are premised on Infineon's theory that the License Agreement is terminated.

188.   But Infineon Americas has also simultaneously defended against MACOM's claims that it has breached its promises of exclusivity (*i.e.*, the claims that Infineon has practiced the Nitronex Patents in MACOM's Exclusive Field) by taking the position that one or more of the Nitronex Patents are invalid and so cannot be subject to promises of exclusivity.  Infineon AG has likewise taken the position that the supposed invalidity of the Nitronex Patents is a full defense to the claim that it intentionally interfered with Infineon Americas' performance under the 2010 License and IP Purchase Agreements.

189.   When Nitronex and International Rectifier entered into the License Agreement and IP Purchase Agreement in 2010, it was with the understanding that that the parties would collaborate on enforcement of the Nitronex Patents, as evidenced by ███████████████████████████████████ ████████████████████████████████

190.   Prior to this litigation, neither International Rectifier nor Infineon ever took the position that the Nitronex Patents are invalid.  To the contrary, the premise of the 2010 agreements was that International Rectifier wanted to obtain the foundational Nitronex Patents—and paid ████████████ to do so, even though they were to be subject to an exclusive license to MACOM in some fields of use—because of their value.

191.   Nitronex would not have agreed to transfer the Nitronex Patents to International Rectifier but for the promises of exclusivity provided to Nitronex in its Exclusive Field.

192.   Further, Infineon paid billions of dollars to acquire International Rectifier, at least in part to obtain access to Nitronex technology and patents and as part of its plan to launch GaN-on-Si RF power products for base stations.

193.   Moreover, as described above, International Rectifier and Infineon both continued to prosecute applications in the Nitronex Patent families after the 2010 transfer of those applications by Nitronex.

194.   But now it has become strategically inconvenient for Infineon to consistently acknowledge the validity of the foundational Nitronex Patents, including even the validity of patents that it has itself prosecuted.  Infineon therefore undercuts the value of the promises and licenses that International Rectifier gave to Nitronex by claiming that one or more Nitronex Patents are invalid.  This is not consistent with the promise of exclusivity to Nitronex (now MACOM) for these patents.

195.   Infineon's attempts to invalidate the Nitronex Patents (including patents that International Rectifier and/or Infineon itself prosecuted) so as to avoid allegations of breach are also inconsistent with its obligations of fair dealing under California law and represent an attempt by Infineon to avoid its obligations under its agreements with MACOM.  Those attempts devalue the patents, which cannot be reconciled with Infineon's implied promise to perform on the express ███████████████████████████████ promises in the 2010 agreements in good faith.

**INFINEON ANNOUNCES THE SALE OF PORTIONS OF INFINEON'S RF POWER BUSINESS TO CREE**

196.   On March 6, 2018, Cree and Infineon AG announced that Cree was acquiring Infineon AG's RF Power business.

197.   The sale encompassed Infineon's LDMOS and GaN-on-SiC technologies and businesses.  The sale also included the main Infineon RF Power facility in Morgan Hill, CA, and Cree became the employer of employees at Americas' United States locations in Morgan Hill and Chandler, Arizona.

198.   On information and belief, ████████████████████████████ ██████████████████████████

199.   On information and belief, Infineon AG has directed or collaborated with Infineon Americas to transfer Infineon's GaN-on-Si RF Power business to Infineon AG and/or other Infineon entities other than Infineon Americas to avoid

-54-

Infineon Americas' contractual promises that it would not practice the Nitronex

Patents in MACOM's Exclusive Field.

**FIRST CLAIM FOR RELIEF – Against Infineon Americas**
**(Breach of Contract – Wrongful Termination of 2010 License Agreement)**

200.   The allegations contained in the preceding Paragraphs are incorporated

by reference herein.

201.   Nitronex Corporation and International Rectifier Corporation entered

into the 2010 License Agreement.

202.   The 2010 License Agreement is a valid contract, supported by

consideration under California Civil Code Sections 1550, *et seq.*

203.   Nitronex Corporation and its successors-in-interest Nitronex, LLC and

MACOM have fully and/or substantially performed their duties under the 2010

License Agreement.

204.   MACOM has not breached the 2010 License Agreement by selling

GaN-on-SiC devices.

205.   In the alternative, MACOM has not materially breached 2010 License

Agreement by selling GaN-on-SiC devices.

206.   Further in the alternative, MACOM cured any alleged breach.

207.   Infineon Americas has breached the 2010 License Agreement by

purporting to terminate it.

208.   Infineon Americas' purported termination of the 2010 License

Agreement was wrongful, pretextual, and made in bad faith.

209.   As a direct and proximate result of Infineon Americas' breach of the

contract, Plaintiffs have suffered and will continue to suffer irreparable harm, as

well as damages, including in the form of diminished value and lost profits from

potential sublicensees and/or customers, uncertainty regarding MACOM's strategic

business activities, and increased legal and other fees.

210.    Additionally, MACOM's damages for unwarranted loss of its exclusive rights to the burgeoning GaN-on-Si RF devices market, which industry analysts and even Defendants themselves estimate will grow to hundreds of millions of dollars per year by the expiration of the Nitronex Patents, would be substantial.  MACOM would suffer significant lost revenues if Infineon is allowed to enter this market segment as a competitor to MACOM.

211.    Plaintiffs are entitled to relief, including damages, specific performance and preliminary and permanent injunctive relief, as set forth below., or, in the alternative, rescission of the 2010 License Agreement and 2010 IP Purchase Agreement and Nitronex Patent assignments, such that Plaintiffs retain title to the Nitronex Patents and Infineon has no rights to or under them.

**SECOND CLAIM FOR RELIEF – Against Infineon Americas**
**(Breach of Contract – Marketing and Preparations for Sale of GaN-on-Si Products within MACOM's Exclusive Field of the 2010 License Agreement; Transfer of GaN-on-Si Activities to Affiliates)**

212.    The allegations contained in the preceding Paragraphs are incorporated by reference herein.

213.    Nitronex Corporation and International Rectifier Corporation entered into the 2010 License Agreement.

214.    The 2010 License Agreement is valid contract, supported by consideration under California Civil Code Sections 1550, *et seq*.

215.    Nitronex Corporation and its successors-in-interest Nitronex, LLC and MACOM have fully and/or substantially performed their duties under the 2010 License Agreement.

216.    MACOM has not breached the 2010 License Agreement by selling GaN-on-SiC devices.

217.    In the alternative, MACOM has not materially breached 2010 License Agreement by selling GaN-on-SiC devices.

218.    Further in the alternative, MACOM cured any alleged breach.

-56-

219.   Infineon Americas, directly or indirectly, has breached the 2010 License Agreement by wrongfully engaging in activities to market and sell (or at least prepare to sell) GaN-on-Si RF devices within MACOM's Exclusive Field.

220.   Infineon Americas has breached the 2010 License Agreement by inducing and/or authorizing, expressly or impliedly, its affiliates to engage in activities in the Field of Use in breach of the License Agreement provisions that give MACOM the sole right to sublicense the Nitronex Patents in the Field of Use. Further, Infineon Americas has breached the 2010 License Agreement by transferring its GaN-on-Si RF business activities for base station products to its affiliates to avoid its promises and obligations under that agreement.

221.   As the direct and proximate result of Infineon Americas' breach of the contract, Plaintiffs have suffered and will continue to suffer irreparable harm, as well as damages, including in the form of diminished value and lost profits from potential sublicensees and/or customers, uncertainty regarding MACOM's strategic business activities, and increased legal and other fees.  If Infineon Americas or its affiliates are allowed to directly or indirectly continue their activities and to enter the GaN-on-Si RF market in MACOM/Nitronex's Exclusive Field (including producing and selling GaN-on-Si cellular base station products), this harm and damage will become more severe.

222.   Additionally, MACOM's damages for unwarranted loss of its exclusive rights to the burgeoning GaN-on-Si RF devices market, which industry analysts and even Defendants themselves estimate will grow to hundreds of millions of dollars per year by the expiration of the Nitronex Patents, would be substantial.  MACOM would suffer significant lost revenues and irreparable harm if Infineon is allowed to enter this market segment as a competitor to MACOM.

223.   Plaintiffs are entitled to relief, including damages, specific performance, and preliminary and permanent injunctive relief, as set forth below, or, in the alternative, rescission of the 2010 License Agreement and 2010 IP

Purchase Agreement and Nitronex Patent assignments, such that Plaintiffs retain title to the Nitronex Patents and Infineon has no rights to or under them.

### THIRD CLAIM FOR RELIEF – Against Infineon Americas
### (Declaratory Judgment – 2010 License Agreement Not Terminated)

224.   The allegations contained in the preceding Paragraphs are incorporated by reference herein.

225.   An actual and justiciable case or controversy exists between Plaintiffs and Infineon Americas regarding the 2010 License Agreement and its purported termination by Infineon Americas.

226.   Infineon Americas has purported to terminate the 2010 License Agreement.

227.   Plaintiffs have not breached the 2010 License Agreement, much less materially breached it.  And, in any event, any breach has been cured.  Thus, Infineon Americas had no right to terminate the 2010 License Agreement.

228.   Plaintiffs are entitled to a judgment declaring that Infineon Americas (a) was not entitled to terminate the 2010 License Agreement, (b) the purported termination of the 2010 License Agreement is null and void, and (c) that the 2010 License Agreement is still valid and binding as to Plaintiffs and Infineon Americas, as set forth below, including to the extent that it limits Defendants' rights to practice in fields that are exclusive to Nitronex and MACOM.

229.   As a direct and proximate result of Infineon Americas' wrongful termination of the 2010 License Agreement, Plaintiffs have suffered and will continue to suffer irreparable harm, including in the form of diminished value and lost profits from potential sublicenses and/or customers, uncertainty regarding MACOM's strategic business activities, and increased legal and other fees.

230.   Additionally, MACOM's damages for unwarranted loss of its exclusive rights to the burgeoning GaN-on-Si RF devices market, which industry analysts and even Defendants themselves estimate will grow to hundreds of

millions of dollars per year by the expiration of the Nitronex Patents, would be substantial.  MACOM would suffer significant lost revenues if Infineon is allowed to enter this market segment as a competitor to MACOM.

231.   Plaintiffs are entitled to preliminary and permanent injunctive relief, as set forth below, including a preliminary and permanent injunction ordering Infineon Americas, its officers, agents, servants, employees, attorneys, and any other person or entity in active concert or participation with Infineon Americas to cease all development, marketing, and sales activities for GaN-on-Si products in MACOM's Exclusive Field.

**FOURTH CLAIM FOR RELIEF – Against Infineon Americas**
**(Breach of Covenant of Good Faith and Fair Dealing – 2010 License and IP Purchase Agreements)**

232.   The allegations contained in the preceding Paragraphs are incorporated by reference herein.

233.   Nitronex Corporation and International Rectifier Corporation entered into the 2010 License Agreement.

234.   The 2010 License Agreement is a valid contract, supported by consideration under California Civil Code Sections 1550, *et seq.*

235.   Nitronex Corporation and International Rectifier Corporation entered into the 2010 IP Purchase Agreement.

236.   The 2010 IP Purchase Agreement is a valid contract, supported by consideration under California Civil Code Sections 1550, *et seq.*

237.   Nitronex Corporation and its successors-in-interest Nitronex, LLC and MACOM have fully and/or substantially performed their duties under the 2010 IP Purchase and License Agreements.

238.   Infineon Americas has breached the implied covenant of good faith and fair dealing governing the 2010 License Agreement by wrongfully, pretextually, and in bad faith attempting to terminate the 2010 License Agreement,

1   thus unfairly and prejudicially interfering with Plaintiffs' rights under the 2010

2   License Agreement.

3        239.   Infineon Americas has also breached the implied covenant of good

4   faith and fair dealing governing the 2010 License Agreement by wrongfully and in

5   bad faith designing, developing, marketing, and preparing to sell GaN-on-Si RF

6   products within MACOM's Exclusive Field, thus unfairly and prejudicially

7   interfering with Plaintiffs' exclusive rights under the 2010 License Agreement.

8        240.   Infineon Americas has breached the implied covenant of good faith

9   and fair dealing governing the 2010 IP Purchase Agreement by wrongfully refusing

10  to cooperate with MACOM in connection with patent enforcement matters,

11  including against Infineon AG, and by refusing to assign Nitronex Patents back to

12  Plaintiffs so that Plaintiffs can enforce those patents themselves.

13       241.   Infineon Americas has breached the implied covenant of good faith

14  and fair dealing by taking the position that one or more of the Nitronex Patents are

15  invalid.

16       242.   Infineon Americas has breached the implied covenant of good faith

17  and fair dealing governing the 2010 IP Purchase Agreement by, at the direction and

18  under the control of Infineon AG, ████████████████████████████

19  ████████████████████████████████████████████████████████

20  ████████████████████████████████████████████████████████

21  ████████████████████████████████████████████████████

22  ████████████████████████████████████.

23       243.   Infineon Americas has breached the implied covenant of good faith

24  and fair dealing by transferring GaN-on-Si RF power technology and operations to

25  Infineon AG or its entities outside the United States and failing to enforce the

26  Nitronex Patents against Infineon AG or other Infineon entities.

27       244.   As a direct and proximate result of Infineon Americas' breach of these

28  contracts, Plaintiffs have suffered and will continue to suffer irreparable harm, as

well as damages, including in the form of diminished value and lost profits from potential sublicenses and/or customers, uncertainty regarding MACOM's critical and strategic business activities, and increased legal and other fees.

245.   Additionally, MACOM's damages for unwarranted loss of its exclusive rights to the burgeoning GaN-on-Si RF devices market, which industry analysts and even Defendants themselves estimate will grow to hundreds of millions of dollars per year by the expiration of the Nitronex Patents, would be substantial.  MACOM would suffer significant lost revenues if Infineon is allowed to enter this market segment as a competitor to MACOM.

246.   Plaintiffs are entitled to relief, including damages, specific performance and preliminary and permanent injunctive relief, as set forth below.

**FIFTH CLAIM FOR RELIEF – Against Infineon Americas**
**(Declaratory Judgment – Non-Infringement of the Nitronex Patents by MACOM's GaN-on-Si RF Products)**

247.  The allegations contained in the preceding Paragraphs are incorporated by reference herein.

248.  When Nitronex agreed to sell the foundational Nitronex Patents to International Rectifier in 2010, it negotiated for and obtained rights to continue to use the Nitronex Patents to develop, manufacture, and sell GaN-on-Si RF products, including the exclusive right to develop, manufacture, and sell GaN-on-Si RF products for certain applications, including cellular base stations, and to ensure that its GaN-on-Si RF products would never be the subject of infringement allegations by International Rectifier or any successor to International Rectifier.

249.  MACOM acquired Nitronex in 2014 to:  provide MACOM with access to Nitronex's fundamental and innovative GaN-on-Si technologies for use in RF applications; enhance MACOM's development of GaN-on-Si RF products and process technology; obtain rights to use (and for certain applications, exclusively use) the foundational Nitronex Patents in its GaN-on-Si RF products and

1 manufacturing processes; and ensure that its GaN-on-Si RF products would never

2 be the subject of infringement allegations under the Nitronex Patents.

3      250.  Since its acquisition of Nitronex, MACOM has continued to use the

4 foundational Nitronex GaN-on-Si technology and to invest in the development of

5 GaN-on-Si RF products, particularly for cellular base stations within its Exclusive

6 Field.  MACOM has been actively marketing, offering for sale, and selling GaN-

7 on-Si RF products and plans to continue to do so.

8      251.  After Infineon AG acquired International Rectifier, Infineon almost

9 immediately began to demand that MACOM relinquish its exclusive rights to use

10 the Nitronex Patents to develop and sell GaN-on-Si products for certain

11 applications, including the cellular base station market that MACOM is targeting.

12 When MACOM refused to relinquish those rights, Defendants purported to

13 terminate the 2010 License Agreement based on a pretextual claim that other

14 MACOM products infringed the Nitronex Patents.

15      252.  According to Infineon, Infineon's purported termination of MACOM's

16 rights to use Nitronex Patents leaves MACOM's GaN-on-Si RF products

17 unlicensed.  This has put MACOM in a position where it must either:  abandon its

18 GaN-on-Si RF business, which it cannot do in view of the investment it has made in

19 GaN-on-Si and the importance of GaN-on-Si products to the company's future; or

20 pursue arguably infringing behavior, which puts MACOM at risk of an

21 infringement suit and puts MACOM's customers in the apprehension that they may

22 be sued for patent infringement if they purchase and use MACOM's products.

23      253.  Infineon's purported termination of the 2010 License Agreement in

24 these circumstances constitutes an express or implied threat to MACOM that it is at

25 risk of a patent infringement suit.  This threat is made worse by the fact that

26 Infineon is actively developing and marketing GaN-on-Si RF products to

27 MACOM's base station customers.

28

254.  As a result, there is an actual, justiciable, substantial, and immediate controversy between Plaintiffs and Infineon Americas regarding whether MACOM's GaN-on-Si RF products infringe the Nitronex Patents.

255.  MACOM is entitled to a judgment declaring that its activities in designing, testing, use, manufacture, having manufactured, offering for sale, selling and/or importing MACOM's GaN-on-Si RF products, including those identified above, do not infringe the Nitronex Patents.

256.  Plaintiffs are also entitled to preliminary and permanent injunctive relief barring Infineon Americas from taking any action or making any statement that asserts that the 2010 License Agreement has been terminated or that MACOM's GaN-on-Si products are not licensed under the 2010 License Agreement.

### SIXTH CLAIM FOR RELIEF – Against Infineon Americas
### (Breach of Contract – Breach of 2010 IP Purchase Agreement)

257.  The allegations contained in the preceding Paragraphs are incorporated by reference herein.

258.  Nitronex Corporation and International Rectifier Corporation entered into the 2010 IP Purchase Agreement.

259.  The 2010 IP Purchase Agreement is a valid contract, supported by consideration under California Civil Code Sections 1550, *et seq*.

260.  Nitronex Corporation and its successors-in-interest Nitronex, LLC and MACOM have fully and/or substantially performed their duties under the 2010 IP Purchase Agreement, including by transferring the Nitronex Patents to International Rectifier ███████████████████████.  Neither Infineon nor International Rectifier has claimed that MACOM or Nitronex have breached the 2010 IP Purchase Agreement in any way.

261.  Infineon Americas has breached the 2010 IP Purchase Agreement by failing to assign U.S. Patent Nos. 6,611,002; 6,617,060; 6,649,287; 6,956,250;

-63-

7,071,498; 7,135,720; 7,233,028; 7,247,889; 7,352,015; 7,352,016; 7,569,871;
7,687,827; 7,994,540; 8,026,596; 8,105,921; 8,344,417; 8,368,117; 8,592,862;
8,928,034; 8,928,035; 8,937,335; 8,946,765; 9,064,775; 9,437,686; 9,437,687; and
9,461,119; and European Patent No. 1343927 B1/DE60128134 to Plaintiffs
pursuant to its obligations under Section 4.02 of the 2010 IP Purchase Agreement,
when, at least three months after MACOM provided a detailed notice showing a
reasonable basis for the allegation of infringement of U.S. Patent Nos. 6,611,002;
6,617,060; 6,649,287; 6,956,250; 7,071,498; 7,135,720; 7,233,028; 7,247,889;
7,352,015; 7,352,016; 7,569,871; 7,687,827; 7,994,540; 8,026,596; 8,105,921;
8,344,417; 8,368,117; 8,592,862; 8,928,034; 8,928,035; 8,937,335; 8,946,765;
9,064,775; 9,437,686; 9,437,687; and 9,461,119; and European Patent No. 1343927
B1/DE60128134, MACOM demanded that Infineon Americas assign U.S. Patent
Nos. 6,611,002; 6,617,060; 6,649,287; 6,956,250; 7,071,498; 7,135,720; 7,233,028;
7,247,889; 7,352,015; 7,352,016; 7,569,871; 7,687,827; 7,994,540; 8,026,596;
8,105,921; 8,344,417; 8,368,117; 8,592,862; 8,928,034; 8,928,035; 8,937,335;
8,946,765; 9,064,775; 9,437,686; 9,437,687; and 9,461,119; and European Patent
No. 1343927 B1/DE60128134 back to MACOM, and Infineon did not do so.

262.   Infineon has breached the 2010 IP Purchase Agreement by █████████
████████████████████████████████████████████████████████ in violation of Section
4.02 of the 2010 IP Purchase Agreement.

263.   As a direct and proximate result of Infineon Americas' breaches of the
contract, Plaintiffs have suffered irreparable harm and damages in the form of
diminished value and lost profits from potential sublicenses and/or customers,
uncertainty regarding MACOM's critical and strategic business activities, and
increased legal and other fees.

264.   Plaintiffs are entitled to relief, including damages, specific
performance, and preliminary and permanent injunctive relief, as set forth below,

or, in the alternative, rescission of the 2010 License Agreement and 2010 IP

Purchase Agreement and Nitronex Patent assignments, such that Plaintiffs retain

title to the Nitronex Patents and Infineon has no rights to or under them.

### SEVENTH CLAIM FOR RELIEF – Against Infineon Americas
### (Declaratory Judgment – No Sale of Nitronex Patents By Infineon Americas)

265.   The allegations contained in the preceding Paragraphs are incorporated

by reference herein.

266.   An actual and justiciable case or controversy exists between Plaintiffs

and Infineon Americas regarding the 2010 IP Purchase Agreement and its

requirements regarding assignment of the Nitronex Patents.

267.   Infineon Americas has attempted to, without Plaintiffs' consent, enter

into a transaction whereby Infineon Americas would transfer some of the Nitronex

Patents to a third party.  It has additionally taken the position that it can proceed

with a transfer at any time that it wishes, without MACOM's consent, under the

terms of the 2010 IP Purchase and License Agreements.  It has additionally ▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮.

268.   An assignment of the Nitronex Patents, or a transfer of rights of similar

effect under a different name, without Plaintiffs' consent would violate Section

12.12 of the 2010 IP Purchase Agreement and would be inconsistent with the

obligations owed by Infineon Americas to MACOM, ▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮.

269.   Such a transfer would also subject Plaintiffs to a cloud of uncertainty

as to their rights with respect to the Nitronex Patents, impair the value of those

rights, and impose unnecessary legal expense on Plaintiffs.

270.   MACOM has advised Infineon Americas of its position that Infineon cannot assign any of the Nitronex Patents without MACOM's consent and requested assurances from Infineon that it would not assign any Nitronex Patents without that consent.  Infineon has stated that it does not believe that MACOM's consent is necessary and declined to agree to seek such consent from MACOM.

271.   MACOM is entitled to a judgment declaring that Infineon Americas cannot transfer any of the Nitronex Patents, or transfer rights amounting to an assignment, to a third party without Plaintiffs' consent.  In the alternative, if Infineon Americas is entitled to transfer the Nitronex Patents without MACOM's consent, MACOM is entitled to a declaration as to the effect that such a transfer has on the obligations owed by Infineon Americas and any purchaser of the Nitronex Patents to MACOM under the 2010 IP Purchase and License Agreements, the rights of any third-party purchaser under those agreements, and the effect of such a transfer on the field of use restrictions of the 2010 License Agreement.  This includes a declaration that Infineon's purported ████████████ ████████████████████████████████████████████████████████ ████████████████ is null, void, invalid, and of no force or effect.

272.   If Infineon Americas transfers any of the Nitronex Patents without MACOM's consent, the value of MACOM's rights under the 2010 IP Purchase Agreement may be irreparably diminished and harmed.  Plaintiffs are therefore also entitled to preliminary and permanent injunctive relief barring Infineon Americas from transferring any of the Nitronex Patents without MACOM's consent.

**EIGHTH CLAIM FOR RELIEF – Against Infineon AG**
**(Intentional Interference With Contractual Relations)**

273.   The allegations contained in the preceding Paragraphs are incorporated by reference herein.

274.   Plaintiffs had valid contracts with International Rectifier, including the 2010 IP Purchase Agreement and 2010 License Agreement.

275.   Infineon AG has either succeeded to those contracts or, alternatively,
is the parent corporation to Infineon Americas, and therefore had the ability to
control and direct Infineon Americas' performance or non-performance under
those Agreements.[5]

276.   Infineon AG was and is fully aware of the 2010 IP Purchase and
License Agreements and their terms.  Indeed, Infineon AG representatives
participated in numerous phone conferences with MACOM in which they
discussed in detail the provisions of the 2010 IP Purchase and License Agreements.

277.   On information and belief, Infineon AG embarked on an intentional
and wrongful course of conduct to interfere with and disrupt Infineon Americas'
performance of the 2010 IP Purchase and License Agreements through its
instructions to Infineon Americas to, among other things:  try to force MACOM to
give up its exclusive rights under the 2010 License Agreement; when MACOM
refused to give up its rights, make baseless and pretextual claims that MACOM
had breached the Agreements; send MACOM a "notice of termination" of the
2010 License Agreement, when, in fact, there was no basis to terminate the 2010
License Agreement; and refuse to take action with respect to infringers of the
Nitronex Patents.

278.   Infineon AG's actions and instructions to Infineon Americas
wrongfully induced Infineon Americas to claim that MACOM had breached the
2010 License Agreement and to purport to terminate it.  Infineon Technologies

---

[5]   To the extent that Infineon Americas is an agent or alter ego of Infineon AG
and/or Infineon AG ratified the Nitronex-International Rectifier agreements,
including the 2010 License Agreement and the 2010 IP Purchase Agreement,
Infineon AG succeeded to International Rectifier's contracts and is subject to
MACOM's claims of breach of contract.  To the extent that Infineon AG did not
succeed to those contracts, it has intentionally interfered with them and is
subject to this alternative eighth claim for relief.

1    AG's actions were improper, without justification, and taken in bad faith and via

2    improper means.

3         279.   Furthermore, Infineon AG caused itself and one or more of its

4    subsidiaries to interfere with MACOM's exclusive rights under the 2010 License

5    Agreement to design, develop, and/or market and to make preparations to sell

6    products within the Exclusive Field reserved to MACOM/Nitronex alone, by

7    causing itself and one or more of its subsidiaries to design, develop, and/or market

8    and to make preparations to sell GaN-on-Si RF products for cellular base station

9    products within MACOM's Exclusive Field.

10        280.   Additionally, Infineon AG's actions and instructions to Infineon

11   Americas wrongfully induced it to enter into contractual arrangements inconsistent

12   with the requirements of the 2010 IP Purchase Agreement and to take the position

13   that one or more of the Nitronex Patents are invalid.

14        281.   Infineon AG has also ████████████████████████████████

15   ████████████████████████████████████████████████████████████

16   ████████████████████████████████████████████████████

17   ████████████████████████████████████████████████████████

18   ████████████████████████████████████████████████

19   interfering with MACOM's rights in the Exclusive Field under the 2010 License

20   Agreement and rights under the 2010 IP Purchase Agreement.

21        282.   On information and belief, Infineon AG's actions were taken with the

22   predominant intent to harm Plaintiff's contractual rights and benefit Infineon AG.

23        283.   Infineon AG's intentional interference with the 2010 License

24   Agreement and 2010 IP Purchase Agreement has damaged Plaintiffs.

25        284.   Plaintiffs have suffered and will continue to suffer irreparable harm, as

26   well as damages, including in the form of diminished value and lost profits from

27   potential sublicenses and/or customers, uncertainty regarding MACOM's critical

28   and strategic business activities, and increased legal and other fees.

285.   Additionally, MACOM's damages for unwarranted loss of its exclusive rights to the burgeoning GaN-on-Si RF devices market, which industry analysts and even Defendants themselves estimate will grow to hundreds of millions of dollars per year by the expiration of the Nitronex Patents, would be substantial.  MACOM would suffer significant lost revenues if Infineon is allowed to enter this market segment as a competitor to MACOM.

286.   Plaintiffs are entitled to relief, including damages, specific performance, and preliminary and permanent injunctive relief, as set forth below.

### NINTH CLAIM FOR RELIEF – Against Infineon AG
**(Unfair Competition in violation of California Business and Professions Code §17200 *et seq*.)**

287.   The allegations contained in the preceding Paragraphs are incorporated by reference herein.

288.   Infineon AG has engaged in unlawful, unfair, and/or fraudulent business practices or acts in violation of California Business and Professions Code §17200 *et seq* ("the UCL").

289.   For instance, Infineon AG's conduct is unlawful, in violation of the UCL, because it contravenes the legislatively declared policy against unfair methods of business competition.  Additionally, Infineon AG's conduct is unlawful because, as alleged herein, it constitutes tortious interference with contractual relations.

290.   Infineon AG engaged in unfair methods of competition in violation of the UCL in at least the following respects:

    a.   Wrongfully interfering with and disrupting Infineon Americas' performance of the 2010 License Agreement and 2010 Purchase Agreement;

    b.   Wrongfully inducing Infineon Americas to claim that MACOM had breached the 2010 License Agreement and to purport to terminate it;

c.  Causing itself and one or more of its subsidiaries to interfere with
    MACOM's exclusive rights under the 2010 License Agreement to
    design, develop, and/or market and to make preparations to sell
    products within the Exclusive Field reserved to MACOM/Nitronex
    alone, by causing itself and one or more of its subsidiaries to design,
    develop, and/or market and to make preparations to sell Gan-on-Si RF
    products for cellular base station products within MACOM's
    Exclusive Field;

d.  Wrongfully inducing Infineon Americas to fail to pursue infringers of
    the Nitronex Patents, to enter into contractual arrangements
    inconsistent with the requirements of the 2010 IP Purchase Agreement,
    and to take the position that one or more of the Nitronex Patents are
    invalid;

e.  

291.   As a result of Infineon AG's violations of the UCL, Infineon AG has
reaped unfair benefits at the expense of MACOM and retained property rights that
should be restored to MACOM.

292.   Infineon AG's unlawful business practices or acts have injured and
will continue to injure Plaintiffs.

293.   Infineon AG has reaped the benefit of and wrongfully retained rights
to practice the Nitronex Patents, including in MACOM's Exclusive Field.

294.   In doing so, Infineon AG has caused MACOM to suffer irreparable
harm.  MACOM has experienced injury due to the unwarranted loss of its exclusive
rights to the burgeoning GaN-on-Si RF devices market.

295.   Plaintiffs are entitled to relief, including preliminary and permanent
injunctive relief and restitution, as set forth below.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs MACOM Technology Solutions Holdings, Inc. and
Nitronex, LLC respectfully request that this Court enter judgment against
Defendants Infineon Technologies AG and Infineon Technologies Americas Corp.
as follows:

A.   A declaration that (a) Infineon Americas was not entitled to terminate
the 2010 License Agreement, (b) the purported termination of the 2010
License Agreement is null and void, and (c) the 2010 License
Agreement is still valid and binding as to Plaintiffs and Defendants;

B.   A declaration that MACOM's GaN-on-Si RF products and activities
do not infringe the Nitronex Patents because all of those activities are
licensed under the 2010 License Agreement;

C.   An order requiring Infineon Americas to specifically perform their
obligations pursuant to the 2010 License Agreement;

D.   A preliminary and permanent injunction preventing Infineon
Americas, its officers, agents, servants, employees, attorneys, and any
other person or entity in active concert or participation with Infineon
Americas from terminating the 2010 License Agreement for actions
that do not constitute material breaches, including MACOM's sales of
GaN-on-SiC devices;

E.   A preliminary and permanent injunction preventing Infineon
Americas, its officers, agents, servants, employees, attorneys, and any
other person or entity in active concert or participation with Infineon

1            Americas from taking any action or making any statement that asserts

2            that the 2010 License Agreement has been terminated or that

3            MACOM's GaN-on-Si products are not licensed under the 2010

4            License Agreement;

5    F.      A preliminary and permanent injunction preventing Infineon

6            Americas, its officers, agents, servants, employees, attorneys, and any

7            other person or entity in active concert or participation with Infineon

8            Americas from, directly or indirectly, developing, marketing, or selling

9            GaN-on-Si products in MACOM's Exclusive Field;

10    G.      A preliminary and permanent injunction preventing Infineon AG, its

11            officers, agents, servants, employees, attorneys, and any person or

12            entity in active concert or participation with Infineon AG from directly

13            or indirectly, developing, making, marketing, or selling GaN-on-Si

14            products in MACOM's Exclusive Field or otherwise practicing the

15            Nitronex Patents;

16    H.      Damages to compensate the losses suffered by Plaintiffs due to

17            Infineon Americas' breaches of contract and breach of the covenant of

18            good faith and fair dealing and Infineon's AG's intentional

19            interference with the 2010 License Agreement and 2010 IP Purchase

20            Agreement;

21    I.      In the alternative to damages to compensate the losses suffered by

22            MACOM due to Infineon Americas' breaches of contract, rescission of

23            the 2010 License Agreement and 2010 IP Purchase Agreement and

24            Nitronex Patent assignments, such that Plaintiffs retain title to the

25            Nitronex Patents and Infineon has no rights to or under them;

26    J.      An order requiring Infineon Americas to specifically perform its

27            obligations pursuant to the 2010 IP Purchase Agreement;

28    K.      An order requiring Infineon Americas to assign U.S. Patents

6,649,287, 6,617,060, 8,105,921, 8,344,417, 8,592,862, 9,064,775, 7,596,871, 7,071,498, 7,687,827, 8,368,117, 6,956,250, 8,937,335, 8,928,034, 8,928,035, 8,026,596, 9,461,119, 9,437,686, 7,135,720, 7,352,016, and 7,994,540 to Plaintiffs;

L.   A declaration that Infineon Americas cannot transfer any Nitronex Patent without MACOM's consent;

M.   A declaration that any purported conveyance of any rights from Infineon ███████ is void, invalid, and of no force or effect;

N.   A preliminary and permanent injunction preventing Infineon AG's continued interference with MACOM's contractual relationships with Infineon AG's affiliates;

O.   An award of restitution for all benefit wrongly reaped and retained as a result of violations of the UCL;

P.   To the extent that the Court rules that the 2010 License Agreement is void, invalid, or unenforceable as violative of the antitrust laws, or for any other reason, an order that both the 2010 License Agreement and the 2010 IP Purchase Agreement and Nitronex Patent assignments are rescinded under Cal. Civ. Code § 1689, such that Nitronex retains title to the Nitronex Patents and Infineon has no rights to or under them.

Q.   For attorney's fees and costs;

R.   For pre-judgment interest on liquidated sums;

S.   For post-judgment interest on any money judgment until paid in full; and

T.   Such other and further relief as this Court or a jury may deem just and proper.

## JURY DEMAND

MACOM demands a trial by jury as to all claims and issues for which a trial by jury has not been waived by contract.

DATED:  June 20, 2018

**PERKINS COIE LLP**

By:/s/ *Amanda Tessar*
Amanda Tessar (*pro hac vice*)
ATessar@perkinscoie.com
Elizabeth Banzhoff (*pro hac vice*)
EBanzhoff @perkinscoie.com
PERKINS COIE LLP
1900 Sixteenth Street, Suite 1400
Denver, CO  80202-5255
Telephone:  303.291.2300
Facsimile:  303.291.2400

Ramsey Al-Salam
RAlsalam@perkinscoie.com
PERKINS COIE LLP
1201 Third Avenue Suite 4900 - Mailstop
43-52
Seattle, WA  98101-3099
Telephone: 206.359.6385
Facsimile: 206.359.7385

Lara J. Dueppen, Bar No. 259075
LDueppen@perkinscoie.com
PERKINS COIE LLP
1888 Century Park East, Suite 1700
Los Angeles, CA 90067-1721
Telephone:  310.788.9900
Facsimile:  310.788.3399

Philip A. Morin, Bar No. 256864
PMorin@perkinscoie.com
PERKINS COIE LLP
11988 El Camino Real, Suite 350
San Diego, CA  92130-2594
Telephone:  858.720.5700
Facsimile:  858.720.5799

Daniel T. Keese, Bar No. 280683
DKeese@perkinscoie.com
PERKINS COIE LLP
1120 N.W. Couch Street, 10th Floor
Portland, OR  97209-4128
Telephone:  503.727.2000
Facsimile:  503.727.2222

Morgan Chu (State Bar No. 70446)
(mchu@irell.com)
Joseph M. Lipner (State Bar No. 155735)
(jlipner@irell.com)
Ellisen Turner (State Bar No. 224842)

-74-

1   (eturner@irell.com)
    IRELL & MANELLA LLP
2   1800 Avenue of the Stars, Suite 900
    Los Angeles, CA 90067-4276
3   Telephone:  310-277-1010
    Facsimile:  310-203-7199

4   Nima Hefazi (State Bar No. 272816)
    (nhefazi@irell.com)
5   IRELL & MANELLA LLP
    840 Newport Center Drive, Suite 400
6   Newport Beach, CA  92660
    Telephone:  949-760-0991
7   Facsimile:  949-760-5200

8   **ATTORNEYS FOR PLAINTIFFS**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28